**QUARLES & BRADLEY LLP**
C. Bradley Vynalek (#020051)
Lauren Elliott Stine (#025083)
Kyle T. Orne (#032438)
Renaissance One Two North Central Ave.
Phoenix, AZ 85004-2391
Tel: (602)229-5261
brad.vynalek@quarles.com
lauren.stine@quarles.com
kyle.orne@quarles.com

**JASSY VICK CAROLAN LLP**
Duffy Carolan (Cal. Bar. No. 154988) (*Pro Hac Vice*)
601 Montgomery Street, Suite 850
San Francisco, California  94111
Tel: (415) 539-3399
dcarolan@jassyvick.com

Jean-Paul Jassy (Cal. Bar No. 205513) (*Pro Hac Vice*)
Kevin L. Vick (Cal. Bar No. 220738) (*Pro Hac Vice*)
800 Wilshire Blvd., Suite 800
Los Angeles, California 90017
Tel: (310) 870-7048
jpjassy@jassyvick.com
kvick@jassyvick.com

Attorneys for Defendants
S&P Global Inc., S&P Global Market Intelligence Inc.,
Kiah Lau Haslet and Zack Fox

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Justine Hurry, an individual; Scottsdale Capita Advisors Corp., an Arizona corporation | Case No.  2:18-cv-01105-PHX-JAT |
| Plaintiffs, | **DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| S&P Global, Inc., a New York corporation; S&P Global Market Intelligence, Inc., a New York corporation; Kiah Lau Haslett, an individual; Zach Fox, an individual; and DOES 1-10, inclusive, | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Lau Haslett and Zach Fox (collectively "S&P Global") hereby move to dismiss the Complaint filed by Plaintiffs Justine Hurry and Scottsdale Capital Advisors Corp. ("SCA") for defamation (Count I) and false light invasion of privacy (Count II).   The three allegedly defamatory statements and the four allegedly false light statements are all either: (1) substantially true and thus protected under the First and Fourteenth Amendment of the United States Constitution, and Article 2, Section 6 of the Arizona Constitution; (2) privileged under the fair report privilege; (3) not "of or concerning" either Plaintiff, or (4) do not constitute provably false statements of fact.   Thus, the statements alleged are nonactionable as a matter of law, and Plaintiffs' claims must be dismissed.

This Motion is supported by the following Memorandum of Points and Authorities and official records referenced in the Complaint and incorporated news article.   A Certificate of Consultation, as required by LRCiv 12.1(c), is also attached hereto as Exhibit "A."

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This action stems from S&P Global Market Intelligence's news reporting about a bank ownership application by Plaintiff Justine Hurry that is subject to review and approval by the Federal Deposit Insurance Corporation ("FDIC").   That application has been returned by the FDIC twice.   As explained in the article, a returned application is neither denied nor approved, and may be returned for technical deficiencies.

Because regulators take into consideration an applicant's background, the article reviews the regulatory history of companies associated with Ms. Hurry—raising the question of whether this history will affect Ms. Hurry's application.

Plaintiffs Justine Hurry and SCA, a broker/dealer that Hurry has admitted owning in a separate action before this Court, bring suit claiming that three statements in the article are defamatory and four portray Justine Hurry in a false light.   The Complaint and publicly available, official records of which this Court can take judicial notice demonstrate that each

of these statements fails to state a claim upon which relief may be granted for several separate and independent reasons.

First, each of the allegedly defamatory statements, and three of the four false light statements are substantially true and thus protected under the First Amendment. The regulatory history upon which the Complaint relies amply supports the first and third allegedly defamatory statements regarding a "poor anti-money-laundering" ruling against a broker/dealer co-owned by Ms. Hurry, and enforcement actions against SCA for the same misconduct. Cmpt.¶¶ 35a, 35c. Indeed, not only has Ms. Hurry herself been sanctioned by the Financial Industry Regulatory Authority ("FINRA") for poor anti-money-laundering compliance, she in fact owns or controls two broker/dealers, including SCA, that have had enforcement actions brought against them for poor anti-money laundering compliance. The second allegedly defamatory statement (and second false light statement) similarly fails. While Ms. Hurry claims she does not own three companies against which the Securities Exchange Commission ("SEC") has brought cases against clients [cmpt., ¶ 31g], she has admitted to owning or controlling at least two of those companies. Cmpt., ¶¶ 35b, 43b. The gist or sting of the published statements, when juxtaposed against the truth, is the same.

Second, as with the substantial truth defense, the reporting fairly and accurately captured the "gist" or "sting" of the official FINRA and SEC proceedings, and thus is fully protected under the fair report privilege recognized in Arizona and arising under the First Amendment and common law.

Third, a bedrock requirement that the complained of statements be "of and concerning" the plaintiff, is lacking. None of the three allegedly defamatory statements are "of and concerning" Ms. Hurry; they are concerning broker/dealers she co-owns, or clients of companies she co-owns. Only one of the allegedly defamatory statements concerns SCA. Similarly, the fourth false light statement clearly concerns schemes the SEC alleges were perpetuated by <u>clients</u> of the Hurry companies, not Ms. Hurry.

Fourth, the allegedly false light statements regarding Ms. Hurry's integrity and character [cmpt., ¶¶ 43a, 43c] are not objective facts capable of being proven true or false,

and thus are nonactionable.  They are, in any event, substantially true.[1]

Important financial reporting will be chilled if claims, such as those presented here, can be predicated on reporting that merely raises legitimate questions about the effects of one's history on future regulatory decisions.  Resolution of this action at the pleading stage is warranted for all the reasons set forth herein.

## II.    FACTUAL BACKGROUND

### A.    The Parties.

Justine Hurry is "an accomplished and independently successful entrepreneur and businesswomen with ventures in a number of industries, including finance, real estate, aerospace, defense, and technology." Cmpt., ¶ 1.  The Complaint states that in 2002, Ms. Hurry "co-founded" SCA, and for its first 10 years served as its Chief Executive Officer. Id., ¶ 18.  The Complaint alleges that Ms. Hurry "remains" as a "Strategic Advisor to Plaintiff SCA." Id.

While the Complaint is silent on her ownership interest in SCA, Ms. Hurry has represented in pleadings before this Court in a separate on-going action against FINRA that both she and her husband, John Hurry, "own or operate" several businesses, including SCA and Alpine Securities Corporation.  See Ex. C, ¶ 2 (Hurry et al., v. FINRA, CV-14-02490-PHX-ROS, ECF # 71).[2]  In that action, Ms. Hurry describes SCA and Alpine as "among the largest and most dominant firms in the clearing microcap securities market in the United States." Id.

In 2017, according to the Complaint, Ms. Hurry "expanded her business portfolio by acquiring an interest in Bank of Orrick, a small, Missouri-based bank with two branches." Id., ¶ 20.  This acquisition is subject to regulatory approval by the FDIC.  Id.

Defendant S&P Global Market Intelligence Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

---

[1]  A demonstrative chart of the defense to each statement is attached as Exhibit B.

[2]  The Court may take judicial notice of court records in other matters, including records filed by Plaintiff Justine Hurry before this Court. See MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of a motion to dismiss and memorandum of points and authorities filed in another action).

1   Id., ¶ 8.  It, along with two of its reporters, and a separate parent company, S&P Global Inc.,

2   are accused of authoring and/or publishing on Market Intelligence's website the January 23,

3   2018 article that is the subject of this action.  Id., ¶ 2 & Ex. 1 to Cmpt.

4   **B.      The Article.**

5        The article, titled "Regulator returns investor application to buy Bank of Orrick for a

6   2nd time," reports that the FDIC had "for a second time" returned an application from a

7   "financial services director," Justine Hurry, "to acquire a controlling stake in the Bank of

8   Orrick, a small Missouri bank." Ex. 1 to Cmpt.  The article states twice that the FDIC

9   declined to comment on why the application was returned, and explains that a returned

10  application "is neither approved nor denied." Id.

11       The article states that "[a]pplications can be returned for technical deficiencies or as

12  an indication regulators are lukewarm on the proposal." Id.  Citing an attorney whose

13  practice focuses on bank regulatory compliance, Charles Horn, the article explains that

14  "[o]ne of the statutory factors that a regulator has to take into account is the background and

15  integrity of the applicant."  This attorney, as made clear in the article, was speaking

16  "generally about the Change in Bank Control Act, a law that governs bank acquisitions, not

17  specifically about Hurry's application." Id.

18       The article sets forth Ms. Hurry's substantial background in selling securities.  It also

19  states that Ms. Hurry, in 2002, founded SCA in Scottsdale, Arizona, with her husband, John

20  Hurry; that John Hurry "would go on to acquire Alpine Securities Corp., in 2011, and in

21  2013 he established an offshore financial institution, Cayman Securities Clearing and

22  Trading SECZ, in the Cayman Islands, according to regulatory actions."

23       After setting forth Justine Hurry's and John Hurry's connections to these three

24  companies, the article's next paragraph states: "[t]he U.S. Securities and Exchange

25  Commission has brought several cases against clients of the three Hurry-owned companies,

26  including one with allegations against two Scottsdale Capital employees.  According to the

27  SEC complaints, clients conducted different penny stock pump-and-dump schemes using

28  accounts at Scottsdale and Alpine." Id.

These cases, as the article states, "do not allege any wrongdoing by the Hurrys individually"; rather, "regulators cited these cases when filing separate enforcement actions regarding inadequate anti-money-laundering compliance at Scottsdale and Alpine."  Id.

An economics professor at New York University, Lawrence White, referenced in the article, then hypothesizes that "this history could affect Justine Hurry's application to buy Bank of Orrick."  Id.  "All of these things raise this 'suitability and good character' type of question.  If somehow, one penny stock pump and dump happened, the individual might say, 'That was a mistake and I learned from my mistake'…Fool me once, shame on you, Fool me twice, shame on me.  More than once, I think, is a serious flag."  Id.

The article then recounts in greater detail the underlying enforcement proceedings.  It describes the June 2017 SEC action against Alpine for failing to properly submit thousands of suspicious activity reports, or SARs.  It recounts the June 2017 FINRA ruling against SCA and John Hurry in which John Hurry was barred from securities activities and SCA was fined $1.5 million.  Immediately after discussing these enforcement actions, the article states, "[n]otably, Justine Hurry was not personally named as a defendant in FINRA's action against Scottsdale Capital nor the SEC's action against Alpine Securities."  Id.

The article also references a 2011 FINRA fine and suspension against Justine Hurry, describing the allegations as involving the filing of "inaccurate or incomplete suspicious activity reports."  Id.  The article states that Ms. Hurry consented to the sanctions "without admitting or denying the allegations."  Id.  The article also states that FINRA "has levied four smaller actions against Scottsdale and two against Alpine."  Id.

The article ends by reiterating the uncertainty about whether this enforcement history will affect Ms. Hurry's application to buy Bank of Orrick: "Whether the histories of Scottsdale Capital and Alpine Securities will affect Justine Hurry's application to buy Bank of Orrick remains to be seen."  Id.

**C.     The Allegedly Defamatory and False Light Statements.**

Plaintiffs' defamation claim is predicated on three allegedly defamatory statements, referred to collectively in the Complaint as the "Defamatory Statements."  Cmpt., ¶ 35.  The

allegedly Defamatory Statements are: (1) Ms. Hurry "'co-owns a broker/dealer that was subject to a ruling for poor anti-money laundering compliance'"; (2) "'The U.S. Securities and Exchange Commission has brought several cases against clients of the three Hurry-owned companies'"; and (3) "Financial regulators have filed enforcement action(s) regarding inadequate anti-money laundering compliance at SCA." Cmpt., ¶¶ 35.[3]

The false light claim, brought solely by Plaintiff Justine Hurry, alleges that four statements about Ms. Hurry portray her in a false light. These statements are collectively referred to in the Complaint as the "False Light Statements." Id., ¶ 43. These statements are that (1) Ms. Hurry lacks integrity; (2) the SEC has brought cases against clients of three companies owned by Ms. Hurry; (3) Ms. Hurry lacks good character; and (4) Ms. Hurry has been involved in "pump-and-dumps" of penny stocks. Id.

## III.   LEGAL ANALYSIS

### A.   The Issues Presented Should be Decided at the Pleading Stage.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise the right of relief above the speculative level." Twombly, 550 U.S. at 555. "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a

---

[3]   The Court may take judicial notice of specific FINRA and SEC enforcement actions because the Complaint (and incorporated article) refers to them and because they are central to Plaintiffs' claim of falsity. Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006); Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered."); U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (a court may consider documents incorporated by reference in the complaint without converting the motion to dismiss into a motion for summary judgment); see, e.g., Hogan v. Widner, 762 F.3d 1096, 1110 (10th Cir. 2014) (finding substantial truth on 12(b)(6) motion by comparing allegedly defamatory article to letter upon which article was based where letter referenced in complaint); Fed. R. Civ. Proc. 10(c).
.

motion to dismiss for failure to state a claim." In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996).  A court need not accept factual allegations as true when they are contradicted by documents subject to judicial notice.  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

Additionally, the Ninth Circuit has recognized the need for more specific pleading in cases that threaten to chill First Amendment rights, and has affirmed the dismissal of claims that fail to meet this exacting standard.  See, e.g., Franchise Realty Interstate Corp. v. S.F. Local Joint Exec. Bd. of Culinary Workers, 542 F.2d 1076, 1083 (9th Cir. 1976) ("the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required").

**B.     The Article Is Protected By The Substantial Truth Doctrine.**

Truth is a complete defense to defamation and false light actions, and indeed to any cause of action based on allegedly actionable speech.  See Read v. Phoenix Newspapers, Inc., 819 P.2d 939, 941 (Ariz. 1991).  It is well established that a defendant need only prove substantial truth, not literal truth.  See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-517 (1991) (under substantial truth doctrine, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified'"); In assessing the accuracy of the reporting, it is sufficient if the report captures "the substance, the gist, the sting of the libelous charge."  Crane v. Ariz. Republic, 972 F.2d 1511, 1519 (9th Cir. 1992).  The key question in evaluating substantial truth is whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  Masson, 501 U.S. at 517; Read, 169 Ariz. at 356, 819 P.2d at 941(court determines whether publishing literal truth would have made "material difference to a reader").[4]

---

[4] See, e.g., Doe v. Mahoney, 2018 WL 710385, at *4 (Ariz Ct. App, Feb. 6, 2018) (substantial truth barred claims based on statement naming subsidiary as company against which three securities commissions found security offerings to be illegal where named company was wholly owned subsidiary of company against which the findings were in fact made); Sign Here Petitions LLC v. Chavez, 402 P.3d 457, 466 (Ariz. Ct. App. 2017) (holding that there was no material difference between published statement claiming

1.   **FINRA and the SEC have brought enforcement actions against broker/dealers owned or operated by Justine Hurry, finding poor anti-money-laundering compliance.**

To support the first and third Defamatory Statements, Plaintiffs allege that Ms. Hurry does not "co-own any broker/dealer that was subject to a ruling for poor anti-money-laundering compliance" [cmpt., ¶ 31b], and that "SCA has not been accused of inadequate anti-money laundering compliance [cmpt., ¶ 31h]."  However, public records demonstrate that FINRA and SEC enforcement proceedings have been brought against SCA, Alpine (another entity in which Ms. Hurry has claimed to be an owner/operator), and against Ms. Hurry personally.  Each of these proceedings involved, among other things, poor anti-money-laundering ("AML") compliance.

First, in 2011, FINRA assessed a $7,500 fine and 40-day suspension against Justine Hurry, and a $125,000 fine and censure against SCA in a proceeding in which both Hurry and SCA consented to FINRA's findings.  FINRA found that both Hurry and SCA "failed to implement the firm's AML procedures for monitoring, detecting, documenting, investigating and reporting red flags and suspicious activities."  See Ex. D at 3 (FINRA Order Accepting Offer of Settlement in Disciplinary Proceedings No. 2008011593301); id. at 21.  FINRA also found that "Scottsdale and Hurry took inadequate steps to investigate or report suspicious transactions in which the firm effected sales, as agent, of millions of shares of penny stocks received by firm customers, through journal transfers and deposits of stock certificates."  Id. at 3.  FINRA further found that Hurry and SCA failed to implement procedures necessary to detect and report suspicious activities.  Id. at 21-22.  They were found in violation of several NASD and FINRA rules, including those specific to deficient anti-money laundering compliance programs.  Id. at 22 (citing FINRA Rule 3310).[5]

The gist or sting of this FINRA Order for poor anti-money laundering compliance is not materially different than the gist or sting of the published statements about which

_____

signatures gathered by company for voter referendum were "bad" because they were collected by felons where truth was that company failed to deliver sufficient number of valid signatures and two collectors were felons).

[5]  A copy of FINRA Rules 3310 and 2010 are attached as Ex. E.

Plaintiffs complain.  Cmpt., ¶ 35a, 35 c.  Indeed, because these FINRA findings were against Hurry individually, they would produce a greater sting on the average person than the published statements relating only to a broker/dealer that she co-owns.

Second, Ms. Hurry also has admitted to being an owner or operator of another broker/dealer – Alpine.  Ex. C, ¶ 2.  In 2017, the SEC filed an action against Alpine for violating the Bank Secrecy Act ("BSA") and its implementing regulations, which require broker-dealers to file SARs with the Financial Crimes Enforcement Network to report certain suspicious transactions.  Ex. F, ¶ 2 (No. 17-cv-04179-DLC, ECF #1) (S.D.N.Y. 2017).[6]  The complaint alleges that Alpine omitted material red flag information from at least 1,950 SARs, and violated the BSA's implementing regulations, including those requiring that broker-dealers 'implement[] and maintain[] an anti-money laundering program that complies with the rules, regulations, or requirements of its self-regulating organization governing such programs…" Id., ¶¶ 28, 45.

Thus, not only has Ms. Hurry had anti-money laundering compliance findings made against her personally, but two broker-dealers that she owns or operates, including SCA, have had enforcement actions brought against them for anti-money-laundering compliance.

Third, a separate 2017 FINRA ruling against SCA found that SCA sold millions of shares of securities without registration and without an exception in contravention of Section 5 of the Securities Act of 1933 [15 U.S.C. § 77e].  Ex. G at 79.  The purpose of Section 5 is to provide full disclosure of the character of securities to investors, and to prevent fraud in the sale thereof.  SEC v. Kahlon, 141 F. Supp. 3d 675, 679 (E.D. Tex. 2015).  In levying a $1.5 million fine against SCA, FINRA found that the documentation submitted to support the exceptions "raised red flags strongly suggesting that the chain of transactions leading to deposits at Scottsdale were sham transactions using false documents and nominees to conceal the identity of the beneficial owners."  Exh. G at 81.  The risk inherent in SCA's weak processes, as found by FINRA, "became undeniable in the summer of 2014, when the

---

[6] As explained in that action, a proper BSA compliance program is intended to "make[] it difficult for illicit actors to operate through legitimate financial institutions without detection by bringing suspicious activity to light." Id., ¶ 4.

SEC and criminal authorities initiated two new proceedings charging that certain Scottsdale customers and others had used sham transactions and nominees to sell penny stocks unlawfully without registration." Id. at 14.  SCA's accumulated violations were found to be part of a "systematic failure at the Firm…." Id. at 101.

The findings in the 2017 ruling would produce no less damage to Plaintiffs' reputation than the article's statement about which they complain—"Ms. Hurry co-owns a broker/dealer that was subject to a ruling for poor anti-money-laundering compliance."[7] See Read, 819 P.2d at 942 (concluding that an accurate account of the conviction would not have been any less damaging to plaintiff's reputation).

### 2. The SEC has brought several cases against clients of the three Hurry-owned companies.

Plaintiffs also claim it was defamatory and portrayed Ms. Hurry in a false light to say that the SEC has brought several cases against clients of "three Hurry-owned companies," because Ms. Hurry "does not own three companies against which the SEC has brought cases against clients." Cmplt., ¶¶ 35b, 43b, 31g.  To be clear, the article ties Ms. Hurry to SCA only, not to Alpine or an offshore financial institution her husband established in 2013. Cmplt., Ex. 1.  Nevertheless, the SEC has brought cases against clients of both SCA and Alpine. See Ex. H, ¶¶ 17, 21, 53 (SEC v. Ruettiger et al., No. 11-cv-02011, ECF # 1 (D. Nev. 2011) (pump and dump of sports drink stocks sold by former Norte Dame football player through SCA and involving SCA defendants Joseph Padilla and Andrea Ritchie)); Ex. I, ¶¶ 26, 78-108 (SEC v. Tavella et. al., No. 13-civ-4609 (S.D.N.Y. 2013) (pump and dump of Biozoom stock sold by eight defendants through SCA)); Ex. J, ¶ 27 (SEC v. Gibraltar Global Securities, Inc. et al., No. 13-cv-2575 (S.D.N.Y. 2013) (one-third of sales of unregistered microcap securities sold through SCA and Alpine)); Ex. K ¶ 31 (SEC v. Affa et. al., No. 14-cv-12959 (D. Mass. 2014) (pump and dump of Amogear stock through accounts at Alpine)).

---

[7]  The ordinary meaning of "money laundering" is "concealing the source of illegally gotten money."   Webster's   Online   Dictionary   (2018)   at   http://www.webster-dictionary.org/definition/money%20laundering.

That the SEC has brought actions against clients of at least <u>two</u> companies co-owned by Ms. Hurry, does not materially affect the gist or sting of the published statement.  <u>See</u>, <u>e.g.</u>, <u>Mahoney</u>, 2018 WL 710385 at * 4 (statement that mining company "bilked" investors out of $30 million was substantially true where company only sought to raise $10 million because the sting was fraudulent practices, not exact amount of money lost).

### 3.  Any innuendo regarding Hurry's integrity and character is supported by her ethical rule violations.

As explained below, the challenged statements about "integrity" and "character" are nonactionable because they do not imply an assertion of verifiable fact about Ms. Hurry. Alternatively, to the extent that such statements could be reasonably read as implying objective facts, they would be barred by the substantial truth doctrine.

Ms. Hurry claims that the reference to "integrity of applicant" portrays her in a false light because "her integrity has never been subject of any ruling by FINRA, the SEC or other regulatory authority."  Cmpt., ¶ 31e, 43a. & b.  This is not so.  As explained above, in 2011, Ms. Hurry consented to the finding by FINRA that she violated FINRA Rule 2010. That rule requires FINRA members to "observe high standards of commercial honor and just and equitable principles of trade."  Ex. E.  A Rule 2010 violation occurs when a member acts in bad faith or unethically.  Bad faith is defined as a dishonest belief or purpose, and unethical conduct is conduct inconsistent with the moral norms or standards of professional conduct.  <u>In re Edward S. Brokaw</u>, 2013 WL 6044123, * 10 (SEC Nov. 15, 2013) (discussing NASD predecessor to FINRA Rule 2010).  FINRA describes this rule as requiring that members conduct themselves with "integrity, fairness, and honesty."  Ex. G at 79; <u>see also</u> <u>Said v. SEC</u>, 873 F.3d 297, 299 (D.C. Cir. 2017) (explaining that "trustworthiness and integrity" advanced by the rule are "essential to functioning of securities industry").  Having been found in violation of ethical Rule 2010, it is substantially true that Ms. Hurry's professional integrity and character have been found lacking.  No false implication, therefore, can be stated.

In sum, all of the allegedly Defamatory Statements and the first, second and third False Light Statements are substantially true, as a matter of law, and thus nonactionable.

C.   **The Fair Report Privilege Independently Protects All of the Statements Pertaining to the Underlying Regulatory Proceedings.**

The fair report privilege immunizes publishers against libel and false light claims based on reports that are "fair and accurate summaries of public information." Jorgensen v. Channel 5 KPHO TV, 249 F. App'x 526 (9th Cir. Sept. 27, 2007) (holding privilege barred plaintiff's claims for libel and false light against defendant television station whose reports were "fair and accurate summaries of public information"). Thus, in Sallomi v. Phoenix Newspapers, Inc., the court held that the fair report privilege barred the plaintiff's libel and false light claims because the defendant publisher's articles "were a fair and accurate abridgment of the public records used." 771 P.2d 469, 472 (Ariz. Ct. App. 1989); see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy, 860 F.3d 1244, 1259 (9th Cir. 2017) ("The First Amendment generally protects those who distribute information obtained through public court proceedings.").

The fair report privilege is lost only when the publisher does not give a fair and accurate report of the proceeding. Green Acres Trust v. London, 688 P.2d 617, 626-27 (Ariz. 1984); see also Restatement (Second) of Torts § 611 cmt. a (1977). The privilege is not conditioned on an absence of malice. Id., 688 P.2d at 627.

To be privileged a report need only be a "substantially correct account of the proceedings." Sallomi, 771 P.2d at 472 (holding report that son owned a resort was fair and accurate where on police booking slip son identified his "employer" as "self" and his "occupation" as "resort manager," even though in truth his parents owned the resort). "In other words, a court must determine whether the report of the public proceeding carries a 'greater sting' in the defamatory content than the original publication during the proceeding." Green Acres, 688 P.2d at 627.

Given the prior enforcement actions[8] against SCA, it was fair and accurate to state

---

[8]   Privileges similar to the fair report privilege have been found to apply to FINRA proceedings. See Adjian v. JPMorgan Chase Bank, N.A., 697 F. App'x 528, 529–30 (9th Cir. Sept. 13, 2017) (applying California's litigation privilege, Cal. Civil Code § 47(d), to statements made in a FINRA pleading because FINRA "is overseen by the Securities and Exchange Commission."); see also Wietecha v. Ameritas Life Ins. Corp., , 2006 WL 2772838, at *11 (D. Ariz. Sept. 27, 2006) (statements made in official forms filed with

that Ms. Hurry co-owns a broker/dealer that was subject to poor anti-money laundering compliance; and that financial regulators have brought enforcement action(s) against SCA involving poor anti-money-laundering compliance—the first and third allegedly Defamatory Statements. [9]   That Ms. Hurry owns at least two companies whose clients have been the subject of SEC proceedings does not affect the gist or sting of the published statement.

### D.      The Published Statements Are Not "Of and Concerning" Plaintiffs.

The First Amendment and common law require that allegedly injurious statements must be "of and concerning" – i.e., about – the plaintiff.  New York Times v. Sullivan, 376 U.S. 254, 288, 291-92 (1964); Reynolds v. Reynolds, 294 P.3d 151, 155-56 (Ariz. Ct. App. 2013) (dismissing defamation and false light claims at pleading stage because the allegedly injurious statement was not "of and concerning" plaintiffs).   "Statements which refer to individual members of an organization do not implicate the organization.  By the same reasoning, statements which refer to an organization do not implicate its members." Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting Provisional Gov't of New Afrika v. ABC, Inc., 609 F. Supp. 104, 108 (D.D.C. 1985)).

None of the three allegedly Defamatory Statements are "of and concerning" Ms. Hurry.  The first and third allegedly Defamatory Statements concern enforcement actions against SCA (not against Ms. Hurry), and the second statement concerns "clients" of the Hurry-owned companies, not Ms. Hurry or even the companies she co-owns with her husband.

Similarly, the second and fourth allegedly False Light Statements are not of and

---

NASD are entitled to qualified privilege under Arizona law); Restatement (Second) of Torts, § 611, cmt. d (fair report privilege "is also applicable to public proceedings and actions of other bodies or organizations that are by law authorized to perform public duties, such as a medical or bar association charged with authority to examine or license or discipline practitioners"); Hurry v. Fin. Indus. Regulatory Auth. Inc., 2015 WL 11118114, at *4 (D. Ariz. Aug. 5, 2015) (recognizing the Ninth Circuit's acknowledgment of the "'quasi-governmental power'" of FINRA (quoting Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1213 (9th Cir. 1998)).

[9]   The 2017 FINRA Ruling states that John Hurry and Justine Hurry, through a trust and holding company, own SCA.  Ex. G at 15.  It was thus accurate to characterize her interest in SCA in this manner.

1    concerning Ms. Hurry.  Again, these statements are concerning "clients" of the Hurry-owned

2    companies.   These clients (not Ms. Hurry or SCA) were accused of "pump and dump"

3    schemes using accounts at SCA and Alpine.  As made clear in the article, these actions did

4    not involve alleged wrongdoing by the Hurrys.  Ex. 1 to Cmpt.

5            **E.      The First Amendment Precludes Liability for the Article's Reference to**
             **"Integrity" and "Character."**
6

7            The U.S. Supreme Court has made clear that, under the First Amendment, statements

8    that "cannot 'reasonably [be] interpreted as stating actual facts about an individual'" are not

9    actionable.   Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) (quoting Hustler

10   Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988)); Turner v. Devlin, 848 P.2d 286, 292

11   (Ariz. 1993) ("[t]o be actionable … words must be capable of being reasonably interpreted

12   as stating actual facts").   To determine whether a statement implies an assertion of objective

13   fact, the Ninth Circuit examines (1) whether the general tenor of the entire work negates the

14   impression that the defendant was asserting an objective fact, (2) whether the defendant used

15   figurative or hyperbolic language that negates the impression, and (3) whether the statement

16   in question is susceptible of being proved true or false.  Gardner v. Martino, 563 F.3d 981,

17   987 (9th Cir. 2009); Underwager v. Channel 9 Australia, 69 F.3d 361, 366 (9th Cir. 1995).

18           First, looking at the general tenor of the entire article here, no reasonable reader could

19   conclude that S&P Global was stating as objective fact that Ms. Hurry lacked integrity or

20   good character.  Rather, the article references the "statutory factors" that regulators consider

21   when reviewing an application for bank ownership, making clear that a "returned application

22   is neither approved nor denied" and can be returned for "technical deficiencies or as an

23   indication that regulators are lukewarm on the proposal." Ex. 1 to Cmpt.  The article then

24   raises "the prospect" that Ms. Hurry's application could be subject to "significant scrutiny"

25   because of past enforcement actions, even though Hurry herself "has not been named as a

26   defendant in the enforcement actions with the largest monetary fines." Id.  The enforcement

27   actions "raise this 'suitability and good character' type of question'" considered by the

28   FDIC, as the article states. Id.  After discussing the enforcement actions, the reporting ends

by raising the main question: "Whether the histories of Scottsdale Capital and Alpine Securities will affect Justine Hurry's application to by Bank of Orrick <u>remains to be seen</u>." <u>Id.</u> (emphasis added).

Ample case law makes clear that a publication that merely raises questions does not reasonably "imply" a verifiable assertion of fact.  For example, in <u>Chapin v. Knight-Ridder, Inc.</u>,  the Fourth Circuit held that an inquiry into a charity program's dealings could not be defamatory because "<u>inquiry itself</u>, however embarrassing or unpleasant to its subject, <u>is not accusation</u>."  993 F.2d 1087, 1094 (4th Cir. 1993) (emphasis added).  As the court observed, there must be an "<u>assertion</u> of a false <u>fact</u>," and the "language used cannot be tortured to 'make that certain which is in fact uncertain.'"  <u>Id.</u> (emphasis in original).  The Ninth Circuit reached the same conclusion in finding that a book which invited questions about the trial tactics used by the plaintiff attorney in a murder trial was not actionable.  <u>Partington v. Bugliosi</u>, 56 F.3d 1147, 1157 (9th Cir. 1994); <u>accord</u> <u>Hosszu v. Barrett</u>, 202 F. Supp. 3d 1101, 1107-08 (D. Ariz. 2016) (relying on <u>Partington</u> and holding that raising "suspicions" is "not an assertion of fact" capable of supporting either defamation or false light claims); <u>Thomas v. Los Angeles Times Commc'ns LLC</u>, 189 F. Supp. 2d 1005, 1016 (C.D. Cal. 2002) (quoting from and endorsing <u>Chapin</u>'s rule that "raising of questions" is not actionable), <u>aff'd</u> 45 F. App'x 801 (9th Cir. Sept. 6, 2002).[10]  Here, raising the prospect that Ms. Hurry's application could receive significant scrutiny because of prior enforcement actions does not convert statements of uncertainty into those of objective fact.  To hold otherwise would seriously chill important speech.

Second, the specific language used signals to readers that the author was not stating objective facts about Ms. Hurry's integrity or character.  The quoted experts were speaking generally about the law, "not specifically about Hurry's application."  <u>Id.</u>  And statements about how regulators "might" react upon learning of pump and dump incidents – "[f]ool me

---

[10] Similarly, language that, taken in context, is understood as "conjecture" or "speculation" is not actionable.  <u>Levin v. McPhee</u>, 119 F.3d 189, 197 (2d Cir. 1997); <u>Sign Here Petitions LLC v. Chavez</u>, 402 P.3d 457, 464 (Ariz. Ct. App. 2017) ("[p]redictions of the future cannot reasonably be interpreted as statements of objective facts").

one, shame on you. Fool me twice, shame on me …" – are nothing more than loose, figurative and conjectural language, fully protected under the First Amendment.

Third, language challenging the integrity or character of a plaintiff are <u>not</u> statements of fact capable of being proven true or false.  <u>See</u>, <u>e.g.</u>, <u>Wartell v. Lee</u>, 47 N.E.3d 381, 384-87 (Ind. Ct. App. 2015) (statements that plaintiff had "lack of integrity" and whose "character is at issue" were too vague to be actionable).  For example, this Court recently concluded that allegations of "unethical" conduct were not actionable as "[m]oral and professional standards differ between persons, companies, industries, societies, and religions," and assertions that the plaintiff was behaving unethically were "incapable of being objectively proven because there is no identifiable standard from which a fact finder can assess such behavior."  <u>Prostrollo v. Scottsdale Healthcare Hospitals</u>, 2018 WL 501414, at *6 (D. Ariz. Jan. 12, 2018); <u>Glaze v. Marcus</u>, 729 P.2d 342, 344 (Ariz. Ct. App. 1986) (calling plaintiff "unprofessional" was protected opinion).[11]  The same holds true here.  The alleged innuendo regarding Ms. Hurry's integrity and character is incapable of being objectively proven as false.

In sum, all of the Ninth Circuit factors support the conclusion that the alleged integrity and character innuendo is not actionable because it is not an objective statement of fact capable of being proven true or false.

## IV.   CONCLUSION

Because the First Amendment and common law protect S&P Global's reporting in this matter, and because the statements at issue are nonactionable on multiple grounds, this motion should be granted with prejudice and without leave to amend.

---

[11]  <u>See</u> <u>also</u> <u>USA Techs., Inc. v. Doe</u>, 713 F. Supp. 2d 901, 905, 909 (N.D. Cal. 2010) (accusing CEO of company of "fleecing," "skimming" and running an illegal Ponzi scheme was not actionable); <u>Okun v. Superior Court</u>, 629 P.2d 1369, 1374-77 (Cal. 1981) (accusing a developer of engaging in "corrupt" business practices is not actionable); <u>Hincey v. Horne</u>, 2013 WL 4543994, at *9 (D. Ariz. Aug. 28, 2013) (statement that plaintiff "can't be trusted" did not "contain factual connotations that [were] provable").

Dated:  April 18, 2018

JASSY VICK CAROLAN LLP

*/s/ Duffy Carolan*

Duffy Carolan
Jean-Paul Jassy
Kevin Vick

QUARLES & BRADY LLP
C. Bradley Vynalek
Lauren Elliott Stine
Kyle T. Orne

Attorneys for Defendants
S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Lau Haslett and Zach Fox

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Monica Limón-Wynn
Limón-Wynn Law, PLLC
1400 East South Avenue, Suite 915
Tempe, Arizona 85282-8008
Milmon-wynn@mlwlawaz.com

Charles J. Harder (Pro Hac Vice)
Jordan Susman (Pro Hac Vice)
Harder LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, CA 90067
CHarder@harderllp.com
JSusman@harderllp.com

Attorneys for Plaintiffs

Dated: April 18, 2018

*/s/  Duffy Carolan*