# *EXHIBIT C*

Robert A. Mandel, SBN 022936
Taylor C. Young, SBN 020743
Peter A. Silverman, SBN 020679
**MANDEL YOUNG PLC**
3001 E. Camelback Rd., Ste. 140
Phoenix, Arizona 85016
Tel (602) 424-8480
Fax (602) 734-5431
taylor@mandelyoung.com
rob@mandelyoung.com
peter@mandelyoung.com
courtorders@mandelyoung.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J. Hurry and Justine Hurry, as husband and wife; Investment Services Corporation, an Arizona corporation; Hurry Family Revocable Trust d/t/d October 18, 2011 amended November 26, 2012, a Nevada trust; Investment Services Partners LLC, an Arizona limited liability company; Scottsdale Capital Advisors Partners LLC an Arizona limited liability company; SCAP I LLC, an Arizona limited liability company; SCAP II LLC, an Arizona limited liability company; SCAP III LLC, an Arizona limited liability company; SCAP 4 LLC, an Arizona limited liability company; SCAP 6 LLC, a Nevada limited liability company; SCAP 7 LLC, a Nevada limited liability company; SCAP 8 LLC, an Arizona limited liability company; SCAP 9 LLC, a Nevada limited liability company; SCAP 10 LLC, a Nevada limited liability company; BRICFM LLC d/b/a Corner of Paradise Ice Cream Store, a California limited liability company; CJ3 LLC, a Montana limited liability company; Association of Securities Dealers | Case No. CV-14-02490-PHX-ROS

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED** |

LLC, a Delaware limited liability company; SCAP 5 LLC, an Arizona limited liability company; Investment Services Capital LLC, a Nevada limited liability company; Investment Services Holdings Corp., a Nevada corporation; NEWCONMGT LLC, a Nevada limited liability company; ISC LLC, an Alaska limited liability company; ISHC LLC, a Montana limited liability company; NEWMGT LLC, a Nevada limited liability company; SCAINTL LLC, a Nevada limited liability company; FLJH LLC, a Nevada limited liability company; ASD Holding Company LLC, a Delaware limited liability company; Hurry Foundation, a Nevada non-profit 501(c)(3) organization.

*Plaintiffs*,

v.

Financial Industry Regulatory Authority, Inc., a Delaware corporation, Scott M. Andersen, a natural person, John and/or Jane Does 1-10.

*Defendants*.

## NATURE OF THE ACTION

1.      This action stems from deliberate, retaliatory, and extra-regulatory conduct by the Financial Industry Regulatory Authority, Inc. ("FINRA"), a self-regulatory organization ("SRO") acting under authority of the U.S. Securities and Exchange Commission ("SEC"); Scott M. Andersen ("Andersen"), FINRA's former regional deputy counsel; and several other FINRA staff members whose identities are currently unknown. (Andersen and unknown Does are collectively

referred to as the "Individual Defendants." Individual Defendants and FINRA are collectively referred to as "Defendants").

2.     John and Justine Hurry (the "Hurrys") are successful entrepreneurs who own or operate several businesses in Arizona, Montana, Nevada, Utah, and California. Two of these businesses, non-parties Scottsdale Capital Advisors Corporation ("SCA"), and Alpine Securities Corporation ("Alpine"), are registered broker-dealers and members of FINRA. (Alpine and SCA are collectively referred to as the "Member Firms.") SCA and Alpine are among the largest and most dominant firms in the clearing microcap securities market in the United States.  Though legal, the microcap securities market, often referred to as the over-the-counter ("OTC") market, is disfavored as a "high risk" industry by FINRA and the SEC.  The Hurrys' other businesses include commercial and residential real estate ventures, retail operations, and prospective ventures in aerospace, defense, technology, professional services, and innovative consumer goods.

3.     John Hurry's role in the securities industry extends beyond any ownership interest he has in the Member Firms. In his capacity as an experienced industry leader and as one of a growing chorus of critics with regard to overreach and abuse by FINRA, John Hurry has sought to improve the industry through the creation of a new self-regulated organization, the "Association of Securities Dealers LLC" or "ASD," a potential competitor to FINRA. ASD's purpose includes the laudatory goals of removing barriers to and preserving a free and open market and a national market system, while adhering to securities laws.

4.     In November of 2012, FINRA and Andersen improperly gained entry to the Hurrys' office at Investment Services Corporation ("ISC"), a non-member company, and coerced access to the computers and hard-drives the Hurrys use for their non-securities related business and

personal pursuits ("ISC computers"). Defendants unlawfully accessed and copied the sensitive, private, confidential, attorney-client privileged, attorney work product, and proprietary computer data, including trade secrets, contained in the ISC computers.

5.     FINRA regularly and explicitly relies upon the potential for a lifetime ban to coerce compliance from its members and associated persons. When FINRA and Andersen were sued for unlawfully accessing and copying the non-member computer data, Defendants coerced the Hurrys into dropping the lawsuit under threat of disciplinary action against the Hurrys and/or those associated with the Member Firms.

6.     Dropping the lawsuit did not mollify the Defendants. Instead, Defendants pursued an unlawful course of conduct designed to prevent the Hurrys from expanding in the over-the-counter sector, shrink their sphere of influence in the securities industry, and, ultimately, drive them out of business altogether. Through an orchestrated campaign of harassment, defamatory statements, press leaks, and capricious interference with the Hurrys' business relationships, Defendants have caused and continue to cause unwarranted reputational damage to the Hurrys and the numerous closely held businesses in which the Hurrys have a direct or indirect interest.

7.     FINRA's executive leadership has shown nothing but callous disregard to entreaties to investigate and stop these reputational injuries. FINRA knows or should know that such reputational injuries inevitably interfere with the target's ability to stay in business by, among other things, causing a loss of essential banking relationships. On information and belief, this is the precise consequence Defendants have pursued through direct and indirect means utilizing tactics consistent with those relied on by the federal government in its Operation Choke Point, a highly controversial and unlawful program to drive companies and individuals engaged in legal

-4-

activities out of business through extra-regulatory means. Under the program, government officials have pressured banks and other financial institutions to cut off accounts for targeted businesses engaged in "high risk" activities. Disfavored industries include gun stores, casinos, tobacco distributers, short-term lenders, among other legal businesses. Government officials have painted the targeted businesses as "high risk," inflicted reputational harm, and engaged in behind-the-scenes, extra-regulatory strong-arm tactics. Officials have created fear among members of the financial industry—reportedly telling banks they would face increased audits and scrutiny if they maintained relationships with customers in disfavored industries. Reportedly, the operation was led by Department of Justice officials working in partnership with officials from other agencies including the Treasury and the SEC. As alleged in this Second Amended Complaint, FINRA has engaged in extra-regulatory activity targeted at the Hurrys and their businesses using the Operation Choke Point model:

      a.     FINRA and the SEC view the legal microcap securities market with disfavor and as high risk;

      b.     FINRA and the Individual Defendants have targeted the Hurrys, as major players in the market, to limit their influence and force them out of the sector.

      c.     The campaign by FINRA and the Individual Defendants has included the infliction of reputational harm and the intentional destruction of the Hurrys' business and financial relationships;

      d.     The misconduct by FINRA and the Individual Defendants bears no legitimate relationship to their regulatory functions and authority.

With no other recourse, the Hurrys and several of their businesses now seek relief in this Court.

## PARTIES

8.   Plaintiff John J. Hurry is a natural person and resident of Douglas County, State of Nevada.

9.   Plaintiff Justine Hurry is a natural person and resident of Douglas County, State of Nevada.

10.   Plaintiff ISC is an Arizona corporation with its principal place of business in Scottsdale, Arizona.

11.   Plaintiff Hurry Family Revocable Trust d/t/d October 18, 2011, amended November 26, 2012, ("Hurry Family Trust") is a Nevada trust. John Hurry and Justine Hurry are trustees of the Hurry Family Trust.

12.   Plaintiff Investment Services Partners LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

13.   Plaintiff Scottsdale Capital Advisors Partners LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

14.   Plaintiff SCAP I LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

15.   Plaintiff SCAP II LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

16.   Plaintiff SCAP III LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Newport Beach, California.

17.    Plaintiff SCAP 4 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.

18.    Plaintiff SCAP 6 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

19.    Plaintiff SCAP 7 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

20.    Plaintiff SCAP 8 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Scottsdale, Arizona.

21.    Plaintiff SCAP 9 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Salt Lake City, Utah.

22.    Plaintiff SCAP 10 LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

23.    Plaintiff BRICFM LLC, d/b/a Corner of Paradise Ice Cream Store, is a limited liability company organized and existing under the laws of the State of California with its principal place of business in Newport, California.

24.    Plaintiff CJ3 LLC is a limited liability company organized and existing under the laws of the State of Montana with its principal place of business in Montana.

25.    Plaintiff Association of Securities Dealers LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Scottsdale, Arizona.

26.    Plaintiff SCAP 5 LLC is a limited liability company organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.

-7-

27.     Plaintiff Investment Services Capital LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

28.     Plaintiff Investment Services Holdings Corp is a Nevada corporation with its principal place of business in Nevada.

29.     Plaintiff NEWCONMGT LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

30.     Plaintiff ISC LLC is a limited liability company organized and existing under the laws of the State of Alaska with its principal place of business in Alaska.

31.     Plaintiff ISHC LLC is a limited liability company organized and existing under the laws of the State of Montana with its principal place of business in Montana.

32.     Plaintiff NEWMGT LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

33.     Plaintiff SCAINTL LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Nevada.

34.     Plaintiff FLJH LLC is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Florida.

35.     Plaintiff ASD Holding Company LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Scottsdale, Arizona.

36.     Plaintiff Hurry Foundation is a non-profit organization (501(c)(3)) organized and existing under the laws of the State of Nevada, with its principal place of operation in Nevada.

37.     Collectively, the plaintiffs in paragraphs 10 through 36 are the "Business Plaintiffs." Collectively, the Business Plaintiffs and the Hurrys are referred to as Plaintiffs.

38.     The Hurrys, jointly or separately, have direct or indirect ownership interest in each of the Business Plaintiffs.

39.     FINRA is a private, not-for-profit corporation organized and existing under the laws of the State of Delaware that operates from Washington D.C. and New York City with regional offices throughout the United States.

40.     FINRA is an SRO registered with the SEC as a national securities association. FINRA has regulatory power, delegated from Congress through the SEC in the Securities Exchange Act of 1934 (the "Exchange Act"), over broker-dealer firms registered under section 15 of the Exchange Act and their registered associated persons.

41.     Andersen is a natural person who, on information and belief, is domiciled in the State of California. He was a FINRA employee holding the title "Deputy Regional Chief Counsel" until on or about April 6, 2015, when Andersen's employment abruptly ceased with FINRA.

42.     Plaintiffs do not know the true names of John and/or Jane Does 1 through 10, inclusive, and therefore sue them by those fictitious names.

43.     John and/or Jane Does 1-10 are employees or agents of FINRA who unlawfully accessed, inspected, copied, or seized three password protected computers belonging to ISC, and the several hard drives within them, and/or unlawfully reviewed, copied, retained, or disseminated information copied from the ISC computers that is beyond FINRA's jurisdiction, and/or acted in concert with Andersen to coerce and retaliate against the Hurrys for bringing their lawsuit and/or engaging in constitutionally protected activity.

44.     Defendants' conduct was and remains deceptive, coercive, invasive, unauthorized, extra-jurisdictional, and unlawful. The Individual Defendants' failure to hue to the limits of FINRA Procedural Rules and their conspiratorial abuses of authority demonstrate that FINRA had and has inadequate control over the Individual Defendants. Plaintiffs sue the Individual Defendants in their personal capacities to secure complete relief.

45.     Plaintiffs seek injunctive relief and damages holding FINRA, Andersen, and all persons or entities acting in concert with them liable for causing irreparable harm to Plaintiffs together with their respective families, their employees past and present, and the several other persons and entities upon whose privacy, privilege, and proprietary rights and obligations Defendants have willfully intruded and interfered by engaging and continuing to engage in the unlawful conduct alleged.

46.     Plaintiffs reserve the right to amend this Complaint to assert, *inter alia*, additional or different claims against FINRA, Andersen, or other members of FINRA staff, including, without limitation, additional or different remedies, or additional or different parties, as its investigation proceeds.

## JURISDICTION AND VENUE

47.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiffs' CFAA, *Bivens*, and Civil Rights claims arise under the Constitution, laws, or treaties of the United States, and under 28 U.S.C. § 1367, as Plaintiffs' state law claims are so related to the federal claims they form part of the same case or controversy under Article III of the United States Constitution.

48.     The Court has general personal jurisdiction over FINRA and the Individual Defendants as they conduct business in the State of Arizona on a substantial or continuous and systematic basis, and, therefore, are constructively present in the State of Arizona.

49.     The Court also or alternatively has specific ("long-arm") jurisdiction over FINRA and the Individual Defendants, as (a) they purposefully availed themselves of the privilege of conducting business in Arizona, (b) Plaintiffs' claims arise out of or relate to their contacts with Arizona, and (c) the exercise of jurisdiction over them is reasonable.

50.     Venue is proper in this judicial district under 28 U.S.C. §§ 1392(b)(1) and (b)(2), as FINRA and the Individual Defendants "reside" in the State of Arizona within the meaning of that statute, and a substantial part of the events or omissions giving rise to Plaintiffs' claims against FINRA and the Individual Defendants occurred, or a substantial part of the property that is the subject of this action is situated, in the State of Arizona.

## ALLEGATIONS OF FACT

### *FINRA's and the Individual Defendants' activities are closely coordinated with the SEC*

51.     Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

52.     At all times pertinent to this Complaint, FINRA, Andersen, and the unidentified FINRA agents were acting under color of federal law.

53.     Upon information and belief, at all times pertinent to this Complaint, FINRA's and the Individual Defendants' examination and other activities related to the Hurrys and the

businesses associated with the Hurrys have been closely and directly coordinated with the SEC and/or other federal authorities.

54.     According to at least one press account, the SEC and FINRA are working together in a purported investigation of the broker-dealers associated with the Hurrys.

55.     Moreover, the inquiries from the SEC and FINRA to the Hurrys and businesses associated with the Hurrys overlap temporally and substantively in a manner that demonstrates joint activity by the regulators. As one example, described fully below, subpoenas from the SEC have closely followed record requests from FINRA substantially mirroring the type and scope of records to be produced.

### FINRA and the Individual Defendants Coerce Access to the ISC Office and Seize, Access, and Copy the ISC Computers

56.     Scottsdale Partners is one of the Hurrys' several real estate businesses, which owns two adjacent building complexes in Scottsdale, Arizona—one at 7110 East McDonald Drive ("Kiva Professional Plaza"), and the other at 7170 East McDonald Drive ("Scottsdale Professional Plaza"). Scottsdale Partners is not involved in broker-dealer activities, is not a FINRA "member" or "associated person" under FINRA's Bylaws or FINRA's Procedures, and is not subject to FINRA's regulatory jurisdiction.

57.     Scottsdale Partners leases offices in the plazas to numerous business tenants unrelated to the Hurrys or their several companies, including a dental practice, a Chinese medicine herbalist, an accounting practice, a physical therapy practice, a pain management clinic, a financial advisory practice, and a sleep disorders institute (collectively, the "Non-Hurry Business Tenants").

58.    In November of 2012, the offices and common areas in Suite 6 of the Scottsdale Professional Plaza, which share a common reception area, were reserved for and divided among the Hurrys' several businesses.

59.    Scottsdale Partners leases several of the offices in Suite 6 to Non-Party Scottsdale Capital Advisors Corporation ("SCA"), an Arizona corporation operating as a securities broker-dealer that John and Justine founded in 2001.

60.    SCA is a FINRA "member" and is subject to FINRA regulations.

61.    In November of 2012, Scottsdale Partners also provided offices in Suite 6 to employees of Scottsdale Partners who perform building maintenance services for the two plazas.

62.    Scottsdale Partners also leases office space at the Scottsdale Professional Plaza to ISC. Presently, ISC's offices are located exclusively in Suite 4 of the Scottsdale Professional Plaza (the "ISC Office Suite"). In November 2012, ISC's offices were located in space it leased from Scottsdale Partners in Suite 6—specifically, the northwest corner office of Suite 6 (the "ISC Corner Office"). ("ISC Office" refers to both the ISC Corner Office and the ISC Office Suite unless context otherwise demands.) At all times relevant to this Complaint, FINRA was on notice of the location of the ISC Office.

63.    ISC is neither a FINRA "member" nor a FINRA "associated person" under FINRA's By-laws and Enforcement Department Procedures Manual ("FINRA's Procedures").

64.    Scottsdale Partners conducts business out of the ISC Office. At all times relevant to this Complaint, the plaza's several tenants remit their rent payments and provide landlord notices to Scottsdale Partners at the ISC Office.

-13-

65.     In November 2012, ISC owned and maintained the ISC Computers—three password protected computers and the several hard drives within them—located in the ISC Office.

66.     The ISC Computers were connected to the internet and used in interstate commerce and communications.

67.     When working onsite at the Scottsdale Professional Plaza, the Hurrys use the ISC Computers in the ISC Office primarily to attend to the management and operations of ISC, Scottsdale Partners, their other non-member real estate businesses, and new and potential business ventures that arise for them from time to time.

68.     When working onsite at the Scottsdale Professional Plaza, Hurrys also use the ISC Computers in the ISC Office for all or most of their charitable endeavors and the personal affairs of their immediate and extended family, including, but not limited to, financial, legal, tax, medical, educational, and numerous other personal matters, as described in greater detail below.

69.     When working from one of their homes or otherwise away from Scottsdale Professional Plaza, the Hurrys access the ISC Computers remotely for the same purposes listed in paragraphs 67 - 68.

70.     A single gigabyte of electronic data is the equivalent of approximately 894,784 pages of plaintext or 4,473 200-page books.

71.     In November 2012, the ISC Computers contained hundreds of gigabytes of electronic data that (1) were not SCA's "books and records" (nor the books and records of any other FINRA member) or (2) were unrelated to SCA, including at least the following categories of sensitive, private, confidential, privileged, and proprietary information that ISC is duty bound to protect from disclosure (collectively, the "Extra-Jurisdictional Materials"):

      a.     confidential and legally protected employment files, medical records, and health information of ISC's and Scottsdale Partners' employees and their family members including, but not limited to, John Davidson, John Lumpkin, John Hurry, Justine Hurry, and various employees of Corner of Paradise in Newport, California;

      b.     proprietary, confidential, and sensitive business, employee, and customer information for numerous non-member entities, which has competitive value because it is not generally known or ascertainable by competitors who could use it to their economic advantage, including, but not limited to, information pertaining to the Non-Hurry Business Tenants, and to the Hurrys' past, present, and future non-regulated businesses and entrepreneurial commercial ventures, such as counterparty information, customer lists, client lists, accounts, business financial information, payroll information, contracts, settlement agreements, non-disclosure agreements, trade secrets, production methods, formulas, plans, and other intellectual property;

      c.     private and confidential communications regarding sensitive family and business matters related to the Hurry family and extended family, including the health records of John and Justine and their four children, the health, military and financial records of Justine's elderly father, for whom Justine holds a power-of-attorney, the account numbers and details of the Hurry's personal bank accounts and accounts at other financial institutions, and a variety of other private personal data, including photos;

      d.     privileged attorney-client communications between John or Justine both in their personal and/or official capacities, on the one hand, and their legal advisors, on the other, with related attorney work product;

      e.     confidential school records related to the Hurrys' children;

f.      personal estate and financial planning information for the Hurrys, including their trust documents, living wills, and the location and disposition of various personal financial assets of the couple; and

g.      business tax returns for various non-member entities and other financial information, including bank account numbers, passwords, and general ledgers.

72.     On the morning of November 12, 2012, staff members representing FINRA's Departments of Member Regulation and Enforcement commenced FINRA Matter No. 20120327319 with a surprise onsite examination of SCA at its headquarters in Suite 6 of the Scottsdale Professional Plaza. Staff members represented at least five FINRA offices (Dallas, Denver, Los Angeles, New York City, and Rockville) and included Andersen, Christina L. Stanland ("Stanland"), FINRA's principal regional counsel, Steven C. Bender, Rebecca Kramer, Cia M. Fiske, Stacie A. Jungling, Christopher Leigh, Nicholas Moor, and Cindy Ponikvar.

73.     FINRA's arrival at Suite 6 bore hallmarks of a government raid. Andersen and his examination team arrived unannounced first thing in the morning. They deliberately intimidated the receptionist and FINRA staff fanned out throughout the offices, bullying SCA personnel and interrupting and interfering with the performance of their job duties.

74.     Andersen and his examination team commandeered SCA's conference room and set up an office of their own within it for four consecutive days, operating around the clock, during which time they interfered with the business operations in Suite 6.

75.     FINRA staff also roamed the outside common areas and parking lot of Scottsdale Professional Plaza, disturbing and causing Non-Hurry Business Tenants enough concern to

inquire of SCA personnel and FINRA staff whether the FINRA individuals were law enforcement or government agents.

76.     FINRA did not disclose to SCA or the Hurrys at the time of the onsite examination its cause for examining SCA in FINRA Matter No. 20120327319.

77.     In the period between the commencement of the onsite examination of SCA on November 12, 2012, and the date of this Second Amended Complaint, FINRA has not charged SCA or any SCA personnel with wrongdoing in FINRA Matter No. 20120327319.

78.     Andersen, FINRA's Deputy Regional Chief Counsel, led the team of FINRA staff members that conducted FINRA's onsite examination of SCA in FINRA Matter No. 20120327319.

79.     When they arrived at SCA's headquarters, Andersen or a member of his team presented SCA's chief compliance officer with a Procedural Rule 8210 Request (the "8210 Request") and related correspondence addressed to John solely in his purported capacity as "president" of SCA.

80.     FINRA issued no separate FINRA Rule 8210 request to John, Justine, or any other "associated person" of SCA in his or her personal capacity relating to FINRA Matter No. 20120327319.

81.     Both Justine and John were under considerable emotional strain at the time of the onsite examination. Justine had recently been diagnosed with a life-threatening brain aneurysm. She was scheduled to undergo surgery on January 17, 2013, to remove it. Nobody knew or could have known whether or not the surgery would succeed. John, Justine, and their four children were traumatized.

82.     Because Justine's imminent surgery was to be followed by at least ten weeks of convalescence, John was preparing to single-handedly undertake the post-operative care of Justine, their four children, and their several companies and business ventures when FINRA commenced the onsite examination of SCA.

83.     Neither John nor Justine was at SCA's headquarters in Suite 6, or at the ISC Office during FINRA's onsite examination of SCA.

84.     FINRA demanded of SCA in the 8210 Request "immediate access to inspect and copy . . . information in the possession, custody, or control of [SCA] and its subsidiaries, affiliates, predecessor corporations, principals, employees, and any other affiliated persons."

85.     FINRA warned SCA in the 8210 Request that "your failure to provide access to the firm's books and records requested . . . may result in a disciplinary action …. Sanctions that could be imposed include fines, expulsion and a permanent bar from the industry."

86.     Among other items, FINRA demanded in the 8210 Request that SCA produce "[f]orensic images of *the hard drives* of select firm employees *identified onsite* by FINRA staff" (emphasis added), advised SCA that "[u]nder FINRA Rule 8210, you are obligated to respond to this request fully, promptly, and without qualification," and warned SCA that "[a]ny failure on your part to satisfy these obligations could expose you to sanctions, including a permanent bar from the securities industry."

87.     Andersen also provided SCA's representatives with a letter dated November 12, 2012, (the "Privilege Letter") wherein he expressed that SCA could provide FINRA with a detailed "privilege log" identifying each electronic record collected by FINRA that SCA claims is "privileged" (the latter term undefined, but subsequently clarified to embrace private and

proprietary information unrelated to SCA) and FINRA would "agree to consider those claims and, *without reviewing the document*, to *delete or otherwise segregate* those documents for which your privilege claim seems reasonable." (Emphasis added).

88. Andersen asserted in words or substance to SCA representatives on the afternoon of November 12, 2012, that FINRA has jurisdiction over the ISC Computers and the power to compel unfettered access to those devices in their entirety. ISC is not a FINRA member firm. There is nothing in FINRA Rule 8210 that authorizes FINRA to demand or seize ISC's computers and hard drives. Interpreting Rule 8210 as providing such authority exceeds the jurisdictional bounds set forth for SRO's in the Securities and Exchange Act of 1934 and violates the Hurrys' and Business Plaintiffs constitutional right to due process.

89. Andersen made the foregoing assertion even though SCA was the only recipient of FINRA's 8210 Request, which applies only to the books and records of SCA and despite the fact that FINRA has no regulatory jurisdiction over ISC.

90. Andersen demanded in words or substance on the afternoon of November 12, 2012, that SCA unlock the ISC Office so FINRA staff under his command could enter ISC's premises, seize the ISC Computers, access the ISC Computers, and create "mirror images" of the ISC Computers in their entirety.

91. Andersen's demand for access to the ISC Computers in their entirety was improper for numerous reasons, including that the ISC Computers were not on SCA's premises but instead on ISC's premises, that the ISC Computers do not belong to SCA, and that the ISC Computers are used predominantly for purposes unrelated to SCA and laden with sensitive, private,

confidential, attorney-client privileged, work product, and/or proprietary information not comprising books and records related to SCA, *i.e.*, the Extra-Jurisdictional Materials.

92. At the time of his demands, Andersen was informed that, to the extent the ISC Computers contain any SCA-related material, that material likely comprises emails to or from John or Justine at their respective SCA-email addresses, which are preserved in a third-party, SEC-approved, cloud-based, verifiable and auditable, electronic data repository maintained by Smarsh, Inc., which could readily provide a true and correct copy of every non-privileged email to or from John or Justine at their respective SCA-email addresses without prejudicing the privacy, privilege, and proprietary rights of ISC and the other individuals and entities about whom Extra-Jurisdictional Material exists on the ISC Computers.

93. Andersen afforded no serious consideration during the onsite examination to any representations or alternative proposals regarding the handling of the ISC Computers.

### FINRA and the Individual Defendants Access the ISC Computers through Coercion and Deceit

94. Andersen told SCA representatives on November 12, 2012, that FINRA would issue "Wells Notices" to several SCA personnel "within the next 15 minutes" if SCA continued to resist his demand to unlock the ISC Office and allow the FINRA examination team to enter the premises, seize the ISC Computers, access the ISC Computers, and create "mirror images" of the ISC Computers in their entirety.

95. To be "Wells'd" is a reportable event on a registered person's Form U4 and carries a significant stigma in the securities industry.

96. The stigma associated with "being Wells'd" can be immediate and devastating to the respondent's career, reputation, and livelihood.

97. The mere issuance of a Wells Notice to a securities professional with regulatory compliance duties can make it extraordinarily difficult for the respondent to find another job in the securities industry, even if the respondent ultimately is found not to have engaged in the alleged misconduct.

98. It was outside the bounds of FINRA's authority for Andersen to threaten to serve a Wells Notice on SCA staff members in the next fifteen minutes if they did not unlock the door to a non-member firm's office. Andersen's threat to issue Wells Notices to SCA's personnel, with the instant attendant stigma and risk that those personnel would face a permanent bar from working in the securities industry, was intended to coerce SCA representatives to unlock the ISC Office and allow the FINRA examination team to access the ISC Computers and, ultimately, had just that effect.

99. With Andersen's threat of imminent Wells Notices for SCA personnel, John and Justine were presented with a classic Morton's fork, *i.e.*, as SCA's founders and indirect owners they could abate the immediate peril to the careers, reputations, and livelihoods of SCA employees or, as the founders and indirect owners of ISC, they could continue to shield ISC's Computers from intrusion and protect the entities and individuals, including themselves, whose private, privileged, and proprietary information is contained in the ISC Computers. They could not do both.

100. Under the circumstances, Andersen's "Wells Notice" ultimatum reasonably caused enormous duress for John and Justine, compounding the severe emotional strain with which they

were burdened because of Justine's life-threatening medical condition and her impending surgery and convalescence, and overcoming their exercise of free will.

101.    Ultimately, FINRA staff under Andersen's command accessed the ISC Office, seized the ISC Computers, accessed the ISC Computers, and copied the ISC Computers in their entirety.  FINRA had no right to coerce and demand that SCA grant it access to a non-FINRA member firm's office and the computers and hard drives therein, and FINRA further had no right to access ISC's devices and make mirror images of them.

102.    Andersen, in undertaking and directing other FINRA staff to undertake the tasks of seizing, accessing and copying the ISC Computers in their entirety, failed to hue to the limits of FINRA Rule 8210.

103.    Andersen, in undertaking and directing other FINRA staff to undertake the tasks of seizing, accessing and copying the ISC Computers in their entirety, violated those provisions of FINRA's procedures that define the nature and scope of FINRA's jurisdiction and that prevail on FINRA staff to respect FINRA's jurisdictional boundaries when conducting examinations.

104.    FINRA, in seizing, accessing and copying the ISC Computers in their entirety, deprived ISC of the full use of those devices for at least five days.

105.    FINRA forced SCA to retain the costly services of a forensic data specialist to monitor and log all material events pertaining to the time-consuming electronic data extraction process to assess the safe handling of the devices and integrity of the data within.

106.    Neither John, Justine, nor any agent or representative of SCA or ISC ever authorized FINRA to review any of the Extra-Jurisdictional Materials. Regulatory counsel for SCA objected to the seizing and copying of the ISC Computers and demanded that FINRA not review any of

the electronic information it copied from the ISC Computers using any procedure that failed to protect the Extra-Jurisdictional Materials from review or dissemination.

107. FINRA, in seizing, accessing, and copying the ISC Computers in their entirety, knowingly and willfully arrogated to itself, at Andersen's direction, and over strenuous objections, the hundreds of gigabytes of Extra-Jurisdictional Material believed to exist on those devices.

### *FINRA and the Individual Defendants Refuse to Protect the Extra-Jurisdictional Materials from Review and Dissemination*

108. Continuing to ignore the fact that the ISC Computers belonged to ISC, FINRA, Andersen, and Stanland initially required that SCA provide a "privilege log" of all electronic information on the ISC Computers—copies of which FINRA now had in its possession.

109. It is impractical, ineffective, and punitive for FINRA to require a small broker-dealer's attorneys to parse as much as two terabytes of electronic data, the equivalent of nearly 1.8 billion pages of plaintext, from a non-member's computers to identify and log every piece of digital information that is privileged, irrelevant, or both, when such privileged and/or irrelevant digital information is anticipated to constitute the majority of that electronic data. Indeed, the Hurrys expended hundreds of thousands of dollars just to collect and track the seized and copied drives.

110. Despite the representation in the Privilege Letter that FINRA would consider "privilege" claims "*without reviewing the document*" and would "*delete or otherwise segregate*" those documents—Andersen responded to SCA's regulatory counsel's written request that the Extra-Jurisdictional Materials be returned by stating that FINRA could not agree to return or destroy any such data because the data purportedly cannot be disaggregated and also stated that,

if Andersen disagreed with SCA's claim of "privilege" on any document, a FINRA staff member would review that document and decide whether, in the FINRA staff member's view, the "privilege" claim is warranted.

111.    Upon information and belief, FINRA commonly uses a method to identify potentially attorney-client privileged documents where a search is run for materials containing the names of attorneys provided by the member, those materials are then segregated and copies provided to the member's attorney for preparation of a privilege log on those documents.

112.    As John and Justine prepared for her brain surgery, it became evident that the "privilege log" approach was unworkable.

113.    FINRA agreed to allow SCA to submit a list of "search terms" beyond attorney names which, if used in electronic searches of FINRA's mirror image copies of the ISC Computers, would yield Extra-Jurisdictional Material.

114.    Under this method, FINRA would run searches of FINRA's mirror image copies of the ISC Computers using the off-limits search terms, provide SCA with some unspecified way to identify the specific electronic data those search terms identified, require SCA to perform a "privilege" review of that enormous universe of electronic data, and require SCA to provide FINRA with a "privilege" log identifying the basis of each of its "privilege" objections to each item of digitized information in that universe.

115.    The "search terms" method and associated review protocol is unworkable to protect the Extra-Jurisdictional Material from review, dissemination, or disclosure.

116.    To craft a list of search terms that would provide a reasonable measure of assurance that all of the Extra-Jurisdictional Material is excluded from FINRA's review is unduly burdensome and entirely impractical, if not impossible.

117.    The review protocol wherein a FINRA staff member determines the validity of privilege claims impinges on regulatory counsels' legal and ethical responsibilities to identify and shield attorney-client privileged data and work product from disclosure.

118.    The more sensible, practical, and efficient approach to dealing with the ISC Computers is for FINRA to place its copies of the ISC Computers in the custody of a mutually-acceptable, neutral, third-party forensic computer specialist to extract any SCA books and records relevant to the undisclosed purpose of FINRA's examination of SCA without prejudicing the privacy, privilege, and proprietary rights of those individuals and non-member entities about whom Extra-Jurisdictional Material exists on the ISC Computers.

119.    SCA, in reaction to further demands and threats by FINRA, and in good faith, provided FINRA with a list of search terms that SCA surmised would shield—at least initially—significant privileged and Extra-Jurisdictional Material.

120.    FINRA rejected the vast majority of the search terms that SCA proposed to yield potentially privileged documents, including such terms as "attorney," "lawyer," "counsel," "counselor," "confidential," "immunity," "litigation," "memorandum," "analysis," "evaluation," "advice," "court," "arbitration," "lawsuit," "action," "case," "precedent," "claim," "defense," "object," "objection," "motion," "complaint," "pleading," "discovery," "civil procedure," "judge," "arbitrator," "adversary," "opposing counsel," "confidentiality agreement," "NDA," "release," and "non-disclosure agreement."

121.    FINRA also rejected the vast majority of the search terms that SCA proposed to yield Extra-Jurisdictional Material, including the terms in the preceding paragraph, the names of the Hurrys' non-member entities, and such terms as "University of San Francisco," "Stanford Medical," "Phoenix Childrens Hospital," "Veteran's Association," "Accountant," "Apartment," "Beneficiary," "Bicycle," "Bookkeeper," "Building," "Brain," "Brother," "Charity," "Charitable," "Child," "Children," "Church," "Dad," "Doctor," "Enjoin," "Executor," "Father," "Grade," "Grandma," "Grandmother," "Grandpa," "Grandfather," "Guardian," "Healthcare," "Home," "Ice cream," "Ill," "Illness," "Infection," "IRA," "IRS," "Landlord," "Lease," "Military," "Mom," "Mortgage," "Mother," "Philanthropy," "Revocable Trust," "Retirement," "School," "Script," "Sick," "Sister," "Social Security," "SSN," "Surgery," "Teacher," "Tenant," "Title," "Treatment," "Trip," "Trustee," "Vacation," and "Veteran's Administration."

122.    The search terms that FINRA rejected were likely to identify Extra-Jurisdictional Material. Highlighting just one example, the search term "ice cream" was intended to exclude electronic data pertaining to Plaintiff Corner of Paradise, the Hurrys' non-member ice cream shop in Newport Beach, California.

123.    Neither FINRA, Andersen, nor Stanland had or has any intention of shielding the Extra-Jurisdictional Materials from review by FINRA staff.

124.    Neither FINRA nor Andersen had or has any intention of not distributing or sharing, or not causing or allowing the Extra-Jurisdictional Materials to be distributed or shared, with government agencies. FINRA's mere act of searching the copies of the ISC Computers could permanently impair significant constitutional protections, including Fourth Amendment protections, to which the Hurrys and Business Plaintiffs are otherwise entitled.

125.    Neither the Hurrys nor the Business Plaintiffs had or have any desire or intention of interfering with FINRA's legitimate examination of its members. To the contrary, the Hurrys and the Business Plaintiffs have cooperated with several requests by FINRA.

126.    ISC even offered to search for and produce from ISC's computers and hard drives any non-privileged SCA books and records related to the undisclosed purpose of FINRA's examination of SCA, a process that should satisfy any legitimate objective of FINRA's SCA examination without prejudicing the privacy, privilege, and proprietary interests of ISC and other individuals and non-member entities.

127.    ISC also offered to share with FINRA the expense of having the ISC Computers placed in the custody of a mutually-acceptable, third-party, neutral forensic computer specialist so any non-privileged SCA books and records related to the undisclosed purpose of FINRA's examination of SCA can be isolated for production. The latter proposal likewise would satisfy any legitimate objective of FINRA's examination of SCA without prejudicing the privacy, privilege, and proprietary interests of individuals and non-member entities

128.    FINRA rejected the aforementioned proposals.

129.    As a direct and proximate result of FINRA's and the Individual Defendants' actions, the Plaintiffs have been and continue to be irreparably injured in that FINRA coercively, deceitfully, and in violation of its jurisdictional boundaries and federal and state law (a) seized the ISC Computers on ISC's premises, (b) accessed the ISC Computers, (c) copied the ISC Computers in their entirety, and (d) refused thereafter to return or destroy the Extra-Jurisdictional Material they copied from the ISC Computers.

130. FINRA, Andersen, Stanland, and the Individual Defendants have no independent basis or authority to retain the Extra-Jurisdictional Materials.

131. As a direct and proximate result of FINRA's, Andersen's, Stanland's, and the Individual Defendants' actions, Plaintiffs have been and continue to be irreparably injured by the imposition of a punitive, unduly burdensome, vexatious, ineffective, and impracticable electronic data review process whereby FINRA ultimately reserves the "right" unilaterally to decide whether to review Extra-Jurisdictional Materials.

132. As a direct and proximate result of Defendants' actions, the Plaintiffs have been and continue to be irreparably injured by FINRA's intent to review, retain, and disclose to government agencies the Extra-Jurisdictional Materials, in blatant violation of privacy, privilege, and proprietary rights of the Hurrys, ISC, and the individuals and entities about whom electronic data exists on FINRA's copy of the ISC Computers.

### *ISC and the Hurrys Demand Destruction, Return, or Escrow of the Copies of the ISC Computers*

133. On February 27, 2013, the Hurrys and ISC demanded that FINRA destroy, return, or deposit with a mutually-acceptable third party computer forensic specialist, any copies of the ISC Computers in FINRA's possession for purposes of preservation and security.

134. On March 1, 2013, FINRA assured ISC and the Hurrys that FINRA had not "accessed the Hurrys' hard drives, and will not do so until there is an agreement on the data that may be accessed." This was consistent with numerous prior communications made to SCA's counsel where FINRA assured them that no review of computer material would take place absent agreement and a mutually acceptable process for resolving disputes.

### ISC Seeks Court Intervention to Protect the Confidential Data
### from Disclosure, Review, and Dissemination

135.    On March 8, 2013, ISC filed suit in the U.S. District Court for the District of Arizona against FINRA and Andersen, alleging that Andersen's invasion of the ISC Office and seizure and copying of the ISC Computers violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, among other claims.

136.    Hopeful that FINRA would be amenable to settling the dispute on mutually agreeable terms, the Hurrys refrained from serving the complaint but sent copies both to FINRA and to Andersen.

137.    In the months that followed, neither FINRA nor Andersen proposed any method for examining any non-privileged books and records of SCA that might be on the ISC Computers without violating the privacy and proprietary interests of non-members.

138.    Instead, on information and belief, FINRA, Andersen, and the Individual Defendants devised a plan to harass and then strong-arm the Hurrys and ISC into dropping their lawsuit against FINRA and Andersen.

### Defendants Engage in a Pattern of Harassment Meant to
### Intimidate, Coerce, and Harm the Hurrys and Business Plaintiffs

139.    In the months that followed the seizure and copying of the ISC Computers, Defendants engaged in a pattern of escalating harassment of the Hurrys and the businesses associated with the Hurrys designed to intimidate, annoy, coerce, and harm the Hurrys and Business Plaintiffs.

140.    On or about December 20, 2012, Alpine filed a standard form application with FINRA for permission to provide retail margin account services on a self-clearing basis and to

remove the restriction upon the firm that it would have no one other than John Hurry dually registered and/or associated with SCA.

141. FINRA informed Alpine that it should withdraw the application because it would never be approved.

142. Then FINRA demanded that Alpine provide John Hurry's personal bank records for FINRA's review and examination as part of the application, allegedly due to a line of credit between Alpine and John Hurry. On information and belief, the request for personal bank records was nothing more than a pretext to harass the Hurrys' and further invade their privacy.

143. In response to the request for bank records, John Hurry produced a "Depository Validation" from JP Morgan Chase Bank verifying that the Hurrys' trust account maintained a minimum of $3,000,000 in collected funds.

144. Based upon the Depository Validation and other information in FINRA's possession regarding the Hurrys' financial resources, FINRA knew or should have known that John Hurry had sufficient liquidity to provide contingent funding to Alpine should the firm need to draw on the line of credit.

145. Nonetheless, on or about May 3, 2013, FINRA issued a denial of Alpine's application to provide retail margin account services on a self-clearing basis.

146. This denial letter was arbitrary and a pretext to harass the Hurrys, impair their businesses and livelihood without due process of law, pressure them into waiving constitutional privacy protections, coerce them to drop their lawsuit against FINRA and Andersen, reduce their influence in the OTC sector, and, ultimately, drive them out of business.

147.    Even when FINRA ultimately approved Alpine to provide retail margin account services on a self-clearing basis, it did so with a margin that was arbitrarily restrictive and largely ineffective for the firm's intended business purposes.

148.    During this same period, the Nevada Secretary of State's Securities Division issued 24 subpoenas seeking numerous records from businesses associated with the Hurrys. On information and belief, there was no active or pending investigation by the Nevada authorities nor was there lawful cause to seek the records. Rather, on information and belief, the subpoenas were issued at the prompting of Andersen and/or one of the Individual Defendants. The Securities Division eventually withdrew the subpoenas.

149.    Andersen also participated directly in the harassment. On or about June 19, 2013, FINRA and Andersen conducted the first in a series of on-the-record ("OTR") interviews with employees and officers of the Hurrys' companies.

150.    Neither the interview of June 19, 2013, nor any of the OTR interviews that followed was conducted strictly in furtherance of legitimate examination goals; the interviews were, rather, designed to harass and cause reputational damage to the Hurrys and their businesses.

151.    In the course of the OTR interviews, Andersen and Individual Defendants framed their questions to insinuate to the interviewees that John Hurry had been engaging in money laundering activities or unlawful activities. These false insinuations that John Hurry is or was engaged in money laundering, that he or his employees were paid in cash, and that customers were permitted to pay in cash, were all deliberate attempts to cause reputational damage to the Hurrys and those businesses associated with them.

152.    As a direct and proximate result of these false insinuations that John Hurry is or was involved in unlawful activity, at least one senior level officer resigned from a business associated with the Hurrys. At least one other senior employee has resigned from a Business Plaintiff as a result of FINRA's and the Individual Defendants' harassing and disparaging conduct.

### FINRA, Andersen, Stanland, and the Individual Defendants Threaten and Coerce the Hurrys into Abandoning the Lawsuit against FINRA and Andersen

153.    On June 25, 2013, Andersen resurrected his threat to "analyz[e]"—without any reasonable method to protect the privacy and propriety interests of non-parties—the information, documents, and data contained on the Hurry's hard drives" "beginning *this* Friday [June 28, 2013] at noon EDT [9:00 a.m. MST]."

154.    Andersen issued this threat despite that FINRA and ISC had not yet agreed on a mutually acceptable process for resolving disputes regarding Extra-Jurisdictional Material and the ISC Computers.

155.    Among the new assertions that Andersen made in his letter was the false assertion that the seizure of the ISC Computers was part of an investigation of John Hurry's outside business activities. This was nothing more than an after-the-fact attempt to justify Andersen's unlawful invasion of the ISC Office and confiscation of the ISC Computers.

156.    FINRA's Procedural Rule 8210 Request of November 12, 2012, was addressed to John Hurry only in his capacity as president of SCA, not in his personal capacity or in his capacity as an owner or manager of any outside business.

157.     Despite seeking disclosure of vast quantities of SCA books and records, FINRA had made no demand whatsoever in its Procedural Rule 8210 Request of November 2012 for disclosure of records related to the Hurrys' outside business activities.

158.     SCA employees were not questioned during the OTRs begun in June 2013 regarding the Hurrys' outside business activities.

159.     On June 26, 2013, in response to Andersen's renewed threat to harm ISC and the Hurrys by reviewing and analyzing Extra-Jurisdictional Materials, ISC expressed in writing to FINRA's outside litigation counsel that it had "no desire to impede FINRA's legitimate examination of a member firm" and that "[w]ithout conceding the presence of any such materials on the ISC Computers, ISC has never objected, and does not object today, to FINRA reviewing non-privileged SCA books, records, and accounts to the extent ISC and its counsel find them on the ISC Computers."

160.     Despite this renewed invitation to negotiate a resolution that would preserve the privacy and proprietary interests of non-members while acknowledging FINRA's right to investigate SCA, FINRA refused to discuss any method for examining non-privileged books and records of SCA that might be on the ISC Computers.

161.     On June 27, 2013, through its outside counsel, FINRA doubled-down on the Andersen threat and accused the Hurrys of attempting to "delay and obstruct FINRA's proper regulatory review" by causing ISC to commence its first lawsuit regarding the Extra-Jurisdictional Materials.

162.     FINRA and the Individual Defendants knew or should have known that its accusations of an improper motive were false and pretextual.

163. FINRA, Andersen, and FINRA's outside counsel made their accusations regarding the Hurrys' purported improper motive in order to intimidate the Hurrys and coerce them not to serve their complaint and to abandon their lawsuit.

164. The Hurrys reasonably understood FINRA's accusations as a threat to bring disciplinary action against them if they allowed ISC to persist in vindicating its rights and the rights of others with data on the ISC Computers.

165. The same day that FINRA falsely accused the Hurrys of attempting to "delay and obstruct FINRA's proper regulatory review" of John Hurry's outside business activities, the SEC issued a subpoena to John Hurry seeking production of electronic and other records.

166. Faced with that prospect of having to defend themselves against contrived obstruction charges in an 8210 proceeding and potentially losing their livelihood as a result, and already feeling the effects of harassment from the multiple quarters, the Hurrys were left with no reasonable alternative but to cause ISC to stand down. This did not mean, however, that the Hurrys, ISC, the Business Plaintiffs, or anyone else with information on the ISC Computers consented to FINRA's access, examination, or retention of the Extra-Jurisdictional materials in FINRA's possession.

167. As of the filing of this Complaint, Defendants still unreasonably retain the Extra-Judicial Material, which was secured in excess of their jurisdiction, and is being held by Defendants without independent basis or authority to do so.

***Defendants Embark on a Campaign to Discredit, Intimidate, and
Harm the Hurrys While Avoiding Further Scrutiny and the
Requirement of Due Process***

168.    On information and belief, when it was clear that ISC was not going to serve its lawsuit, Defendants embarked on a campaign to discredit the Hurrys, intimidate them from pursuing their federal lawsuit, and force them out of the OTC sector, while avoiding the scrutiny and due process attendant to formal regulatory action.

169.    On or about September 19, 2013, FINRA conducted an OTR of John Hurry.

170.    During the Hurry OTR, John Hurry was asked to disclose the name of the financial institution in which he conducted his personal banking. He responded in substance that his primary personal banking relationship was with Chase, where his trust accounts were established.

171.    On or about October 7 and October 18, 2013, FINRA propounded Rule 8210 requests seeking personal and business records from the Hurrys and their non-regulated businesses, including bank records, phone records, and flight records.

172.    FINRA's demands for records were unnecessarily overbroad and sought records not reasonably related to any issue in FINRA's examination. FINRA's staff had no evidence or grounds to believe that the records they sought contained any information relevant to the subject of FINRA's examination. The 8210 requests were intended to harass the Hurrys, injure and impair Hurrys' businesses, pressure the Hurrys to waive their constitutional privacy protections, retaliate against the Hurrys for bringing their lawsuit against FINRA and Andersen, and prevent the Hurrys from reinitiating their lawsuit against FINRA, Andersen, or others.

173.    The overbroad and overreaching 8210 requests were also part of a scheme to harass the Hurrys into abandoning the OTC sector, part of their lawful business activities, without due process of law.

174.    Faced with the threat of further charges of obstruction, the Hurrys provided FINRA with hundreds of pages of personal bank records, personal phone records, and flight records. FINRA's request was unduly burdensome, extremely costly and time consuming.  Nevertheless, the Hurrys fully cooperated.  The records were redacted to remove personal information pursuant to an agreement with FINRA, marked confidential, and provided to FINRA over the Hurrys' express objections.

175.    On or about February 4, 2014, a short time after the Hurrys provided their records in redacted form as per their agreement with FINRA, the SEC issued a subpoena to Pinnacle Aviation for the very same flight records as well as for communications between the Hurrys and the company that manages the airplane. The timing and substance of the subpoena from the SEC establish close coordination between FINRA and the SEC, including on matters that do not concern FINRA's regulatory functions.  The subpoena invaded the Hurrys' business and privacy interests by exposing information redacted by the Hurrys when responding to FINRA's 8210 request and revealing private and sensitive communications to regulators.

### Defendants Leak Non-Public, Confidential, and Misleading Information to the Deal Pipeline

176.    On information and belief, in furtherance of their scheme to discredit, harass, and injure the Hurrys, Andersen, or the other Individual Defendants, conspired to leak non-public, confidential, and false and misleading information to a reporter for the Deal Pipeline, a financial

news and information service whose readership includes a range of financial institutions and other key audiences in the financial services market. Defendants leaked the information for the specific purpose and with the design of causing its publication.

177. On or about September 17, 2013, Bill Meagher ("Meagher") of the Deal Pipeline wrote the first of several articles using the information leaked by FINRA. Citing "internal documents" Meagher obtained from FINRA, Meagher described "a series of reports Finra sent to the SEC in 2012 and 2013."

178. The "internal documents" to which Meagher alluded were obtained from FINRA's Office of Fraud Detection and Market Intelligence ("OFDI").

179. The "internal documents" to which Meagher alluded made reference to "trading records obtained from U.S.-based broker[] Scottsdale Capital Advisors," among others.

180. Meagher's article disclosed non-public information including the name of an individual who opened a trading account with SCA, when the account had been opened, on whose behalf it was opened, and the volume of trading in the account. Meagher identified no source for these disclosures in his article apart from FINRA.

181. On information and belief, Andersen, and FINRA staff members from OFDI, were present for all testimony taken as part of FINRA Matter No. 20120327319.

182. On December 3, 2013, the Deal Pipeline's Meagher contacted SCA's outside regulatory counsel, seeking responses from SCA, Alpine, and/or the Hurrys to several questions regarding FINRA's investigation into trading in a company called Biozoom, among other matters. Meagher's inquiries reflected a knowledge of non-public and confidential information, the leaking of which can be attributed plausibly only to FINRA.

183.   Meagher requested comments from SCA's outside regulatory counsel regarding a former SCA employee, Tim Scarpino—specifically, comments regarding the termination of his employment with SCA, which was known to FINRA investigators but had not been publicly reported by SCA.

184.   Meagher also requested comments from SCA's outside regulatory counsel regarding John Hurry's plans to buy Wilson Davis, a transaction which was known to FINRA, but had not been publicly reported.

185.   Meagher's questions demonstrated that, at minimum, he had knowledge of FINRA's ongoing examination of SCA, and the questions posed by FINRA staff members to SCA and its employees. His questions reflected a distinct "prosecutorial" perspective consistent with the tenor of FINRA's examination. His questions made reference to a full spectrum of details reflecting FINRA Matter No. 20120327319 and what FINRA had learned regarding SCA's business, internal practices, customers, customer transactions, securities deposits, wire activities, and trading activity. Other than SCA's in-house and outside regulatory counsel, only Andersen and the other Individual Defendants who were present at the OTRs would have had knowledge of the details reflected in Meagher's questions.

186.   Neither SCA's outside regulatory counsel nor anyone else associated with SCA, Alpine, or the Hurrys responded to Meagher's inquiries.   Any calls from Meagher were referred to the president and chief counsel of SCA without discussing the matters with Meagher.  The president and chief counsel of SCA was unable to identify anyone at SCA or Alpine who provided the leaks to Meagher.

187.    On December 3, 2013, SCA's outside regulatory counsel emailed Andersen expressing that "SCA is extremely concerned that confidential information has been leaked that may be damaging to the firm or its employees" and asking that Andersen "advise as to whether [FINRA] Staff is aware of this information being provided to the reporter."

188.    Andersen never responded to the December 3, 2013, inquiry by SCA's outside regulatory counsel.

189.    On or about December 4, 2013, Brad Bennett, FINRA's head of enforcement, left a voice mail for SCA's outside regulatory counsel.

190.    Despite that the September 17, 2013, Deal Pipeline article demonstrated that Meagher was provided internal documents from FINRA, Bennett was dismissive of the concerns and suggested that the press leaks "could have come from someone at Scottsdale [Capital Advisors]."

191.    Bennett expressed in his December 4 voicemail that he was "confident on our side that we didn't leak" and declined to respond further, stating that "no one on staff can have anything more to say about it."

192.    On December 6, 2013, just days after the inquiries from Meagher, the Deal Pipeline ran an article by Meagher entitled, "FBI, securities officials investigating Scottsdale Capital, Alpine Securities, source says." As his source, Meagher referenced in his December 6 article only "a person familiar with those investigations."

193.    The information disclosed in Meagher's December 6 article was non-public and confidential.

194.    Meagher's December 6 article demonstrated knowledge of FINRA's ongoing examination of SCA, Alpine, and the questions FINRA staff members had posed to those companies and their employees. His article reflected a distinct "prosecutorial" perspective consistent with the tenor of FINRA's examination.

195.    According to Meagher's December 6 article, FINRA is "work[ing] with the SEC" on investigations involving SCA, Alpine, and the Hurrys."

196.    Meagher also reported in his December 6, 2013, article that "John Hurry, who controls both Scottsdale and Alpine, is in negotiations to buy Wilson Davis."

197.    On information and belief, no one associated with the parties to the Wilson Davis purchase informed Meagher or anyone else in the media that John Hurry or any entity associated with the Hurrys was acquiring Wilson Davis. The article made clear that the Deal Pipeline did not receive comments from anyone who was approached by Meagher at SCA.

198.    Meagher falsely and misleadingly stated in his December 6, 2013, article that the FBI was investigating SCA and Alpine falsely implying that the firms or their principals are targets of criminal or securities' investigations.

199.    On information and belief, SCA is and was not the target of any federal law enforcement investigation and neither are Alpine nor the Hurrys.

200.    Meagher falsely reported in his December 6 article that Biozoom shareholders were allowed to trade in violation of SCA policies and were provided special perks. Meagher also falsely implied in his December 6 article that SCA had disregarded "red flags" regarding the Biozoom trades and that SCA had failed to follow up.

201.    On information and belief, if FINRA conducted any investigation regarding the press leaks following the inquiry from SCA's outside regulatory counsel to Andersen and the subsequent voice message from Bennett, the investigation was incomplete and inadequate.

202.    On information and belief, if FINRA took any action to curb or prevent press leaks or inappropriate disclosure of confidential or non-public information regarding the Hurrys, their businesses, or their customers following the inquiry from SCA's regulatory counsel to Andersen and the subsequent voice message from Bennett, the action was incomplete and inadequate.

203.    On January 9, 2014, SCA's chief in-house counsel, wrote the FINRA Office of the Ombudsman and Robert L.D. Colby, FINRA's Chief Legal Officer, regarding the information leak to Meagher and the Deal Pipeline. The January 9 letter notified FINRA that SCA and its customers have been embarrassed and harmed by the reports and sought a "full investigation" of the matter by FINRA and the SEC. He also requested an assurance that "FINRA is appropriately safeguarding confidential information obtained during its investigations."

204.    On information and belief, if FINRA conducted any investigation regarding the press leaks following SCA's January 9, 2014, letter, the investigation was incomplete and inadequate.

205.    On information and belief, if FINRA took any action to curb or prevent press leaks or inappropriate disclosure of confidential or non-public information regarding the Hurrys, their businesses, or their customers following the January 9, 2014, letter, the action was incomplete and inadequate.

206.    On February 18, 2014, outside counsel for John Hurry spoke with Deb Tarasevich (Assistant Director of Enforcement) and Jennie Krasner (Senior Counsel) of the SEC. Counsel

-41-

expressed concerns regarding the leaks and the reputational harm they were causing the Hurrys and their businesses.

207. Tarasevich stated that no one at the SEC was speaking to the press about any investigations or examinations involving the Hurrys.

208. On March 20, 2014, the Deal Pipeline published a Bill Meagher article entitled "SEC requests default judgment in $34M Biozoom pump-and-dump case." The article mentions information that would only be known to FINRA, SEC, and SCA, including that a FINRA audit of SCA was scheduled for the end of March and that FINRA had made a regulatory request for the personal notes of SCA employees.

209. The March 20, 2014, article repeats the false and misleading statement that the FBI is investigating SCA and Alpine and repeats the false and misleading implication that the firms or their principals are the targets of criminal or securities' investigations. The March 20, 2014, article further falsely implies that SCA and/or the Hurrys were involved in a "pump-and-dump" scheme with Biozoom.

210. As the disclosures of non-public and confidential information to Meagher was attributable to FINRA, on March 21, 2014, SCA's in-house counsel again emailed Colby detailing SCA's concerns about the March 20, 2014, article in the Deal Pipeline. He explained that breach of confidentiality associated with FINRA's examination and "the distorted factual portrayal of these disclosures has interfered with current and prospective business relationships of SCA." He demanded that the disclosure of confidential or non-public matters stop immediately.

211. On March 21, 2014, Colby confirmed to SCA that "FINRA's policies prohibit disclosing our audit schedule and regulatory requests to firms." Colby represented that FINRA's

"Ombudsman's office is actively reviewing whether our staff disclosed any information inconsistent with our policies."

212. As of the filing of this Second Amended Complaint, FINRA has not communicated the result of any Ombudsman's office review to SCA or the Hurrys.

213. On information and belief, FINRA did not conduct a thorough and adequate investigation regarding the press leaks and inappropriate disclosures following SCA's March 21, 2014 email.

214. On information and belief, FINRA did not take action to curb inappropriate leaks or disclosures of confidential, non-public, and misleading information regarding the Hurrys, their businesses, or their customers following the March 21, 2014, email.

215. On April 9, 2014, outside counsel for SCA received a phone call from reporter Bill Meagher. The reporter informed SCA's counsel that the Deal Pipeline would be publishing a story that would disclose that FINRA AML examiners appeared at the SCA offices in March of 2014 and requested account documentation for a number of customer accounts, which he specified by name.

216. On or about April 16, 2014, the Deal Pipeline published an article written by Meagher disclosing an unannounced FINRA examination of SCA. Under FINRA policies, unannounced examinations of members are non-public and confidential. The article contained details regarding the unannounced examination of SCA that could be known only to FINRA and SCA.

217. On or about April 17, 2014, SCA's in-house counsel emailed Colby notifying him of the contact from Meagher, the April 16, 2014, article in the Deal Pipeline, and attesting "no

one at [SCA] disclosed to the press the [unannounced] visit or the documentation [FINRA examiners] requested." He notified Colby that "FINRA Staff are providing information to this reporter on a near real-time basis, with the apparent intent to embarrass and/or financially hurt [SCA], as well as to expose confidential client information." He continued that "[t]his behavior, if coming from FINRA Staff, is a violation of your own policies and unbecoming of a member regulatory organization." He requested that FINRA "thoroughly investigate this matter, and respond" to him or SCA's outside regulatory counsel, "whether anyone on the Staff has in fact violated FINRA policies."

218.    In response to SCA's email, on or about April 17, 2014, Colby confirmed that "[p]roviding information to the press about exams is unacceptable" and promised that he "will review this situation also."

219.    On information and belief, FINRA did not conduct an appropriate, thorough, and adequate investigation regarding the press leaks and inappropriate disclosures following SCA's April 17, 2014, email.

220.    On information and belief, FINRA did not take action to curb inappropriate leaks or disclosures of confidential, non-public, and misleading information regarding the Hurrys, their businesses, or their customers following the April 17, 2014, email from SCA.

### *The Leaks to the Deal Pipeline Damage the Hurrys' Reputation, Harm Customer Relationships, and Force Closure of the Hurrys' Bank Accounts*

221.    On or about February 3, 2014, Morgan Stanley denied an application by Alpine for an omnibus account. On information and belief, the Morgan Stanley denial of Alpine's application was directly and proximately caused by leaked information appearing in the December 6, 2013,

-44-

Deal Pipeline article. Alpine lost at least one major client or prospective client as a direct and proximate result of the Morgan Stanley denial of the omnibus account application. The denial has injured and impaired Alpine's ongoing business operations and business expansion.

222.   On or about February 26, 2014, John Hurry was notified by J.P. Morgan Private Bank, where he had been a longtime client, that the bank was closing his accounts. The bank informed him that based upon a review of its client relationships, it had determined that Mr. Hurry's "interests are no longer served by maintaining a relationship with J.P. Morgan Private Bank." Based upon information and belief, the closure of the Hurrys' accounts by J.P. Morgan Private Bank was directly and proximately caused by leaked information appearing the December 6, 2013, Deal Pipeline article.

223.   The closure of the J.P. Morgan Private Bank accounts impaired numerous prospective and existing business transactions and relationships for the Hurrys.

224.   On or about May 19, 2014, Chase Bank notified the Hurrys that it was closing all accounts associated with the Hurrys and their businesses. Upon information and belief, the closure of the Hurrys' accounts by Chase Bank was directly and proximately caused by Defendants' actions including wrongful and inappropriate leaks of information to Meagher, which was then published by the Deal Pipeline.

225.   The closure of the Chase Bank accounts, including accounts for Plaintiff ISC, which provides administrative and legal services to the Hurrys' other businesses, and accounts for Plaintiff Corner of Paradise, the Hurrys' retail ice cream parlor and bicycle rental shop, has and will directly and substantially impair the Hurrys' business operations.

226.   On or about September 11, 2014, Zions Bank notified Alpine in writing of its intent to close accounts associated with Alpine and the Hurrys. Upon information and belief, the closure of these accounts by Zions Bank was directly and proximately caused by Defendants' actions including wrongful and inappropriate leaks of information to Meagher, which was then published by the Deal Pipeline.

227.   On or about July 16, 2015, the Hurrys were informed that Comerica Bank was closing their account. These various bank account closures were modeled on tactics used by DOJ, the Treasury Department and the SEC in Operation Choke Point. Indeed, a representative of the Office of the Comptroller of the Currency directly cautioned Zions Bank against doing business with broker-dealers generally, and specifically with the Hurrys' business Alpine Securities.

228.   The closure of the Zions Bank accounts has and will directly and substantially impair the Hurrys' business operations.

229.   On information and belief, other bank accounts for businesses associated with the Hurrys are being negatively impacted in ways similar to the Chase and Zions accounts.

230.   On information and belief, other banks, as a direct and proximate result of the Deal Pipeline articles, have refused to open accounts for businesses associated with the Hurrys or have announced their intent to terminate their customer relationship with those businesses based on perceived "reputational risk."

231.   As Defendants are well aware, maintaining bank accounts and banking relationships is essential to the Hurrys' livelihood and to the viability of each of the Business Plaintiffs and other businesses with which the Hurrys are affiliated. Unless Defendants' unlawful and tortious conduct is stopped, it is likely that the Hurrys will be unable to pursue their entrepreneurial activity

and the Business Plaintiffs will be forced to shut down. At a minimum, the Hurrys will be effectively barred from doing business in the securities industry despite no formal sanction from FINRA or the SEC dictating that result.

### FINRA Wrongfully Interferes with Plaintiff WD Clearing's Acquisition of the Broker-Dealer, Wilson Davis & Co. citing the Deal Pipeline Article

232.    The harm from the Deal Pipeline articles has not been limited to third parties. FINRA, itself, has cited one of the Deal Pipeline articles as a pretext for denying the Hurrys the right to purchase an interest in broker-dealer Wilson Davis & Co.

233.    On April 30, 2013, John Hurry entered into a Financing Agreement with Wilson-Davis & Co., Inc. ("Wilson Davis"), a closely held Utah corporation and securities broker/dealer headquartered in Salt Lake City, and its shareholders ("Wilson Davis Shareholders").

234.    Pursuant to the Financing Agreement, John Hurry lent to Wilson Davis the sum of four million dollars in exchange for (i) a Senior Promissory Note in the principal amount of four million dollars and (ii) an option to purchase one hundred percent of the issued and outstanding equity interests of Wilson Davis (the "Wilson Davis Option").

235.    Absent the loan from the Hurrys, Wilson Davis likely would have ceased operating as a going concern. FINRA received contemporaneous notice of the Financing Agreement and the Wilson Davis Option.

236.    On or about September 16, 2013, John Hurry assigned the Wilson Davis Option to WD Clearing, LLC, a company he formed and controlled, and to various independently controlled trusts formed to acquire ownership interest in Wilson Davis (collectively, the "Wilson Davis Buyers").

237.    On or about September 16, 2013, the Wilson Davis Buyers each exercised their respective rights under the Wilson Davis Option.

238.    On or about December 2, 2013, the Wilson Davis Buyers entered into a Securities Purchase Agreement ("Wilson Davis Purchase Agreement") with Wilson Davis and the Wilson Davis Shareholders to effectuate the transactions contemplated by the exercise of the Wilson Davis Option. Under the Wilson Davis Purchase Agreement, the Wilson Davis Buyers agreed to buy, and the Wilson Davis Shareholders agreed to sell, one hundred percent ownership interest in Wilson Davis. The parties to the transaction agreed that it would close on "the seventh business day of the first month subsequent to the passage of at least 30 days following the filing of a 'substantially complete' [Continuing Membership Application]" with FINRA.

239.    As of February 24, 2014, FINRA had received a "substantially complete" Continuing Membership Application requesting approval of the change in Wilson Davis's firm ownership.

240.    Despite receiving a substantially complete application, FINRA did not approve the change in ownership. Rather, FINRA, acting through agents Leyna Goro, Kathy Gurczynski, Joseph Sheirer, Domingo Diaz, and Jennifer Danby, imposed unjustified, arbitrary, and pretextual requirements upon the Wilson Davis Buyers and—in violation of its own rules—unlawfully directed Wilson Davis not to close the transaction with the Wilson Davis Buyers.

241.    Although FINRA requires advance notice in the form of a change in ownership, it does not require prior approval. NASD Rule 1017(c)(1) states that "[a] member may effect a change in ownership or control prior to the conclusion of the proceeding, but the Department may place new interim restrictions on the member based on the standards in Rule 1014, pending final

Department action." As FINRA advises in its Continuing Membership Guide, "[i]n the event of a denial, lapse or withdrawal of the application, the new owners (if the transaction has been consummated) may not conduct business."

242. On February 25, 2014, FINRA purported to impose "interim restrictions" prohibiting Wilson Davis from:

- "Effecting any portion of the . . . ownership change transaction, including unapproved individuals or entities acting in any capacity that would suggests that they are approved direct and/or indirect owners of the Firm"

- "Permitting any trustee, grantor, or beneficiary of the trusts – including, but not limited to, Mr. Hurry – to act in any principal, supervisory or control capacity."

243. According to FINRA, the interim restrictions on Wilson Davis "are based upon the fact that the Staff is in the process of reviewing the Firm's information to determine whether the Firm meets all of the Standards in Rule 1014, including, but not limited to, 1014(a)(1), (3), (7) and (13)."

244. FINRA justified its interim restrictions by noting specifically that it had concerns based on "an article relating to an investigation involving Scottsdale Capital and Alpine Securities, which are controlled by Mr. Hurry." On information and belief, the FINRA letter refers to the December 6, 2013, Deal Pipeline article by Meagher, which is based upon non-public, confidential, and misleading information secretly leaked by FINRA or the Individual Defendants.

245.    As a direct and proximate result of FINRA's interim restrictions, Wilson Davis refused to close the transaction with the Wilson Davis Buyers, resulting in separate litigation by the Wilson Davis Buyers seeking to enforce the agreed transaction ("Wilson Davis litigation").

246.    Moreover, when J.P. Morgan Private Bank terminated its banking relationship with the Hurrys, it also closed accounts for the several trusts that comprise the Wilson Davis Buyers. These account terminations, which were a direct and proximate result of FINRA's and the Individual Defendants' wrongful conduct, have directly and substantially impaired the Wilson Davis transaction.

### The Deal Pipeline Articles and Pretextual Investigation Conducted by FINRA and Individual Defendants Leads to Additional Harm to the Hurrys, the Business Plaintiffs, and Businesses Associated with the Hurrys

247.    As a direct and proximate result of improper and wrongful leaks to Bill Meagher and their subsequent and calculated publication in the Deal Pipeline articles, John Hurry has had prospective investments in businesses across various sectors hampered, delayed, or declined.

248.    SCA has been notified by at least one website catering to the OTC investment sector, where SCA has been a longtime advertiser, that the website will no longer accept SCA's advertisements. Based upon information and belief, the rejection of SCA as an advertiser is the direct and proximate result of the Operation Choke Point-like tactics employed by FINRA, including the pretextual examination conducted by FINRA and Individual Defendants and the improper and wrongful leaks of non-public, confidential, and misleading information targeting the Hurrys and published in the Deal Pipeline.

249.    As a direct and proximate result of the inappropriate disclosures to the press and FINRA's failure to investigate and curb these leaks, Plaintiffs have suffered substantial reputational harm and injury to existing and prospective business relationships.

***Continuing its Pattern of Ongoing Harm to the Hurrys, FINRA Issues Premature Wells Notice that Inexplicably Names John Hurry Individually Shortly After He Completes Majority of Filings Necessary to Establish Separate Self-Regulatory Organization and at the Eleventh Hour Before the Wilson Davis Closing***

250.    On August 31, 2014, John Hurry completed the majority of filings with the SEC necessary to advance his goal of establishing a separate self-regulated organization named "Association of Securities Dealers LLC" or "ASD," one of the plaintiffs in this action.

251.    On the morning of September 12, 2014, the Wilson Davis Buyers amended their complaint in the Wilson Davis litigation to include claims of securities fraud based on Wilson Davis' conduct related to the underlying transaction.

252.    Later that same day, on the afternoon of September 12, 2014, FINRA issued a Wells notice that named John Hurry individually. The notice was not related to FINRA Matter No. 20120327319 or any of the facts raised in this Complaint.  The Wells notice is the first reportable event against John Hurry under FINRA rules in his more than 20 years in the securities industry. The agents involved in issuing this Wells notice were Blake Snyder, Surveillance Director; Jason Foye, Examination Manager; Eli Renshaw, Regulatory Principal; Laura Leigh Blackston, Senior Regional Counsel; and Aimee Williams-Ramey, Regional Chief Counsel, Enforcement.

253.    The Wells notice that named John Hurry, among others, lacked merit.    Upon information and belief, the Wells Notice was a pretext by FINRA to block the Hurry family trust's purchase the following week of the broker-dealer Wilson Davis & Co.  The proximity of the Wells

Notice on September 12, 2014 and the projected closing date of September 16, 2014 for the sale of Wilson Davis strongly suggests the Wells Notice was a last minute tactic by FINRA and the Individual Defendants to prevent the sale. Indeed, in a dramatic departure from FINRA procedure, Defendants issued the Wells notice before collecting documents or deposing John Hurry.

254. On September 15, 2014, FINRA agents Domingo Diaz, Jennifer Danby, and Allissa Robinson engaged in a conversation with Mark O. Van Wagoner of Wilson Davis, and provided Mr. Van Wagoner with specific information regarding the Wells notice as to John Hurry, apparently deeming it appropriate to provide more notice to this third-party regarding FINRA's concerns than to John Hurry himself.

255. During the September 15, 2014, conversation between FINRA agents and a Wilson Davis representative, the FINRA agents specifically requested that Wilson Davis withdraw its pending application

256. On September 17, 2014, Wilson Davis gave into FINRA's coercive demand and withdrew the pending Continuing Membership Application.

257. On September 22, 2014, the judge in the Wilson Davis litigation issued an order granting a partial summary judgment in that case excusing Wilson Davis' performance of the transaction agreement with the Wilson Davis Buyers on the basis of FINRA's interference. The remaining claims in the Wilson Davis litigation are currently pending discovery. The Wilson Davis Buyers are also pursuing SEC review of FINRA's actions with regard to the Wilson Davis transaction. FINRA has taken the position that the SEC lacks jurisdiction to conduct such review.

# FIRST CAUSE OF ACTION

## Violation of 18 U.S.C. § 1030 (a)(2)(C)

258.    Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

259.    The ISC Computers were "protected" under the CFAA.

260.    Defendants accessed the ISC Computers intentionally.

261.    Defendants accessed the ISC Computers through coercion and deceit.

262.    Defendants accessed the ISC Computers without authorization, or, in the alternative, exceeded authorized access to them.

263.    As a result of the misconduct alleged herein, Plaintiffs suffered a loss of $5,000 or more.

264.    The misconduct alleged herein constitutes violations of 18 U.S.C. § 1030(a)(2)(C).

265.    The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

266.    No rule or statute under which FINRA operates purports to preempt the CFAA.

267.    Plaintiffs have suffered damage and loss through the cost of responding to the offenses, including conducting damage assessments and restoring data, programs, systems and or information to its condition prior to the offenses.

268.    Unless Defendants are enjoined from violating and continuing to violate 18 U.S.C. § 1030(a)(2)(C), Plaintiffs will continue to suffer irreparable injury.

269.    Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

270.     Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Violation of 18 U.S.C. § 1030(a)(5)(C)

271.     Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

272.     The ISC Computers were "protected" under the CFAA.

273.     Defendants accessed the ISC Computers intentionally.

274.     Defendants accessed the ISC Computers through coercion and deceit.

275.     Defendants accessed the ISC Computers without authorization.

276.     Defendants caused damage to the ISC Computers.

277.     As a direct and proximate result of Defendants' unauthorized access of the ISC Computers, Plaintiffs suffered a loss of $5,000 or more.

278.     The misconduct alleged herein constitutes violations of 18 U.S.C. § 1030(a)(5)(C).

279.     The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

280.     No rule or statute under which FINRA operates purports to preempt the CFAA.

281.     Plaintiffs have suffered damage and loss through the cost of responding to the offenses, including conducting damage assessments and restoring data, programs, systems and or information to its condition prior to the offenses.

282.     Unless Defendants are restrained and enjoined from violating and continuing to violate 18 U.S.C. § 1030(a)(5)(C), Plaintiffs will continue to suffer irreparable injury.

283.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

284.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Trespass Upon Chattel

285.   Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

286.   Defendants accessed the ISC computers through coercion and deceit.

287.   Defendants dispossessed Plaintiffs of the ISC Computers, including for a substantial period of time.

288.   Defendants impaired the ISC Computers.

289.   The misconduct alleged herein constitutes trespass upon chattel.

290.   The misconduct by Defendants bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

291.   As a direct and proximate result of Defendants' trespass upon chattel, Plaintiffs have suffered, and continue to suffer, irreparable injury.

292.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

293.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Intrusion Upon Seclusion

294.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

295.    Defendants, by engaging in the misconduct alleged herein, intruded upon the solitude and seclusion of the private affairs and concerns of Plaintiffs and those individuals and entities who have private, privileged, and proprietary information in Plaintiffs' custody.

296.    Defendants' intrusion was intentional.

297.    Defendants' intrusion would be highly offensive to a reasonable person.

298.    As a direct and proximate result of Defendants' intrusion upon seclusion, Plaintiffs have suffered, and continue to suffer, irreparable injury.

299.    Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

300.    Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Conversion

301.    Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

302.    Defendants have wrongfully and intentionally asserted dominion and control over the private, sensitive, personal, confidential, privileged, and proprietary information belonging to Plaintiffs in a manner that is inconsistent with Plaintiffs' ownership of the information.

303.    As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered, and continue to suffer, irreparable injury.

304.    Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

305.    Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Misappropriation of Trade Secrets

306.   Plaintiffs repeat and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

307.   Defendants, in seizing, accessing and copying the ISC Computers in their entirety, acquired one or more trade secrets of one or more persons.

308.   Defendants knew or had reason to know that the trade secrets were acquired by improper means.

309.   As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs have suffered, and continue to suffer, irreparable injury.

310.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

311.   Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Prima Facie Tort

312.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

313.   Defendants have intentionally caused injury to Plaintiffs.

314.   Defendants' conduct is culpable and not justifiable under the circumstances.

315.   As a direct and proximate result of misconduct alleged, Plaintiffs have suffered, and continue to suffer, irreparable injury.

316.   Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

317. Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Violation of Privacy Act - 5 U.S.C. § 552a

318. FINRA is an "agency" subject to the Privacy Act, 5 U.S.C. § 552a, as a government actor acting under color of law or, in the alternative, as a government contractor under 5 U.S.C. § 552a(m)(1).

319. Andersen, and the Individual Defendants are employees of an agency and are subject to the Privacy Act, 5 U.S.C. § 552a, as government actors acting under color of law or, in the alternative, pursuant to 5 U.S.C. § 552a(m)(1).

320. Andersen, and the Individual Defendants, by virtue of their employment or official position, have possession of or access to agency records which contain individually identifiable information the disclosure of which is prohibited by the Privacy Act.

321. On information and belief, Andersen, and the Individual Defendants, separately or in concert willfully disclosed agency records containing individually identifiable information to a person or agency not entitled to receive it.

322. As a direct and proximate result of the misconduct alleged, Plaintiffs have suffered and continue to suffer irreparable injury.

323. Plaintiffs have no adequate remedy at law and are entitled to injunctive relief.

324. Plaintiffs are entitled to an award of compensatory damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### Defamation and Defamation by Implication

325.     Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

326.     Defendants conspired to malign, harass, humiliate and injure Plaintiffs by making false statements to Meagher of the Deal Pipeline, statements intended for publication in the Deal Pipeline or for other public dissemination.

327.      Defendants falsely stated that John Hurry, Justine Hurry, and/or their businesses were engaged in money laundering.

328.     Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were under investigation by the FBI, and falsely implied they were the target of criminal investigations.

329.     Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were involved in a "pump-and-dump" scheme.

330.     Defendants falsely stated that John Hurry, Justine Hurry and/or businesses associated with the Hurrys allowed Biozoom shareholders to trade in violation of SCA policies and were provided special perks.

331.     Defendants falsely implied that John Hurry and/or Justine Hurry caused SCA to disregard so-called "red flags" regarding the Biozoom trades and failed to follow up.

332.     The false and malicious statements are attributable to FINRA and/or the Individual Defendants.

333.  The Deal Pipeline article dated September 17, 2013 cited "internal documents" obtained by Meagher.  Those documents could only have originated with FINRA and/or the Individual Defendants.

334.  When Meagher contacted SCA on December 3, 2013, neither SCA's outside regulatory counsel nor anyone associated with SCA, Alpine, or the Hurrys responded to Meagher's inquiries.

335.  The Deal Pipeline article dated December 6, 2015 made clear that the Deal Pipeline did not receive comments from anyone associated with SCA approached by Meagher.

336.  The Deal Pipeline article dated March 20, 2014 mentioned information that would only be known to FINRA, the SEC, and SCA. The SEC categorically denied disseminating such information to the press.

337.  The Deal Pipeline article dated April 16, 2014 disclosed non-public information regarding FINRA's onsite examination.  SCA's in-house made clear in an inquiry to FINRA that no one at SCA disclosed to the press the unannounced visit or the the documents FINRA examiners requested.

338.  Indeed, following internal inquiries by top leadership of SCA, Plaintiffs are satisfied that the leaks either did not or could not originate with SCA, Alpine, the Hurrys, or any other entity or individual associated with the Hurrys.

339.  The leaks are attributable to Defendants, who possess rare and intimate knowledge of the non-public and confidential information reflected in Meagher's damaging articles.

340.  Defendants made and continue to make these statements and omissions knowing that the statements were and are false; in the alternative, Defendants have acted and continue to

act in reckless disregard of the truth in making each of these defamatory statements; in the alternative, Defendants have been and continue to be negligent in failing to ascertain the truth of each of these defamatory statements before publishing them.

341. Defendants' defamatory statements were and are published or otherwise disseminated with evil motives and malice toward Plaintiffs, were and are intended and designed to injure and defame Plaintiffs, and did injure and defame and continue to injure and defame Plaintiffs.

342. Each defamatory statement, singularly or in combination, has impeached and continues to impeach the honesty and integrity of Plaintiffs, leaving their reputation severely damaged and subjecting them to scorn in the eyes of business associates, current and prospective clients, and the general public.

343. Some of Defendants' false and defamatory statements have imputed egregious conduct onto John Hurry.

344. Upon information and belief, Defendants continue to make defamatory statements to third parties in an effort to impair the Hurrys' business relationships, to force the Hurrys out of business, prevent the Hurrys from establishing new and competing businesses, and destroy the Hurrys' livelihood.

345. Many of these false and defamatory statements are made in a secretive manner that inhibits Plaintiffs' ability to discover and respond to the sum and substance of the statements until well after they are made.

346. Nothing in FINRA Rules permits the "leaking" of internal documents.

347. Defendants' wrongful conduct bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants. By reason of the false, libelous, and defamatory statements set forth in this Complaint, Plaintiffs have suffered damages and are entitled to an award of compensatory damages in an amount to be proven at trial.

348. Defendants' wrongful conduct was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## TENTH CAUSE OF ACTION

### Intentional Interference with Contract Relationship or Business Expectancy

349. John Hurry and his companies have or had a valid contract with Wilson Davis.

350. The Hurrys and Business Plaintiffs also have or had valid contracts with numerous banking institutions, including JP Morgan Private, Comerica, and Chase.

351. Defendants are and were aware of these contractual relationships.

352. Defendants intentionally interfered with the Wilson Davis contract by coercing Wilson Davis into withdrawing its continuing membership application and inducing Wilson Davis to breach the contract and resist the acquisition.

353. Defendants also intentionally interfered with the banking relationships of the Hurrys and Business Plaintiffs, causing the banks to terminate their business relationships with the Hurrys, Business Plaintiffs, and businesses associated with the Hurrys by knowingly, willfully, and intentionally increasing the Hurrys' "reputational risk" and improperly pressuring banking institutions to terminate or refuse banking relationships with the Hurrys, Business Plaintiffs, and businesses associated with the Hurrys.

354.   In an effort to force the Hurrys out of the microcap securities business, Defendants leaked non-public and confidential information to Meagher for publication in the Deal Pipeline.

355.   Upon information and belief, the dissemination of the non-public and confidential information was intended to inflict reputational harm upon the Hurrys and related businesses.

356.   Upon information and belief, Defendants sought to blemish the Hurrys and related businesses so that banks and other financial institutions would be unwilling to commence or maintain banking relationships.

357.   Upon information and belief, the Wells notice issued in September 2014 was further intended to harm the Hurrys' relationships with financial institutions by causing reputational harm.

358.   On July 16, 2015, Comerica Bank terminated its relationship with the Hurrys, further denying them and related businesses access to critical capital.

359.   Upon information and belief, this recent blow to the Hurrys underscores the efficacy of Defendants' campaign to interfere with the Hurrys' contractual relations as alleged herein.

360.   Defendants' have modeled their actions on the actions on the controversial and unlawful Operation Choke Point, in which government agencies sought to squeeze disfavored but legal companies out of business.

361.   Defendants' wrongful conduct bears no legitimate relationship to the regulatory functions and authority of FINRA and the Individual Defendants.

362.   Defendants' intentional acts and defamatory statements have resulted in a loss of beneficial economic relationships and actual profits to Plaintiffs.

363.   Plaintiffs have sustained damages as a direct and proximate result of Defendants' intentional business interference and are entitled to an award of compensatory damages in an amount to be proven at trial.

364.   Defendants' wrongful conduct was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

**ELEVENTH CAUSE OF ACTION**

**Public Disclosure of Private Facts**

365.   Plaintiffs repeat and incorporate herein by reference all prior allegations of this Complaint as if fully set forth herein.

366.   Defendants intentionally and wrongfully disclosed the private affairs and concerns of Plaintiffs.

367.   Defendants' disclosure of Plaintiffs' private affairs and concerns is highly offensive to Plaintiffs.

368.    Defendants' disclosure of Plaintiffs' private affairs and concerns would be highly offensive to a reasonable person.

369.   Defendants' disclosure of Plaintiffs private affairs and concerns also is not a matter of legitimate concern to the public.

370.   The wrongful disclosure of Plaintiffs' private affairs and concerns, for purposes of this claim, consists of Defendants' leaks to Meagher concerning the on-site examination of SCA on November 12, 2014 and related examinations under FINRA Matter no. 20120327319.

371.   Defendants' misconduct is highly offensive to any reasonable person in that the publicity Defendants gave to FINRA's examination of SCA cast a negative and injurious light on

-64-

Plaintiffs with respect investors, financial institutions and other critical audiences and relationships.

372.     FINRA's examination of SCA is not a matter of legitimate public concern, as evidenced by FINRA's own policies.  FINRA's policy is that examinations under FINRA Rule 8210 are non-public and confidential.  Stated differently, the public is not entitled to know.

373.     Examinations under Rule 8210 are routinely used to gain information regarding FINRA members or associated persons that are not the recipient of the 8210 Request.  In other words, a recipient of an 8210 Request may have done nothing wrong.

374.     As FINRA's 8210 letter explains, the examination "should not be construed as an indication that the Enforcement Department or the Department of Member Regulation or its staff has determined that any violations of federal securities laws or FINRA, NASD, NYSE or MSRB rules have occurred."

375.     After nearly three years, Plaintiffs are not the subject of any regulatory action arising out of FINRA Matter No. 20120327319.  Defendants' disclosure of such examinations, as alleged in this Complaint, has inflicted irrevocable harm.

376.     As a direct and proximate result of Defendants' disclosure of Plaintiffs' private affairs and concerns, Plaintiffs suffered mental anguish and economic harm.

377.      Plaintiffs have sustained damages as a direct and proximate result of Defendants' public disclosure of private facts and are entitled to an award of compensatory damages in an amount to be proven at trial.

378.     Defendants' wrongful conduct is and was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## TWELFTH CAUSE OF ACTION

### False Light

379.    Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

380.    Defendants intentionally and wrongfully gave publicity to matters concerning Plaintiffs that place Plaintiffs before the public in a false light and, thus, wrongfully invaded Plaintiffs' privacy.

381.    Defendants falsely stated that John Hurry, Justine Hurry, and/or their businesses were engaged in money laundering.

382.    Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were under investigation by the FBI, and falsely implied they were the target of criminal investigations.

383.    Defendants falsely stated that John Hurry, Justine Hurry, and/or businesses associated with the Hurrys were involved in a "pump-and-dump" scheme.

384.    Defendants falsely stated that John Hurry, Justine Hurry and/or businesses associated with the Hurrys allowed Biozoom shareholders to trade in violation of SCA policies and were provided special perks.

385.    Defendants falsely implied that John Hurry and/or Justine Hurry caused SCA to disregard so-called "red flags" regarding the Biozoom trades and failed to follow up.

386.    The false light in which Plaintiffs have been placed is highly offensive to Plaintiffs and would be highly offensive to a reasonable person.

387.    Defendants knew of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed as a result.

388.    Plaintiffs have sustained damages as a direct and proximate result of Defendants' giving publicity to matters concerning Plaintiffs that place Plaintiffs before the public in a false light and are entitled to an award of compensatory damages in an amount to be proven at trial.

389.    Defendants' wrongful conduct is and was guided by evil motives and/or by willful or wanton disregard of the rights of others, such that Plaintiffs are entitled to punitive damages.

## THIRTEENTH CAUSE OF ACTION

## Deprivation of Constitutional Rights – *Bivens*

390.    Plaintiffs repeat and incorporate by reference all prior allegations of this Complaint as if fully set forth herein.

391.    By wrongfully coercing access to the ISC Computers, subsequently ordering and/or personally reviewing the Extra-Jurisdictional Materials, and retaining access to the Extra-Jurisdictional Materials beyond any reasonable period, Andersen and the other Individual Defendants deprived Plaintiffs of rights secured by the Constitution of the United States, including the 1st, 4th, 5th, and 14th Amendments.

392.    Defendants Andersen, and the other Individual Defendants, and each of them were acting under color of federal law when they wrongfully coerced access to the ISC Computers, subsequently ordered and/or personally reviewed the Extra-Jurisdictional Materials, and unreasonably retained the Extra-Jurisdictional Materials without any independent authority or basis to do so.

393.    Acting under color of law, Andersen and Individual Defendants individually and personally conspired to coerce Plaintiffs not to serve or pursue their federal lawsuit or otherwise protect their proprietary and privacy interests by threatening to bring disciplinary action against Plaintiffs or their employees if they persisted.

394.    Plaintiffs have sustained damages as a direct and proximate result of Defendants' unconstitutional conduct and are entitled to an award of compensatory damages in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

## Conspiracy to Violate Civil Rights – 42 U.S.C. § 1985(2)

395.    Defendant Andersen conspired with Individual Defendants and one or more other persons to deter Plaintiffs from prosecuting their original complaint in this Court by intimidation and threats.

396.    Andersen and Individual Defendants intentionally accessed information on a protected computer under the CFAA in an effort to intimidate and deter the Hurrys, Plaintiff ISC, and the Business Plaintiffs from prosecuting their original complaint in this Court.

397.    Defendant Andersen further conspired with one or more of the Individual Defendants to disclose unlawfully protected information in violation of the Privacy Act and, in so doing, injured Plaintiffs and impaired Plaintiffs' property rights and livelihood—all on account of Plaintiffs having filed a lawsuit against Andersen and FINRA.

398.    Plaintiffs have sustained damages as a direct and proximate result of Defendants' wrongful conduct and are entitled to an award of compensatory damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

A.     For an injunction restraining and enjoining FINRA, Andersen, Individual Defendants, and all other persons or entities acting in concert with them, including but not limited to FINRA's employees, agents, representatives, subsidiaries, affiliates, and attorneys, from:

1.      continuing unlawfully to maintain possession of the ISC Computer data in its entirety, including the Extra-Jurisdictional Materials.

2.      failing to immediately return or certify the destruction of the ISC Computer data, including all Extra-Jurisdictional Materials.

3.      making any further review or use of the ISC Computer data, including all Extra-Jurisdictional Materials.

4.      disclosing or distributing the ISC Computer data, including any Extra-Jurisdictional Materials, either in whole or in part to any person or entity other than the Hurrys or Plaintiff ISC.

5.      further disclosure of information protected under the Privacy Act.

B.     Enjoining Andersen, the Individual Defendants, FINRA, its board officers, employees, and agents from implementing, applying, or taking any action whatsoever or applying informal pressure to banks to encourage them to refuse or terminate business relationships with the Hurrys, Business Plaintiffs, or any businesses associated with the Hurrys.

C.     Awarding actual damages in favor of Plaintiffs against Defendants in an amount to

be determined by the trier of fact.

D.     Awarding punitive damages in favor of Plaintiffs and against Defendants in an amount no less than $50 million.

E.     Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action.

F.     For such further relief the Court deems just and appropriate.

DATED this 28th day of August, 2015.

                                MANDEL YOUNG PLC

                                By: */s/ Taylor C. Young*
                                     Robert A. Mandel
                                     Taylor C. Young
                                     Peter A. Silverman
                                     3001 E. Camelback Rd., Suite 140
                                     Phoenix, Arizona 85016
                                     *Attorneys for Plaintiffs*

1

### CERTIFICATE OF SERVICE

The undersigned certifies that the original of the foregoing was transmitted this 28th day of August 2015 to the Office of the Clerk of the U.S. District Court using the CM/ECF System, which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants for this case.

George Brandon
Gregory A. Davis
Gregory S. Schneider
SQUIRE PATTON BOGGS (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
george.brandon@squirepb.com
gregory.davis@squirepb.com
gregory.schneider@squirepb.com
*Attorneys for Defendants*

_/s/ Erin Ford Faulhaber_____