# *EXHIBIT I*

13 CIV 4609

JUDGE BUCHWALD

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                             Plaintiff,

           v.

MAGDALENA TAVELLA,
ANDRES HORACIO FICICCHIA, GONZALO
GARCIA BLAYA, LUCIA MARIANA
HERNANDO, CECILIA DE LORENZO,
ADRIANA ROSA BAGATTIN,
DANIELA PATRICIA GOLDMAN,
MARIANO PABLO FERRARI,
MARIANO GRACIARENA, and
FERNANDO LOUREYRO,

                        Defendants.

Civil Action No.

Jury Trial Demanded



RECEIVED
JUL - 3 2013
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

1.    The Commission brings this civil law enforcement action against Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, and Mariano Pablo Ferrari (collectively, the "Selling Defendants") on an emergency basis to prevent millions of dollars of proceeds from unlawful sales of securities being transferred out of the country.  Over the past month, the Selling Defendants have sold almost $34 million worth of securities in Biozoom, Inc. ("Biozoom") (f/k/a Entertainment Art, Inc.), a penny stock company traded on the Over-the-Counter Bulletin Board ("OTCBB"), and

millions more shares are sitting in defendants' brokerage accounts and likely to be sold unlawfully to the public.   No registration statement was in effect for the Selling Defendants' resale of securities, thus their sales were in violation of Section 5 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e].   Further, almost $17 million of the Selling Defendants' ill-gotten proceeds have been transferred out of the United States.   Unless an asset freeze covering the Selling Defendants' Biozoom shares is issued, the unlawful sales of securities and transfer or dissipation of the proceeds from sales of the securities will likely continue.

2.       The Commission also brings this civil law enforcement action against Mariano Graciarena and Fernando Loureyro.   These defendants recently deposited over a total of approximately 4.4 million shares of Biozoom stock into their respective brokerage accounts.   Like the shares sold by the Selling Defendants, there is no registration statement in effect permitting the lawful resale of the Biozoom shares held by Graciarena and Loureyro.   Because Graciarena and Loureyro are likely to engage in the sale of securities in violation of Section 5 of the Securities Act, the Commission seeks to enjoin them from offering for resale their Biozoom shares until such time as a registration statement is filed and in effect.

3.       From March 2013 to June 2013, defendants opened brokerage accounts at broker-dealers and deposited millions of shares of Biozoom, Inc. (f/k/a Entertainment Art, Inc.) that they claimed did not bear a restrictive legend and were free-trading shares. All of the defendants claimed that they had purchased all or some of their shares from some of the original shareholders of Entertainment Art in transactions between November 2012 and March 2013.

2

4.      To bolster their claims, each of the defendants submitted stock purchase agreements dated between November 2012 and March 2013 that purportedly evidenced their purchase of Entertainment Art stock from the former Entertainment Art shareholders.  Based on these stock purchase agreements and other documentation, the defendants – between March 2013 and June 2013 – deposited a total of 20,130,000 shares of Biozoom into their brokerage accounts.

5.      The defendants could not, however, have purchased any of their shares from the original Entertainment Art shareholders as they claimed because those shareholders ceased to have any interest in the company on or around May 2009 –more than *three years* earlier than the defendants' claimed purchases.

6.      Almost immediately after defendants deposited shares of Biozoom in their brokerage accounts, Biozoom began issuing a series of press releases and a stock promotional campaign for the company began.  Following these press releases and stock promotional campaign, from May 16, 2013 to June 21, 2013, the company's stock price and volume increased dramatically.  For example, prior to May 16, 2013, no shares in Biozoom had traded.  However, from May 16, 2013 to June 21, 2013, Biozoom's stock price shot past $4 per share, with total volume of more than 87 million shares.

7.      During this same period, eight of the defendants sold millions of Biozoom shares into the rising market — reaping millions of dollars in proceeds as a result.  In total, over an approximately one month period from May 16, 2013 – June 17, 2013, eight of the defendants sold a total of over 14 million shares of Biozoom stock into the public markets for proceeds of almost $34 million.

8.      None of these sales were made pursuant to an effective registration statement.  By engaging in the foregoing conduct, the eight Selling Defendants violated the registration provisions of the federal securities laws, Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 15 U.S.C. §§ 77e(a) and 77e(c)].

9.      While the remaining two defendants – Graciarena and Loureyro – have yet to sell any of their Biozoom shares, they are likely to do so unless restrained.  They recently deposited millions of shares into their respective brokerage accounts, claiming (as the other defendants) that these shares have no restrictive legend and are available for resale to the public.  Therefore, the Commission seeks an order pursuant to Securities Act Section 20(b) [15 U.S.C. 77t(b)] to enjoin them from violations of Sections 5(a) and 5(c) of the Securities Act.

### JURISDICTION AND VENUE

10.     The SEC brings this action pursuant to Section 5 [15 U.S.C. § 77e] and Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)].  Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and 28 U.S.C. § 1331.

12.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v], because certain acts, practices, and courses of business constituting the violations alleged herein have occurred within the Southern District of New York.

13.     Defendants will, unless restrained and enjoined, continue to engage in the acts, practices, transactions, and courses of business alleged in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## THE DEFENDANTS

14.     Defendant Andres Horacio Ficicchia resides in Buenos Aires, Argentina and is an Argentine citizen.

15.     Defendant Gonzalo Garcia Blaya resides in Buenos Aires, Argentina, and is an Argentine citizen.

16.     Defendant Luciana Mariana Hernando resides in Buenos Aires, Argentina, and is an Argentine citizen.

17.     Defendant Cecilia De Lorenzo resides in Buenos Aires, Argentina, and is an Argentine citizen.

18.     Defendant Magdalena Tavella resides in Buenos Aires, Argentina, and is an Argentine citizen.

19.     Defendant Adriana Rosa Bagattin resides in Buenos Aires, Argentina, and is an Argentine citizen.

20.     Defendant Daniela Patricia Goldman resides in Buenos Aires, Argentina, and is an Argentine citizen.

21.     Defendant Mariano Pablo Ferrari resides in Buenos Aires, Argentina, and is an Argentine citizen.

22.     Defendant Mariano Graciarena resides in Buenos Aires, Argentina, and is an Argentine citizen.

23.     Defendant Fernando Loureyro resides in Buenos Aires, Argentina, and is an Argentine citizen.

## OTHER RELEVANT ENTITIES

24.     Biozoom, Inc. (f/k/a Entertainment Arts, Inc.) is a Nevada corporation with its principal place of business in Kassel, Germany.  Biozoom purports to be in the business of researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication. Biozoom's common stock is registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78l] and is quoted on the Over-the-Counter Bulletin Board ("OTCBB") under the trading symbol "BIZM."

25.     Legend Securities ("Legend") is a registered broker-dealer located in New York, New York.

26.     Scottsdale Capital Advisors ("Scottsdale") is a registered broker-dealer located in Phoenix, Arizona.

## FACTUAL BACKGROUND

**A.     The Creation of Entertainment Art and Initial Sale of Company**

27.     On June 15, 2007, Entertainment Art was incorporated under the laws of the state of Nevada.  In public filings, Entertainment Art represented that it was a developmental stage company formed to design, produce, and sell a line of leather bags, with offices located in West Hempstead, New York.  Entertainment Art was controlled by the three members of company management.

28.     From November 2007 through March 2008, Entertainment Art offered and sold a total of 610,000 shares to 34 different investors in private placement transactions.

A share certificate reflecting Entertainment Art share ownership was issued to each investor.

29.     On July 18, 2008, Entertainment Art filed a Form S-1 registration statement with the Commission to register the resale transactions for the 34 shareholders who acquired Entertainment Art stock in these private placements ("the Form S-1 Shareholders"). In particular, of the total 1,810,000 shares outstanding at the time of the Form S-1, Entertainment Art's S-1 covered 610,000, or approximately one-third, of the company's then outstanding shares.

30.     The remaining 1,200,000 shares of Entertainment Art stock were held by the three company officers in three identical 400,000 share blocks.

31.     On May 1, 2009, Entertainment Art announced, in a public filing with the Commission, that the three Entertainment Art officers sold their total 1,200,000 shares of Entertainment Art to Medford Financial Ltd. ("Medford Financial"), a Belizean entity, for a purchase price of $120,000.

32.     Contrary to this disclosure, however, Medford Financial purchased more than 1,200,000 shares of Entertainment Art. In fact, Medford Financial also purchased all of the 610,000 shares that had been purchased by the Form S-1 shareholders. Thus, in this transaction, Medford Financial purchased *all* of the outstanding shares, including the shares then held by the Form S-1 Shareholders.

33.     Each of the Form S-1 shareholders received their initial investment back, with an additional, small return on their investment. Thus, by on or around May 2009, each of the Form S-1 shareholders had no remaining shares or other interest in Entertainment Art.

34.     According to company filings, on June 30, 2009, Entertainment Art's board of directors approved the implementation of a 33:1 forward split for Entertainment Art stock without correspondingly increasing the authorized shares of common stock for Entertainment Art.  On July 21, 2009, the forward split became effective, and as a result of the forward split, the company had 59,730,000 shares of common stock outstanding – which was *all* owned by Medford Financial.

**B.     Another Sale of Entertainment Art and Acquisition of Biozoom Technology**

35.     On October 25, 2012, Entertainment Art reported, in a public filing with the Commission, that on October 19 Medford Financial sold 39,600,000 common shares of Entertainment Art in a private transaction with Le Mond Capital for a purchase price of $430,000, which equates to approximately $0.01 per share.

36.     Le Mond Capital purports to be a foreign entity based in the British Virgin Islands.  As a result of the sale, Entertainment Art disclosed that Le Mond Capital controlled over 66.3% of the Company's issued and outstanding common stock.

37.     However, on information and belief, Le Mond Capital purchased the *entire* company from Medford Financial – and all of 59,730,000 outstanding shares.

38.     The owner of Le Mond Capital, Sara Deutsch, became Entertainment Art's new President, Chief Executive Officer, Principal Executive Officer, Treasurer, Chief Financial Officer, Secretary, Treasurer, and Director.  On information and belief, Deutsch is a resident of Buenos Aires, Argentina.

39.     From September 2011 to at least October 2012, Deutsch worked as a manager of Magdalena's Party.  According to the business' website, Magdalena's Party is

a restaurant located in Buenos Aires, Argentina. According to another website describing Magdalena's Party, it is co-owned by Deutsch, defendant Magdalena Tavella, and others.

40. On March 12, 2013, Entertainment Art filed a Form 8-K with the Commission in which it announced a dramatic change in its business operations from a company that developed fashionable leather bags to a company that was involved in the biomedical industry. In particular, Entertainment Art announced a transaction pursuant to which its newly formed subsidiary, Biozoom Technologies, Inc., acquired certain patents, licenses, and related assets from each of three separate companies: Opsolution Spectroscopic Systems, Opsolution NanoPhotonics, and Opsolution GmBH, (the "Opsolution acquisition") in exchange for cash of $50,000 and 39 million shares of Entertainment Art common stock.

41. Entertainment Art described that, through Biozoom, it was now in the business of "researching, developing, and licensing technologies relating to the mobile remote collection of biomedical data as well as bilateral diagnostic communication."

42. Entertainment Art further disclosed that – as of immediately after closing of the Opsolution acquisition and filing of the Form 8-K – Deutsch would step down as CEO and Chief Financial Officer of Entertainment Art, but would stay on as a Director only.

43. As a result of the transaction, the 59,730,000 outstanding shares of Entertainment Art were allocated in the following manner. First, Le Mond Capital returned 39,000,000 shares to the company, and then those 39,000,000 shares were allocated – as shares bearing a restrictive legend – to four entities that were associated with the Opsolution entities.

44.     Thus, after these allocations, 20,730,000 shares of Entertainment Art remained.  Le Mond Capital retained 600,000 of these shares bearing a restrictive legend. The remaining 20,130,000 shares – which represented the total shares purchased by the Form S-1 Shareholders (and subsequently sold in the Medford Financial transaction on or around May 2009) – were unallocated.

45.     On April 1, 2013, Entertainment Art changed its name to Biozoom, under the trading symbol "BIZM" on the OTC Bulletin Board.

### C.     Defendants Deposit Biozoom Shares In Their Newly Opened Brokerage Accounts

46.     From January 2013 to May 2013, brokerage accounts were opened at Legend, a registered broker-dealer based in New York, in the name of four of the defendants:  Ficicchia, Blaya, Hernando, and De Lorenzo.

47.     In May 2013, brokerage accounts were opened at Scottsdale, a registered broker-dealer based in Phoenix, Arizona, in the name of another four defendants: Tavella, Bagattin, Goldman, and Ferrari.

48.     According to the account opening documentation – and as reflected in the table below – with one exception, none of the defendants worked in fields related to securities.

| Defendant | Profession |
|---|---|
| Ficicchia | Self-employed music producer |
| Blaya | Music producer-stock investments |
| Hernando | Marketing Manager |
| De Lorenzo | Self-employed marketing specialist |

| Defendant | Profession |
|---|---|
| Tavella | Attorney practicing administrative, political, intellectual property, and patent law |
| Bagattin | Retired Teacher |
| Ferrari | Sales and Marketing |
| Goldman | Delicatessen owner |

1.  Accounts at Legend

**Andres Horacio Ficicchia**

49.     Defendant Ficicchia opened his account at Legend on or about January 24, 2013 and funded the account with $26,000 cash.

50.     On November 30, 2012, Entertainment Art's transfer agent issued an Entertainment Art certificate for 165,000 shares to Ficicchia.

51.     On March 13, 2013, Entertainment Art's transfer agent issued an Entertainment Art certificate for 1,237,500 shares to Ficicchia.

52.     The certificate for 1,237,500 shares was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – the company approved the issuance of that certificate to Ficicchia.

53.     In order to deposit the certificate for 1,237,500 shares and the certificate of 165,000 shares of Entertainment Art into his brokerage account at Legend, defendant Ficicchia completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.

54.     The documentation reflected that Ficicchia acquired the 1,237,500 shares pursuant to two private sales that were completed on February 19, 2013: (1) a purchase of 412,500 shares from Investor A and (2) a purchase of 825,000 shares from Investor B. The documentation also reflected that Ficicchia paid a total of approximately $6,300 for these shares, which equals approximately $.005 per share.  For the following reasons, the documentation submitted by Ficicchia was false.

55.     Investor A was one of the Form S-1 shareholders who had sold his shares of Entertainment Art on or around May 2009 – almost four years before Ficicchia's claimed purchase of shares from Investor A.  Investor B was purportedly a shareholder that acquired its shares from some of the Form S-1 shareholders in 2011 – approximately two years after the Form S-1 shareholders actually sold their shares.

56.     The documentation further reflected that Defendant Ficicchia acquired the 165,000 shares pursuant to a private sale that was completed on November 30, 2012 with Investor C – shares that he acquired for $24,750, which equals $0.15 per share.  Investor C was also one of the Form S-1 Shareholders who had sold his shares of Entertainment Art on or around May 2009 – over three years before Ficicchia's claimed purchase of shares from Investor C.

57.     On March 5, 2013, Ficicchia deposited 165,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend; and then on March 27, 2013, Ficicchia deposited an additional 1,237,500 shares (again not bearing a restrictive legend) – for a total of 1,402,500 shares.

58.     On April 1, 2013, due to the name change of Entertainment Art to Biozoom, these shares became Biozoom shares.   Thus, defendant Ficicchia held

1,402,500 shares of Biozoom that were purportedly available to be sold on the public markets.

**Gonzalo Garcia Blaya**

59.     On or about March 26, 2013, defendant Blaya opened an account at Legend and funded this account with $26,000 cash.

60.     On March 22, 2013 – just four days prior to opening this account – Entertainment Art's transfer agent issued a certificate for 1,485,000 Entertainment Art shares to Blaya.

61.     In order to deposit his certificate for 1,485,000 shares of Entertainment Art into his brokerage account at Legend, defendant Blaya completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.  For the following reasons, the documentation submitted by Blaya was false.

62.     The documentation reflected that Blaya acquired the 1,485,000 shares in four separate private sales that were completed on March 4, 2013: (1) a purchase of 165,000 shares from Investor D; (2) a purchase of 495,000 shares from Investor E; (3) a purchase of 165,000 shares from Investor F; and (4) a purchase of 660,000 shares from Investor G.  The documentation also reflected that Blaya paid a total of approximately $6,765 for these shares, which equals approximately $.005 per share.

63.     Each of Investors D, E, F, and G were Form S-1 Shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before Blaya's claimed purchase of shares from these investors.

13

64.     On April 16, 2013, Blaya deposited 1,485,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Legend.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Blaya held 1,485,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Luciana Mariana Hernando**

65.     On or about March 7, 2013, defendant Hernando opened an account at Legend and funded the account with $50,000 cash.

66.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 1,815,000 Entertainment Art shares to Hernando.

67.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account at Legend, defendant Hernando completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.  For the following reasons, the documentation submitted by Hernando was false.

68.     The documentation reflected that Hernando acquired the 1,815,000 shares pursuant to two separate private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor H; and (2) a purchase of 165,000 shares from Investor I.  The documentation also reflected that Hernando paid a total of approximately $5,445 for these shares, which equals approximately $.003 per share.

69.     Both Investors H and I were Form S-1 shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before Hernando's claimed purchase of shares from these investors.

70.     On May 14, 2013, defendant Hernando deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend Securities.   As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Hernando held 1,815,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Cecilia De Lorenzo**

71.     On or about February 4, 2013, defendant De Lorenzo opened an account at Legend and funded the account with $50,000 cash.

72.     On March 13, 2013, Entertainment Art's transfer agent issued a certificate for 2,062,500 shares to De Lorenzo.

73.     The certificate was accompanied by a corporate certification stating that Deutsch certified – at a board meeting of Entertainment Art on March 22, 2013 – the company approved the issuance of the above certificate to De Lorenzo.

74.     In order to deposit her 2,062,500 shares of Entertainment Art into her brokerage account at Legend, De Lorenzo completed a "Deposit for Securities Request Certificate Questionnaire" that was required by Legend, and provided additional documentation.   For the following reasons, the documentation submitted by De Lorenzo was false.

75.     The documentation reflected that De Lorenzo acquired the 2,062,500 shares pursuant to two separate private sales that were completed on February 19, 2013 – the same day as the purported purchases of Entertainment Art stock by Ficicchia: (1) a purchase of 1,650,000 shares from Investor J; and (2) a purchase of 412,500 shares from

Investor K.  The documentation also reflected that Defendant De Lorenzo paid a total of approximately $8,300 for these shares, which equals approximately $.004 per share.

76.     Both Investors J and K, however, were Form S-1 shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before defendant De Lorenzo's claimed purchase of shares from these investors.

77.     On March 22, 2013, defendant De Lorenzo deposited 2,062,500 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Legend. As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant De Lorenzo held 2,062,500 shares of Biozoom that purportedly could be sold on the public markets.

  2.  Accounts at Scottsdale

**Magdalena Tavella**

78.     On March 22, 2013, Entertainment Art's stock transfer agent issued a certificate for 1,815,000 shares of Entertainment Art to Tavella.

79.     On or about May 16, 2013, defendant Tavella opened an account at Scottsdale.

80.     In order to deposit her 1,815,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Tavella, completed a securities deposit checklist.   For the following reasons, the documentation submitted by Tavella was false.

81.     The documentation reflected that Tavella acquired the 1,815,000 shares pursuant to three separate private sales that were completed on March 5, 2013 – the same day as the purported purchases of Entertainment Art by defendant Hernando: (1) a

purchase of 165,000 shares from Investor L; (2) a purchase of 165,000 shares from Investor M; and (3) a purchase of 1,485,000 shares from Investor N. The documentation reflected that Tavella paid a total of approximately $9,075 for these shares, which equals approximately $.006 per share.

82.     Investors L and M were two of the Form S-1 shareholders who had sold their shares of Entertainment Art on or around May 2009 – almost four years before Tavella's claimed purchase of shares from them.   Investor N was purportedly a shareholder that acquired its shares from some of the Form S-1 shareholders in March 2011 – almost two years after the Form S-1 shareholders sold their shares.

83.     On May 22, 2013, defendant Tavella deposited 1,815,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Tavella held 1,815,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Adriana Rosa Bagattin**

84.     On March 13, 2013, Entertainment Art's transfer agent issued a certificate for 2,310,000 Entertainment Art shares to defendant Bagattin.

85.     On or about May 10, 2013, defendant Bagattin opened an account at Scottsdale.

86.     In order to deposit her 2,310,000 shares of Entertainment Art into her brokerage account, Scottsdale, using information and documentation provided by Bagattin, completed a securities deposit checklist.   For the following reasons, the documentation submitted by Bagattin was false.

87.     The documentation reflected that Bagattin acquired the 2,310,000 shares pursuant to three private sales that were completed on February 26, 2013: (1) a purchase of 1,650,000 shares from Investor O; (2) a purchase of 330,000 shares from Investor P; and (3) a purchase of 330,000 shares from Investor Q. The documentation reflected that Defendant Bagattin paid approximately $6,930 for these shares, which equals approximately $.003 per share.

88.     Each of Investors O, P, and Q, however, were Form S-1 Shareholders who had sold their Entertainment Art shares on or around May 2009 – almost four years before defendant Bagattin's claimed purchase of shares from these persons.

89.     On May 22, 2013, Bagattin deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale. As a result of the business name change on April 1, 2013, these shares became Biozoom shares. Thus, defendant Bagattin held 2,310,000 shares of Biozoom that were purportedly available to be sold on the public markets.

**Daniela Patricia Goldman**

90.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 2,485,000 Entertainment Art shares to Goldman.

91.     On or about May 13, 2013, defendant Goldman opened an account at Scottsdale.

92.     In order to deposit her 2,485,000 shares of Entertainment Art into her brokerage account, Scottsdale, using documentation and information provided by Goldman, completed a securities deposit checklist. For the following reasons, the documentation submitted by Goldman was false.

93.     The documentation reflected that Goldman acquired the 2,485,000 shares pursuant to two private sales that were completed on March 4, 2013:  (1) a purchase of 1,485,000 shares from Investor R; and (2) a purchase of 1,000,000 shares from Investor S.  The documentation also reflected that Goldman paid approximately $7,455 for these shares, which equals approximately $.003 per share.

94.     Investor R purportedly obtained its shares from some of the Form S-1 Shareholders in March 2011 – almost two years after the Form S-1 shareholders sold their shares.  Investor S was one of the Form S-1 shareholders and sold his shares on or around May 2009 – almost four years before defendant Goldman's claimed purchase of shares from him.

95.     On May 22, 2013, Goldman deposited 2,485,000 shares of Entertainment Art not bearing a restrictive legend into her brokerage account at Scottsdale.  As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Goldman held 2,485,000 shares of Biozoom that were purportedly available for sale on the public markets.

**Mariano Pablo Ferrari**

96.     On March 22, 2013, Entertainment Art's transfer agent issued a certificate for 2,310,000 Entertainment Art shares to Ferrari.

97.     On or about May 20, 2013, Ferrari opened an account at Scottsdale.

98.     In order to deposit his 2,310,000 shares of Entertainment Art into his brokerage account, Scottsdale, using documentation and information provided by Ferrari, completed a securities deposit checklist.  For the following reasons, the documentation provided by Ferrari was false.

19

99.     The documentation reflected that Ferrari acquired the 2,310,000 shares pursuant to two private sales that were completed on March 5, 2013: (1) a purchase of 1,650,000 shares from Investor T; and (2) a purchase of 660,000 shares from Investor U. The documentation also reflected that Goldman paid approximately $9,240 for these shares, or approximately $.004 per share.

100.    Investor T was one of the Form S-1 shareholders and sold his shares on or around May 2009 – almost four years before defendant Ferrari's claimed purchase of shares from him.  Investor U purportedly obtained its shares from some of the Form S-1 shareholders in September 2009.

101.    On May 22, 2013, Ferrari deposited 2,310,000 shares of Entertainment Art not bearing a restrictive legend into his brokerage account at Scottsdale.   As a result of the business name change on April 1, 2013, these shares became Biozoom shares.  Thus, defendant Ferrari held 2,310,000 shares of Biozoom that were purportedly available for sale on the public markets.

**Two Other Accounts in Names of Defendants Graciarena and Loureyro**

102.    On March 22, 2013, Manhattan Transfer issued a certificate for 2,145,000 Entertainment Art shares to Graciarena and 2,300,000 Entertainment Art shares to Loureyro.   Graciarena and Loureyro submitted documentation reflecting that they had obtained their shares in the same manner as the other eight defendants – i.e. – by purportedly purchasing shares from the Form S-1 shareholders.

103.    On or about June 14, 2013, Fernando Loureyro and Mariano Graciarena opened separate accounts at Scottsdale.  Like the other eight defendants, both stated in brokerage firm documents that they resided in Buenos Aires, Argentina.

104.    On June 18, 2013, these shares were deposited in the brokerage accounts of these two individuals.  To date, none of these shares have been sold.

105.    In sum, from November 2012 to June 2013, the ten defendant accounts received a total of 20,130,000 shares of Entertainment Art.  These shares represented all of the shares that were unallocated after the Opsolution acquisition.  Moreover, these shares represented *100%* percent of the total shares without a restrictive legend outstanding in Biozoom at the time, and more than *33%* percent of the total outstanding shares of Biozoom.

**D.    Defendants Sell Millions of Biozoom Shares**

106.    Beginning on May 22, 2013 – and after nearly all of the defendants had deposited their Biozoom shares not bearing a restrictive legend in their accounts – Biozoom began issuing a series of press releases in which it claimed it "created the world's first portable, handheld consumer device" to instantly and non-invasively measure certain biomarkers.  These claims were also made by other entities, including Global Financial, Inc., Stock Preacher.com, among others.

107.    Following these positive claims concerning Biozoom's prospects, the accounts in the name of eight of the selling defendants sold substantial amounts of their Biozoom stock that did not bear a restrictive legend for massive proceeds.  In particular, and as reflected in the chart below, eight of the defendants sold 14,078,406 shares of BIZM stock for proceeds of $33,997,152.

| Defendant | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|---|---|---|---|---|
| Blaya | 1,312,053 | 5/16/13 – 6/13/13 | $3,014,965 | 172,947 |
| De Lorenzo | 1,328,000 | 6/17/13 – 6/18/13 | $4,809,836 | 734,500 |
| Hernando | 1,815,000 | 6/6/13 – 6/17/13 | $5,048,217 | 0 |

| Defendant | Shares Sold | Dates Sold | Proceeds | Shares Remaining |
|-----------|-------------|-----------|----------|------------------|
| Ficcichia | 1,402,500 | 5/20/13 – 6/5/13 | $1,979,389 | 272,620[1] |
| Tavella | 1,592,444 | 6/7/13 – 6/11/13 | $3,116,894 | 382,956[2] |
| Bagattin | 2,176,726 | 6/10/13 – 6/18/13 | $6,223,310 | 133,724 |
| Ferrari | 1,994,038 | 6/7/13 – 6/19/13 | $5,456,690 | 315,962 |
| Goldman | 2,457,645 | 5/28/13 – 6/6/13 | $3,771,761 | 27,355 |

108.     All of the eight selling defendants placed their orders to sell Biozoom

stock in the same manner – via e-mail and instant message to either Legend or Scottsdale.

109.     Upon selling shares in Biozoom, several of the defendants instructed their

brokerage firms to wire the proceeds of their sales to foreign bank accounts in various

countries:

- **Ficicchia**:  On June 7, 2013, defendant Ficicchia instructed Legend, to wire $1

    million to Alpine Securities, Inc., a registered clearing broker-dealer.  Alpine

    provides clearing services for Scottsdale, and as described earlier, Ficicchia

    opened an account at Scottsdale on or around June 10, 2013 and funded it with

    this $1 million.  On June 25, 2013 – the same day as the Commission's order

    suspending trading in Biozoom – Ficicchia instructed Scottsdale to wire $325,000

    to a bank account in Cyprus.  This wire was not executed.  Ficicchia's brokerage

    account at Legend currently has a cash balance of slightly over $1 million, and

    Ficicchia's brokerage account at Scottsdale currently has a cash balance of

    approximately $328,000.

---

[1]     On or around June 10, 2013, Ficicchia opened an account at Scottsdale and funded this account with $1 million from his account at Legend.  Ficicchia's "Shares Remaining" column reflects Biozoom purchases that he has made in his account at Scottsdale.

[2]     Tavella's "Shares Remaining" column includes 160,400 Biozoom shares that she purchased in the open market on June 19, 2013.

- **Blaya**:  On June 14, 2013, Blaya instructed Legend to wire "all settled funds except $30,000" to an account held in Geneva, Switzerland.  This wire was not executed.  This account currently has a cash balance of approximately $3.5 million.

- **Hernando**:  On June 13, 2013, Hernando instructed his broker-dealer, Legend, to wire "all available settled cash" in her account, which at the time, was approximately $600,000, to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus.  This wire was executed.  On June 17, 2013, Hernando instructed his broker-dealer, Legend, to wire $2 million, again to an account held at Hellenic Bank Public Company Limited in Lemesos, Cyprus. This wire was not executed by Legend.  This account has a cash balance of approximately $4.5 million.

- **De Lorenzo**:  De Lorenzo has not yet attempted to wire any money out of her account.  De Lorenzo has a bank account in Dar Es Salaam.  The account has a cash balance of approximately $4.8 million.

- **Tavella**:  On June 25, 2013 – the day of the Commission's order suspending trading in the securities of Biozoom – Tavella attempted to wire approximately $2,450,000 out of her account at Scottsdale to a bank account in St. Vincent and the Grenadines.  This wire has not been executed.  The current cash balance in Tavella's brokerage account is approximately $2.47 million.

- **Bagattin**:   On June 20, 2013, Bagattin instructed Scottsdale to wire approximately $4.33 million to a bank account in Cyprus.  This wire was executed.  On June 24, 2013, Bagattin instructed Scottsdale to send an additional

approximately $1.89 million to the same bank account.   This wire was also executed.  The current cash balance in Bagattin's brokerage account is $3,000.

- **Goldman:**   On June 11, 2013, Goldman instructed Scottsdale to wire approximately $3.77 million to an account held at a bank in Geneva, Switzerland – a bank where Blaya also holds an account.  This wire was executed.  The cash balance in Goldman's account is $0.

- **Ferrari:**  On June 19, 2013, Ferrari instructed Scottsdale to wire $500,000 to an account held at a bank in Panama.  This wire was executed.  On June 24, 2013, Ferrari instructed Scottsdale to wire an additional $4.9 million, this time to a bank in Belize.  This wire was also executed.  The cash balance in Ferrari's account is $0.

**F.**     **No Registration Statement Was In Effect At the Time Defendants Sold Biozoom Shares**

110.    Section 5 of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, using the U.S. mails or interstate commerce, unless such offer or sale is registered with the Commission.

111.    No registration statement was in effect for the shares sold by the Selling Defendants.

112.    No registration statement is in effect for the Biozoom shares held by defendants Graciarena and Loureyro.

**G.**     **Biozoom Is A Penny Stock As Defined By The Securities Exchange Act of 1934 ("Exchange Act")**

113.    Biozoom's stock is a "penny stock" as defined by the Exchange Act. At times relevant to this Complaint, the stock's shares traded at less than $5.00 per share. During the same time period, Biozoom's stock did not meet any of the exceptions to

penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.

114.    For example, the company's stock: (1) did not trade on a national securities exchange; (2) was not an "NMS stock," as defined in 17 C.F.R. § 242.242.600(b)(47); (3) did not have net tangible assets (i.e., total assets less intangible assets and liabilities) in excess of $5,000,000; and (4) did not have average revenue of at least $6,000,000 for the last three years.  (*See* Exchange Act, Rule 3a51-1(g).)

## COUNT I

### VIOLATION OF SECTION 5 OF THE SECURITIES ACT, 15 U.S.C. §77e

### (Defendants Tavella, Ficicchia, Blava, Hernando, De Lorenzo, Bagattin, Ferrari, Goldman)

115.    Paragraphs 1 through 114 are hereby re-alleged and incorporated by reference.

116.    Defendants, by engaging in the conduct described above, directly or indirectly, and without a registration statement in effect as to such securities:

> (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise; or
>
> (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale.

117.    Defendants, by engaging in the conduct described above, also directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or

medium of any prospectus or otherwise securities, without a registration statement having been filed as to those securities.

118.    By engaging in the foregoing conduct, Defendants directly or indirectly, violated, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

## INJUNCTION PURSUANT TO SECTION 20(b) OF THE SECURITIES ACT

### (Defendants Graciarena and Loureyro)

119.    Paragraphs 1 through 114 are re-alleged and incorporated by reference herein.

120.    Securities Act Section 20(b) provides that "whenever it shall appear to the Commission that any person is engaged in or is about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title, the Commission may in its discretion, bring an action in district court to enjoin such acts or practices . . ."

121.    Defendants Graciarena and Loureyro have deposited shares of Biozoom in their respective brokerage accounts.   Those shares do not bear a restrictive legend. However, no registration statement is in effect for the offer of sale of those shares.

122.    Unless restrained and enjoined, Graciarena and Loureyro are likely to offer or sell their Biozoom shares to the public in violation of Section 5 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court:

## I.

Issue findings of fact and conclusions of law that defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari committed the violations charged and alleged herein.

## II.

Enter an order temporarily restraining and enjoining defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, Ferrari, Graciarena, and Loureyro, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## III.

Enter an order freezing the brokerage accounts and any assets of defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari derived from the sale of Biozoom stock; and, freezing the brokerage accounts of defendants Graciarena and Loureyro holding Biozoom shares.

## IV.

Enter an order requiring defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari to return to the United States any proceeds from the sale of Biozoom stock that have been transferred abroad and those proceeds which are

returned be frozen in a domestic bank during the pendency of this action to preserve such assets for the satisfaction of disgorgement.

## V.

Enter an Order of Permanent Injunction restraining and enjoining defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, Ferrari, Graciarena, and Loureyro, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## VI.

Enter an Order requiring defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

## VII.

Issue an Order imposing upon defendants Ficicchia, Blaya, Hernando, De Lorenzo, Tavella, Goldman, Bagattin, and Ferrari appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)].

## VIII.

Issue an order permanently and unconditionally barring, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], the Selling Defendants from participating in an

offering of penny stock as defined by Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other relief as this Court deems appropriate.


Dated: July 3, 2013

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


By: _Richard E. Simpson_
Richard E. Simpson (RS5859)
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4420
SimpsonR@sec.gov


*Of counsel:*

David J. Gottesman
Patrick M. Bryan

Antonia Chion
Ricky Sachar
Deborah J. Tarasevich
Scott M. Lowry
Jennie B. Krasner
U.S. Securities and Exchange Commission
100 F Street, NE

Washington, DC 20549