# *EXHIBIT K*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                               :
SECURITIES AND EXCHANGE COMMISSION,            :
                                               :
                    Plaintiff,                 :
                                               :
              v.                               :      Civil Action No.
                                               :
MICHAEL A. AFFA,                               :
ANDREW J. AFFA,                                :   **JURY TRIAL DEMANDED**
MITCHELL H. BROWN,                             :
CHRISTOPHER R. PUTNAM, and                     :
CHRISTOPHER G. NIX,                            :
                                               :
                    Defendants.                :
_____:

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the

following against defendants Michael A. Affa ("Mike Affa"), Andrew J. Affa ("Andrew Affa"),

Mitchell H. Brown ("Brown"), Christopher R. Putnam ("Putnam") and Christopher G. "Gabe"

Nix ("Nix"), and collectively ("Defendants"):

**SUMMARY**

1.      Defendants engaged in a scheme to manipulate the stock price and trading of, and

to pump and dump, the publicly traded stock of Amogear Inc. ("Amogear") in a scheme that

began not later than August 2012 and continued through at least February 2014.  The planned

scheme involved artificially inflating the price of Amogear stock by, among other things, a)

issuing news releases and/or promotional materials containing false or exaggerated information,

b) generating mass emails containing false or exaggerated information, and c) engaging in

undisclosed coordinated trading of the stock, all designed to generate the appearance of demand

for the stock and to increase the price of the stock (the "pump"). The next stage of the scheme would be the sale of the stock at artificially high prices to unsuspecting investors (the "dump"). Unknown to the defendants, meeting and interacting with them in the scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded stock of Amogear was an individual cooperating with federal law enforcement authorities (the "CI") as well as undercover agents of the Federal Bureau of Investigation (the "FBI"). From on or about September 2013 through February 2014 an undercover agent of the FBI served as Amogear's Chief Executive Officer ("CEO") as part of the undercover operation ("undercover operation" or "undercover investigation").

2.       Amogear is a Nevada corporation based in Boston, Massachusetts. Amogear's stock is quoted under the ticker symbol "AMOG." Amogear was listed and could trade nationally on the over-the-counter ("OTC") securities markets. Amogear was acquired and controlled by the CI, who then worked in conjunction with the FBI in the undercover investigation. Amogear only existed as a shell company, which is a company that can serve as a vehicle for business transactions by other related companies or entities without itself having any real assets or operations. Amogear, which purportedly was a company that marketed, among other things, athletic wear and sports apparel, never had any real assets or operations, nor did it ever serve as a vehicle for business transactions by other related companies or entities. As a result, Amogear stock had no real trading history.

3.       Beginning on or before August 2012, defendants Nix and Putnam participated in discussions, planning and the implementing of a scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded stock of Amogear. At all relevant times, Nix was the owner of a promotional firm called Global Marketing Media LLC ("GMM"). GMM

owned and operated websites that tout, or aggressively promote, penny stocks. Penny stocks are common shares of stock, typically of small public companies, that trade at low prices per share. Putnam was a Senior Account Executive at GMM. As part of the scheme, Nix and Putnam planned, coordinated and participated in a touting campaign for Amogear stock knowing that the intent and purpose of the scheme was to pump the demand for and the price of the stock by, among other things, aggressively promoting the stock on websites; i.e., a touting campaign. Nix and Putnam knew that the touting campaign would include material misstatements and omissions about Amogear. Once the price of Amogear stock had been pumped, the next step in the scheme was to dump, or sell, Amogear stock at artificially inflated prices. Nix and Putnam then would receive a slice of the profits realized from the sales.

4.     Mike Affa and Andrew Affa became participants in the scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded stock of Amogear no later than September 6, 2013, and one or both of them recruited Brown into the scheme. In discussions with the CI, Mike Affa and Andrew Affa outlined the steps they would take, including a touting campaign that included material misstatements and omissions, to carry out the scheme. The CI, Mike Affa and Andrew Affa also discussed using rigged trades, or planned trades arranged by participants in the scheme in which the stock is bought and sold at artificially inflated prices, as part of the scheme.

5.     On or about January 23, 2014, Mike Affa directed a trade to create the false appearance of a market for Amogear stock. On January 23, 2014, there was a single executed trade during the day and it was for 10,000 shares at $.10 per share. Mike Affa was responsible for that planned trade in which the stock was bought and sold at an artificially inflated price.

6.      No later than January 29, 2014, Brown met with Andrew Affa and the CI in Boston, with Mike Affa participating by telephone. Brown, the Affas and the CI discussed arranging trades between accounts they controlled in order to increase Amogear's stock price before beginning a false touting campaign. The trades Brown, Mike Affa, Andrew Affa and the CI discussed were to be rigged trades, arranged by participants in the scheme in which Amogear stock would be bought and sold at artificially inflated prices. The participants agreed to trade among accounts they controlled to create a false appearance of market activity, with inflated prices, for Amogear stock. Brown and the CI, with Andrew Affa present, discussed the rigged trades and the plan to follow the trades with a touting campaign, which they also referred to as "media." Brown, the Affas and the CI discussed and understood that the touting campaign would include material misstatements and omissions about Amogear.

7.      In January and February 2014, the defendants discussed with each other and the CI and agreed that Monday, February 10, 2014 would be the date to start the pump of Amogear's stock. On or about February 9 and 10, 2014, GMM's websites and other websites associated with Andrew Affa, Mike Affa, and Brown released e-mail blasts, or mass emails, touting Amogear's stock. These e-mail blasts contained material misstatements and omissions.

8.      On or about February 10, 2014, before the defendants' touting campaign could artificially increase the volume of trading and the price Amogear's shares as intended, the Commission issued an order pursuant to Section 12(k) of the Securities Exchange Act of 1934 ("Exhange Act"), 15 U.S.C. § 78l(k), suspending trading in Amogear stock. The Commission acted to suspend trading in Amogear stock based on information obtained during the undercover investigation. The Commission acted in order to prevent innocent investors from trading into the

manipulative pump and dump scheme that had been planned and was in the process of being implemented by the defendants.

9.     Based on this conduct, the Commission seeks the following relief against the Defendants:  (i) entry of permanent injunctions prohibiting all Defendants from engaging in future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act of 1933 ("Securities Act") , 15 U.S.C. § 77q(a); (ii) an order requiring all Defendants to disgorge their ill-gotten gains and pay pre-judgment interest; (iii) an order requiring all Defendants to pay appropriate civil monetary penalties; and, (iv) an order barring all defendants from participating in any offering of penny stock, pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## AUTHORITY AND JURISDICTION

10.     The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].  The District of Massachusetts is the proper venue for this action under 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because many of the Defendants' acts and transactions constituting violations of the Exchange Act and the Securities Act took place in the District of Massachusetts.

12.     The Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mail, in connection with the acts, practices,

and course of business alleged herein.

### DEFENDANTS

13.     Michael A. Affa, 34, resides in Toms River, New Jersey.  Michael Affa is Andrew Affa's cousin.

14.     Andrew J. Affa, 30, resides in Huntington Station, New York.  Andrew Affa is Michael Affa's cousin.

15.     Mitchell H. Brown, 49, resides in Long Branch, New Jersey.

16.     Christopher R. Putnam, 37, resides in Charleston, South Carolina.

17.     Christopher G. Nix, 34, resides in Charleston, South Carolina.

### THE SCHEME TO MANIPULATE THE PRICE AND TRADING OF AND TO PUMP AND DUMP AMOGEAR STOCK

18.     Beginning or before August 2012, and continuing to at least February 2014, defendants Mike Affa, Andrew Affa, Brown, Putnam, and Nix planned and participated in a scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded stock of Amogear.  Amogear was a shell company that had been acquired and controlled by the CI, who subsequently acted in an undercover capacity in concert with special agents of the FBI. In August 2012 the CI held in his office the physical stock certificate for 40,000,000 restricted shares of Amogear stock.  Because the 40,000,000 shares of stock were restricted they could not readily be bought and sold.  The stock certificate for the shares had been issued in the name of an associate of the CI, but had been delivered to the CI's office by a transfer agent pursuant to the associate's instructions. The CI also held a convertible promissory note through a company he owned and controlled which was converted into 17,000,000 purportedly unrestricted shares of Amogear stock between March 19, 2012 and October 29, 2013.  Unrestricted shares of stock were able to be bought by and sold to investors in the marketplace.  As a result of these actions,

by October 29, 2013, the CI owned or otherwise controlled all but a few thousand shares of Amogear's purportedly unrestricted stock.

19.      In the summer of 2012, the CI engaged in discussions with, among others, defendants Nix and Putnam about pumping and dumping Amogear stock.  The CI knew Nix and Putnam prior to these discussions because of having worked with them on prior stock promotions. At all relevant times, Nix was the owner of the GMM, a promotional firm that owned and operated a number of websites that tout penny stocks, and Putnam was a Senior Account Executive at GMM.

### Nix and Putnam Travel to Boston to Discuss a Scheme to Manipulate the Price of Amogear Stock and to Pump and Dump Amogear Stock

20.      On or about August 27, 2012, Nix and Putnam traveled to Boston to discuss pumping and dumping Amogear stock with the CI and, unbeknownst to them, an undercover FBI special agent (the "undercover agent").  Nix and Putnam also were not aware that the meeting was secretly recorded by federal law enforcement agents.  During the meeting, Nix and Putnam participated in discussions about, among other things, plans to artificially increase, or pump, the price of Amogear stock using news releases and other promotional materials.  At the meeting, the CI presented Nix and Putnam with Amogear's shareholder list, as well as physical stock certificates, and informed them that he controlled virtually all of Amogear's stock.   Nix and Putnam also were told, and understood, that Amogear had no operations.  When Nix asked, "[Y]ou know, what's the plan for the actual company," Putnam stated, "[W]ho gives a f*** about the actual company," and the CI referred to a cardboard box in the corner of the office where they were meeting and said, "[T]hat's it [the company] right now."

21.      At the meeting the group discussed hiring traders to engage in "bid support," which is the practice of posting bids for a particular stock in order to create a false appearance of

7

demand.  The group also discussed steps to conceal their scheme to illegally pump and dump Amogear stock.  During the conversation, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, Putnam suggested that the members of the group purchase "throw-away phones" to communicate about the scheme.  The throw-away phones were to be pre-paid cellular telephones that could be registered in false names or without a name associated with them.  Nix, Putnam and the CI agreed to purchase the telephones and only to speak about the pump and dump scheme on those pre-paid cellular telephones.

22.     At some point after the August 2012 meeting, the plan to pump and dump Amogear stock was delayed when the individual who was going to coordinate the actual trading of the stock backed out of the plan.

23.     Nix and Putnam stayed in contact with the CI and by the fall of 2013 revived plans to pump and dump Amogear stock.  On or about September 30, 2013, the CI and Putnam spoke by telephone and discussed the profit Nix and Putnam could realize by participating in a touting campaign for Amogear, telling him that he and Nix would receive five percent of the proceeds from the sale of Amogear's stock in exchange for promoting the stock on their websites.  The CI also informed Putnam that another individual and his associates had become participants in the scheme.  The conversation, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, included the following exchange:

CI:                     So there's 17 million shares.  We're going to take all the shares and
                        place them in one place so it's all orderly.  . . .  what I'm saying is
                        that we're going to give you guys 5% of 17 million shares which
                        comes out to be just under a million shares.  The only thing I'm
                        asking for is that you basically stay on it for a week and you don't
                        do any other deals and you bring some of the other guys into it and
                        maybe . . . the epics and those guys, you bring them on board.

Putnam:              I can do that.

8

24.     On or about October 10, 2013, Nix spoke with the CI by telephone about Amogear.  Federal law enforcement agents secretly recorded the conversation as part of an undercover investigation.  The CI discussed with Nix the fact that Amogear still had no operations or products, as follows:

> CI:     Like in the beginning, I was hoping that we'd get financing, go out and do product and everything, but I mean the money's just not there to do it.  So essentially it's going to be a stock deal. . .

> Nix:    Okay, well, that's what I was going to say, maybe that could be part of what we bring to the table too is just put together, even though, I mean there's really no product, let's say, right now, you know a marketing approach, some landing pages, higher quality website…

25.     In the October 10, 2013 telephone call the CI also discussed with Nix that the purpose of a touting campaign for Amogear would be to dump Amogear stock in the market at artificially inflated prices and give Nix and Putnam a slice of the profits realized from the manipulation scheme.  Specifically, the CI again told Nix that he and Putnam would receive five percent of the proceeds from the sale of Amogear's stock in exchange for promoting the stock on their websites.  The call, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, included the following exchange:

> CI:     We've got 17 million shares of stock.  I would like to ideally, you know, sell the stock at somewhere in the ballpark of 20 cents on all 17 million shares and bring in 3 and 1/2 million dollars, somewhere in that ballpark, and would be happy to… you know I talked with Chris about giving you guys 10% of the deal… actually 5% I think I told him.  And I think it'd be an opportunity for you guys to make 150, 200 thousand dollars over the course of a couple weeks' time.

> Nix:    Yeah, sounds good. . .

26.     Nix and Putnam agreed to participate in the scheme to manipulate the price of Amogear stock and to pump and dump Amogear stock by promoting Amogear on GMM's

websites.  In fact, Putnam implored the CI to allow GMM's website to be the first to promote

Amogear, stating: "Please let us be first."  The CI told them they would be.

### Andrew Affa and Mike Affa Fly to Boston to Discuss the Scheme to Manipulate the Price of Amogear Stock and to Pump and Dump Amogear Stock

27.     On or about September 6, 2013, defendants Andrew Affa and Mike Affa flew to

Boston and met with the CI and a third individual who, unknown to Andrew Affa and Mike

Affa, was a special agent of the FBI working in an undercover capacity.   From on or about

September 2013 through February 2014 the undercover agent served as Amogear's Chief

Executive Officer ("CEO") as part of an undercover operation.   The meeting was secretly

recorded by federal law enforcement agents as part of an undercover investigation.  Among other

things, the group discussed the fact that Amogear did not have any legitimate business

operations.  The group also discussed plans to tout, or aggressively promote, Amogear's stock.

28.     A purpose of the meeting was to discuss whether the CI controlled enough of the

outstanding Amogear stock to make a manipulation of the stock possible.   During the meeting,

the CI handed a shareholders list to Mike Affa and stated:

> So there's the shareholders list. . . . there's 42 million shares out there.  I've got, the
> restricted cert for 40 million, I've got it in my desk. . . .one, which is 2.2 million, I have
> that right here, a copy of it, the cert's in my desk . . .  if you take a look at that
> shareholders list, you can take it home with you, there's 2,000 shares against us - 2,000.

Mike Affa replied, "2,000, this is as clean of a deal as you can get, obviously."  The CI further

explained that there was a note that could be converted into approximately 15 million additional

shares.  Mike Affa then placed a call to Titan International Securities Inc. ("Titan"), a Belize-

based brokerage firm with accounts at various U.S. registered broker-dealers, and confirmed that

physical stock certificates for the additional 15 million shares should be put in the names of three

foreign entities.

29.     Having confirmed that entities controlled by the CI and Mike Affa would control almost all of the stock of Amogear and that their shares would be traded by Titan, Mike Affa asked the CI about Amogear, which purportedly was a company that marketed, among other things, athletic wear.  In the meeting, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, Mike Affa asked: "Isn't there a company or not really?"  The CI pointed to a cardboard box in the corner of the CI's office and said: "No. There's the company right there."  The participants laughed and Mike Affa joked about someone placing an order for a T-shirt and their response being: "We've got two mediums left.  What do you want?"  Mike Affa, Andrew Affa and the CI then discussed touting Amogear's stock with false news about the company and profiting by dumping their overpriced shares into the market.

### Mike Affa Executes a Trade for the Purpose of Creating the Appearance of a False Market in Amogear Stock

30.     Following the September 6, 2013 meeting, the CI assigned the convertible promissory note held by the CI's company to three foreign entities that Mike Affa designated: Backwoods Ventures Inc., Partners Consultants Inc., and Chateau Properties Limited.  The notes were then converted into approximately 15 million shares (about 4.9 million shares apiece), and physical stock certificates for purportedly unrestricted shares were issued to each of the three entities.  The physical stock certificates were delivered to Titan.

31.     The lack of historical trading in Amogear's stock created appearance issues, and, as a result, Titan only transferred 4,920,000 shares of Amogear stock to Titan's account at Alpine Securities ("Alpine"), a broker-dealer registered with the Commission since 1984.  Titan waited until January 14, 2014 to do so.  Titan then informed Mike Affa that they could not trade Amogear's stock until a market was observed for it.  Because there had been no trading in Amogear's stock for years, there was no market to observe.  Mike Affa took steps to create the

11

appearance of an active market for Amogear stock.

32.     In order to create the appearance of an active market for Amogear stock, on January 23, 2014, Mike Affa arranged for there to be a trade in Amogear stock.  On January 23, 2014 there was a single executed trade during the day and it was for 10,000 shares of Amogear stock at $.10 per share.  Mike Affa caused that trade to happen.

33.     Shortly after causing the trade to be completed, Mike Affa called the CI and reported on his activities.  The call, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, included the following exchange:

| | |
|---|---|
| Mike Affa: | Obviously you saw that, right? |
| CI: | What's that? |
| Mike Affa: | Printed at 10. |
| CI: | Oh, I didn't see it, when did you do it, today? |
| Mike Affa: | Yeah, probably an hour ago I just called the guy.  I think I told him to do it at a nickel, but he did it at 10, so whatever. |
| CI: | How many shares did he do? |
| Mike Affa: | 10K at 10. |

34.     Mike Affa's efforts to create the appearance of a market for Amogear stock by causing the January 23, 2014 trade were successful and on January 28, 2014, after the trade had cleared, 3.4 million shares of Amogear stock held at Alpine were transferred out of physical certificate form and readied for trading.  The transfer made the shares of Amogear stock available to be used in the scheme to manipulate the stock price and trading of, and to pump and dump, the publicly traded stock of Amogear.

**Mitchell Brown Travels to Boston to Participate in the Scheme to Manipulate the Price and Trading of Amogear Stock and to Pump and Dump Amogear Stock**

35.     With millions of shares of Amogear's stock now cleared to trade, another meeting was held in Boston on January 29, 2014 to discuss the next phase of the scheme. This time, Andrew Affa and Brown flew to Boston to meet with the CI and the undercover agent. This was Brown's first meeting with the CI. Mike Affa was not present in Boston but called in for part of the meeting. The meeting was secretly recorded by federal law enforcement agents as part of an undercover investigation. The CI explained various aspects of the manipulation scheme, telling Brown and the others, "there's literally 2,000 shares against us" and "there's like 3.9 million or something like that . . . that's cleared . . . at Alpine." The CI also told Brown that the company had no operations. Brown understood that Amogear was a sham company, stating, "so that box is really the whole company."

36.     Andrew Affa, Brown, Mike Affa and the CI then discussed performing arranged trades to increase Amogear's stock price before the touting campaign began. The trades they discussed were to be rigged trades between participants in the scheme to manipulate Amogear's stock price in which the participants would trade with and among accounts they controlled to create the appearance of a false market, with inflated prices, for Amogear stock. Brown and the CI, with Andrew Affa present, discussed the "cross trades" and the plan to follow the trades with false touting, or "media." The discussion, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, included the following exchange:

| | |
|---|---|
| Mitch Brown: | We're going to walk it up . . . |
| CI: | I think we do the next cross at maybe 11 or 12 cents… |
| Mitch Brown: | Every other penny, so you do the 10, you do the 12, you do the 14, you do the 16, all the way to 20 . . . 5 prints... |

CI:                    …and then we drop the media.

Shortly after this exchange between Brown and the CI, Mike Affa joined the conversation by

telephone.  Andrew Affa summarized the plans being discussed as follows:

> Mike, as far as price, we were talking about you know before starting the campaign,
> walking it up to 20, starting from there, using our data and some in-house data and kind
> of bringing it up to hopefully about 30 and building some momentum there, you're good
> with that, right?

Mike Affa replied:  "That's fine with me…"

37.    Andrew Affa, Brown, Mike Affa and the CI also discussed the press releases that

would be released by Amogear as part of the manipulation scheme, including the specific content

of Amogear's press releases and the order in which they would be released.  Brown stated that he

would provide $350,000 to finance the touting campaign for Amogear that would be part of the

manipulation scheme.  Andrew Affa, Mike Affa and the CI agreed with Brown's proposal for the

touting campaign.

38.    During the discussion, Mike Affa suggested that they start the promotion on their

websites and discussed the order in which press releases and other information would be released

and publicized, which involved coordination among a number of participants and various

websites, stating:

> Then, not in order, but he goes, Circle is going, Fernando goes, Beacon goes, Market
> Authority goes, Parlay goes . . . then we'll really be . . . reaching, but you know, we'll get
> some guys.

39.    Andrew Affa, Brown, Mike Affa and the CI also discussed during the meeting the

profit they expected to make when they dumped their overpriced shares of Amogear stock on the

market.

### The Attempted "Pump" of Amogear's Stock

40.     The defendants discussed with each other and the CI and agreed that Monday, February 10, 2014 would be the date to start the pump of Amogear's stock.  On February 6, 2014, Brown sent $30,000 via a wire transfer to A&A Capital LLC, an entity controlled by Andrew Affa, as partial funding for the marketing component of the scheme; i.e., the touting campaign.

41.     Mike Affa told the CI that he would try to raise Amogear's stock price from about $.10 per share to $.12 per share on Friday, February 7, 2014, stating in a discussion which was secretly recorded by federal law enforcement agents as part of an undercover investigation: "we'll try to trade it at $.12 today."   Affa then arranged for 25,000 shares of Amogear stock to be sold from Titan's account at Alpine at $.1182 per share later in the day on February 7, 2014.

42.     On or about February 9 and 10, 2014, GMM's websites and other websites associated with Andrew Affa, Mike Affa, and Brown released e-mail blasts to a wide variety of recipients, including potential investors, touting Amogear's stock.  These e-mail blasts contained material misstatements and omissions.  At the time of the e-mail blasts, which signaled the start of the touting campaign, Amogear had no operations and consisted of a single box of sample clothing items sitting in the corner of an office.   The touting campaign, with serial material misstatements and omissions, was designed to create the illusion that Amogear was, instead, a real company, with real business operations, and real prospects.

43.     GMM's websites used in the false touting campaign included: TheStockScout.com, PennyStockPlayers.net, PennyStockCircle.com, PennyStockPros.net, 123StockAlerts.com, and StockMarketQuote.us.  Nix and Putnam orchestrated the dissemination

of emails about Amogear using these websites knowing that it was part of the scheme to fraudulently inflate the price of Amogear stock and to create the appearance of a false market in the stock. Among the material misstatements and omissions communicated on these websites were the following:

- Amogear is focused on providing sports and training apparel for the world-wide mixed martial arts (MMA) audience as well as for other custom athletic sports fans.

- Amogear is working to design and develop sports apparel prototypes for MMA, boxing, as well as other custom athletic consumers. AMOG's prototypes are further developed into a product line and are classified into three categories - training, competition, and lifestyle. The company is focused on marketing and distributing their product line in order to build brand recognition within the MMA and boxing sports apparel industries.

- Amogear could quickly become a force to be reckoned with in the MMA industry!

44. Mike Affa, Andrew Affa and Brown used a number of websites they controlled or influenced in the false touting campaign. Among the websites controlled or influenced by Mike Affa, Andrew Affa and Brown that were used in the false touting campaign were RisingPennyStocks.com, PennyStockPickAlert.com and SixFigureStockPicks.com. Mike Affa, Andrew Affa and Brown orchestrated the dissemination of emails about Amogear using these websites knowing that it was part of the scheme to fraudulently inflate the price of Amogear stock and to create the appearance of a false market in the stock. Among the material misstatements and omissions communicated on these websites were the following:

16

- Amogear designs and develops sports apparel for mixed martial arts (MMA), similar fighting styles, and other custom athletic sports. It provides training, competition, lifestyle/sportswear, and equipment products. The company's training products include synthetic fabrications geared toward athletic pursuits, such as rash guard training tops in short sleeve and long sleeves, and polyester training shorts. Its competition products comprise shorts made from recycled polyester, MMA fight gloves, boxing gloves, and polyester boxing shorts. The company's lifestyle/sportswear products consist of graphic tee shirts in tank, short sleeves, and long sleeve; hoody's in full zip and pullover; rayon tee shirts; and fitted hats. Its equipment products include gym bags and backpacks.

- Boston-based Amogear has already designed and has an entire MMA line on the market ready to sell!  Currently, Amogear has three categories in its MMA line: training, competition, and lifestyle.

45.     On all of these websites it was falsely stated in disclaimers that those promoting and touting the Amogear stock on the websites expected to be compensated in cash in connection with their promotion of Amogear.  In reality, all compensation would be from the proceeds from the sale of Amogear stock.  All of GMM's websites stated in disclaimers: "[website name] is owned and operated by Global Marketing Media LLC.  Global Marketing Media, LLC expects to receive up to one hundred thousand dollars cash compensation for a one week marketing and promotional effort on AMOG."

46.     While the disclaimers on the Affa/Brown websites varied somewhat, all of them falsely stated that they expected cash compensation as well, and many stated: "[website name] expects to be compensated fifteen thousand dollars for a one day public awareness marketing

campaign for AMOG by a third party non affiliate of the company." OTCRockstar.com, a
website over which Mike and Andrew Affa claimed exclusive ownership, falsely stated in its
disclaimer: "OTCROCKSTAR.com's officers and directors do not own any shares of the
mentioned company(s)."

47.     On or about February 10, 2014, before the defendants' touting campaign could
artificially increase the price and trading volume of Amogear's shares as intended, the
Commission issued an order pursuant to Section 12(k) of the Exchange Act, 15 U.S.C. § 78l(k),
suspending trading in Amogear stock. The Commission acted to suspend trading in Amogear
stock based on information obtained during the undercover investigation and to prevent innocent
investors from trading into the manipulative pump and dump scheme planned and being
implemented by the defendants.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

(Against All Defendants)

48.     The Commission realleges and incorporates by reference each and every
allegation contained in paragraphs 1 through 47 above as if set forth fully herein.

49.     From at least August 2012 through February 2014, the Defendants, directly and
indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in
connection with the purchase or sale of securities, knowingly, willfully and recklessly a)
employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and
courses of business which operated and which would operate as a fraud or deceit upon certain
persons.

50.     By reason of the foregoing, defendants Michael A. Affa, Andrew J. Affa, Mitchell

18

H. Brown, Christopher R. Putnam and Christopher G. Nix, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1) and (3) of the Securities Act

(Against All Defendants)

51.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 47 above as if set forth fully herein.

52.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

53.    By engaging in the conduct described above, defendants Michael A. Affa, Andrew J. Affa, Mitchell H. Brown, Christopher R. Putnam and Christopher G. Nix, singly or in concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act , 15 U.S.C. § 77q(a)(1) and (3).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment that:

### I.

Permanently enjoins defendants Michael A. Affa, Andrew J. Affa, Mitchell H. Brown, Christopher R. Putnam and Christopher G. Nix, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the

19

injunction by personal service or otherwise, and each of them, from future violations of Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.

Permanently enjoins defendants Michael A. Affa, Andrew J. Affa, Mitchell H. Brown,

Christopher R. Putnam and Christopher G. Nix, their agents, servants, employees, attorneys, and

all persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from future violations of Section

17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## III.

Orders Michael A. Affa, Andrew J. Affa, Mitchell H. Brown, Christopher R. Putnam and

Christopher G. Nix to pay civil money penalties pursuant to Section 20(d) of the Securities Act

[15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## IV.

Orders and requires Michael A. Affa, Andrew J. Affa, Mitchell H. Brown, Christopher R.

Putnam and Christopher G. Nix to disgorge their ill-gotten gains and losses avoided, plus pre-

judgment interest, with said monies to be distributed in accordance with a plan of distribution to

be ordered by the Court.

## V.

Issues an Order barring Michael A. Affa, Andrew J. Affa, Mitchell H. Brown,

Christopher R. Putnam and Christopher G. Nix from participating in any offering of penny stock,

pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VI.

Retains jurisdiction over this action to implement and carry out the terms of all orders

and decrees that may be entered.

## VII.

Grants such other and further relief as the Court may deem just and proper.

### JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated:  Boston, Massachusetts
       July 11, 2014


On behalf of the Commission,


\_\_\_\_\_//s// Martin F. Healey_____
Martin F. Healey (MA BBO No. 227550)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8952 (Healey)
HealeyM@sec.gov