**QUARLES & BRADLEY LLP**
C. Bradley Vynalek (#020051)
Lauren Elliott Stine (#025083)
Kyle T. Orne (#032438)
Renaissance One Two North Central Ave.
Phoenix, AZ 85004-2391
Tel: (602)229-5261
brad.vynalek@quarles.com
lauren.stine@quarles.com
kyle.orne@quarles.com

**JASSY VICK CAROLAN LLP**
Duffy Carolan (Cal. Bar. No. 154988) (*Pro Hac Vice*)
601 Montgomery Street, Suite 850
San Francisco, California 94111
Tel: (415) 539-3399
dcarolan@jassyvick.com

Jean-Paul Jassy (Cal. Bar No. 205513) (*Pro Hac Vice*)
Kevin L. Vick (Cal. Bar No. 220738) (*Pro Hac Vice*)
800 Wilshire Blvd., Suite 800
Los Angeles, California 90017
Tel: (310) 870-7048
jpjassy@jassyvick.com
kvick@jassyvick.com

Attorneys for Defendants
S&P Global Inc., S&P Global Market Intelligence Inc.,
Kiah Lau Haslet and Zack Fox

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Justine Hurry, an individual; Scottsdale Capita Advisors Corp., an Arizona corporation,<br><br>Plaintiffs,<br><br>v.<br><br>S&P Global, Inc., a New York corporation; S&P Global Market Intelligence, Inc., a New York corporation; Kiah Lau Haslett, an individual; Zach Fox, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-cv-01105-PHX-JAT<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

Defendants S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Haslett, and Zach Fox (collectively "S&P Global") hereby submits this reply memorandum in support of their Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint (Dkt. 8).

## I.     INTRODUCTION

Faced with their own regulatory history and judicial admissions, Plaintiffs' defamation claims and second false light statement devolve into minor distinctions as between an order entered on consent of the parties and a contested ruling, and whether Ms. Hurry owns or controls two or three companies whose clients have been the subject of enforcement actions. Substantial truth and the fair report privilege, which exist to provide breathing space for speech, do not and cannot turn on such thin, technical inaccuracies. Nor should the Court wait to resolve these claims where official records of Plaintiffs' own making—that are properly subject to judicial notice—show that the allegedly actionable statements are absolutely protected. Resolution at the earliest stage helps guard against the chilling effect defamation actions have on important news reporting.

Further, the First Amendment protections for "pure" opinion (statements that are not capable of being proven false) apply regardless of the label affixed to the claim. Because integrity and character are not subject to any measurable standard allowing for proof of falsity, Ms. Hurry's claims predicated on this alleged innuendo fail as a matter of law.

Lastly, that S&P Global dared to report on Ms. Hurry's application to own a bank and raise questions about how Plaintiffs' regulatory history would factor into the FDIC's review does not mean that every statement in the article is about Plaintiffs. Statements about SCA are not about Ms. Hurry and statements about clients of SCA are not about either Plaintiff. The "of and concerning" element is a constitutional limitation on all claims involving injurious speech, and those limitations apply here.

## II.    LEGAL ANALYSIS

### A.     A Comparison of Official Records to Published Statements is Proper on a 12(b)(6) Motion Advancing Substantial Truth and Privilege Defenses.

In deciding a Rule 12(b)(6) motion the court may consider (1) documents appended

to the complaint [Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)]; (2) materials properly subject to judicial notice whether or not appended to the complaint [id. at 688-89]; and (3) evidence upon which the complaint "necessarily relies." [Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006)]. In the very case Plaintiffs cite, Ferm v. McCarty, the court took judicial notice of plaintiff's indictment, plea agreement and transcript of a plea colloquy (none of which were attached to the complaint) in ruling on substantial truth.[1] 2014 WL 6983234, at *5 (D. Nev. Dec. 9, 2014); see also Prostrollo v. Scottsdale Healthcare Hosp., 2018 WL 501414, at * 3 (D. Ariz. Jan. 12, 2018) (taking judicial notice of powerpoint and letter in deciding defamation and false light claims on motion to dismiss).

S&P Global asks the Court to take judicial notice of official FINRA and SEC records (as well as Plaintiffs' own complaint in another action before this Court). The complaint and incorporated news article,[2] are replete with references to the FINRA and SEC proceedings, and Plaintiffs' claim that S&P Global published false statements about these proceedings necessarily relies on these records. Even if they hadn't been referenced in the complaint, they are judicially noticeable as official records. See MGIC Indem Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986) (taking judicial notice of documents filed in another action).

**B.   The Article Is Protected By The Substantial Truth Doctrine.**

Plaintiffs cannot rely on mere allegations in the complaint to defeat a 12(b)(6) motion where the allegations are contradicted by judicially-noticeable official records. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). This is especially apt here where the records pertain to proceedings involving one or both of the Plaintiffs, and involve facts to which Plaintiffs consented and/or which constitute judicial admissions.

In the face of the judicially-noticeable documents and their own admissions therein, Plaintiffs' defamation claims shrink beyond recognition, turning on a supposed distinction

---

[1] In looking beyond the complaint to public records, the court does not convert the motion to one for summary judgment. Ferm v. McCarthy, 2013 WL 800536, at * 4 (D. Nev. Jan. 28, 2013) (citing Harris v. County of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012)).

[2] As an attachment to the complaint, this article is incorporated into the complaint "for all purposes." Fed. R. Civ. Proc. 10(c). The article specifically references these SEC and FINRA records.

between a FINRA order entered into on a <u>consented set of facts and violations</u> versus a ruling following a contested proceeding, and the difference between owning or controlling two as opposed to three companies subject to SEC proceedings. [Dkt. 12 at 5-6.]

<u>First</u>, while technical precision is not necessary, it is correct that the 2011 FINRA proceeding, which indisputably involved poor anti-money laundering compliance by both Ms. Hurry and SCA, was an enforcement proceeding. The order makes clear that FINRA initiated enforcement proceedings by filing a complaint against plaintiffs, which, under FINRA procedures, initiates a disciplinary proceeding. [Dkt. 8-4 at 1]; <u>see</u> Ex A, at 2 (FINRA Guide to Disciplinary Hearings). Thus, it is true that FINRA filed an enforcement action against SCA (and Ms. Hurry) for poor anti-money laundering compliance. [Cmpt., ¶ 35c.]

<u>Second</u>, that this enforcement proceeding ended in a settlement, with Ms. Hurry and SCA consenting to FINRA's findings <u>and</u> rule violations [<u>see</u> Dkt. 8-4 at 2], as opposed to a ruling entered upon a contested proceeding [<u>see</u>, <u>e.g.</u>, Dkt. 8-7], does not alter the gist or sting of the published statements. <u>Doe v. Mahoney</u>, 2018 WL 710385, ¶ 20 (Ariz. Ct. App. Feb. 6, 2018) (holding "sting of violating anti-fraud provisions of securities laws in three states rather than two is inconsequential," and statement that company "bilked" investors out of $30 million, where company only sought to raise $10 million, was substantially true where sting was fraudulent practices, not amount of money); <u>Read v. Phoenix Newspapers, Inc.</u>, 819 P.2d 939, 941-42 (Ariz. 1991) (holding sting from statement that plaintiff served jail time for firing a gun at a motorist not substantially different from truth that plaintiff was convicted of exhibiting a gun not in self-defense). The sting here goes to the underlying anti-money laundering conduct and findings, not whether that conduct was set forth in an order entered upon consent of the parties or a ruling.[3]

<u>Third</u>, for the purposes of substantial truth, it does not matter whether Ms. Hurry co-owns SCA and Alpine, or operates them. [<u>See</u> Dkt. 8-3, ¶ 2 (admitting that she owns or

---

[3] If anything, <u>consenting</u> to a set of facts and rule violations, including anti-money laundering compliance rules, carries a <u>greater</u> sting than having a ruling entered following a contested proceedings, which remains contested and is subject to appeal.

1  operates the companies)]; Mahoney, 2018 WL 710385, ¶ 20 (finding substantially true
2  statement that three different states found securities offered by parent company to be illegal
3  where one state's order was actually entered against wholly owned subsidiary); Sallomi v.
4  Phoenix Newspapers, Inc., 771 P.2d 469, 473 (Ariz. Ct. App. 1989) (articles stating son
5  owned and operated lodge, described as a hangout for narcotics dealers, where son entered
6  into booking slip he was lodge manager held substantially correct reading of public record).
7  The statement that Ms. Hurry "co-owns a broker/dealer that was subject to a ruling for poor
8  anti-money-laundering compliance" [Cmpt., ¶ 35a] carries the same gist or sting and thus is
9  substantially true.  Indeed, "controlling" the daily operations of a securities firm arguably
10 places Ms. Hurry closer to the firm's wrongdoing than mere ownership.  Any distinction
11 would not make a material difference to a reader.  This is especially so where Ms. Hurry was
12 found by FINRA to be personally responsible for SCA's anti-money laundering violations.
13 [Dkt. 8-4 at 3 & 21-22.]

14       Fourth, the 2017 FINRA ruling independently establishes the substantial truth of the
15 first and third allegedly defamatory statements.  That ruling issued significant monetary
16 fines and sanctions against SCA and John Hurry not only for "inadequate supervision," as
17 Plaintiffs claim, but for the illegal sale of millions of shares of unregistered securities, and
18 activities "designed to enable" the unlawful transactions and "evade regulatory scrutiny."
19 [Dkt. 8-7 at 1, 79.]  FINRA found SCA failed to ensure compliance with Section 5 and
20 failed to respond appropriately to red flags, which failures led to the illegal sale of securities.
21 [Id. at 101.]  The evidence also suggested SCA submitted false documents and nominees to
22 "conceal" the identity of beneficial owners.  [Id. at 89.]  Its own regulatory history,
23 including four disciplinary actions against SCA employees and customers involving sham
24 transactions and nominees, placed SCA on notice of what FINRA described as "systematic
25 failures." [Id. 11, 101.]

26       These findings would have no material difference on a reader than the published
27 statement that Ms. Hurry "co-owns a broker dealer subject to a ruling for poor anti-money
28 laundering compliance." [Cmpt. 35a, 35c.]  Having poor anti-money laundering processes

"enabling the unlawful securities sales," as stated in the article, has no greater sting, and is consistent with the ordinary meaning of money laundering. [Dkt. 8, n. 7]; see also Fendler v. Phoenix Newspapers, Inc., 636 P.2d 1257, 1261-62 (Ariz. Ct. App. 1981) (holding as substantially true article incorrectly stating plaintiff was doing "four-to-five years in prison" when he had been released on bond pending appeal since gist was that he was found guilty of a crime).

Separately, judicial records show that the SEC has in fact brought enforcement actions against clients of at least two companies owned or operated by Ms. Hurry–SCA and Alpine. [Dkt. 8-3 at 2; Dkt. 8-8, ¶¶ 17, 21, 53; Dkt. 8-9, ¶ 26, 78-108; Dkt. 8-10, ¶ 27; and Dkt. 8-11, ¶ 31.] Her claim to operate rather than own Alpine does not alter the substantial truth analysis, as explained above. Nor is having enforcement proceedings against clients at two companies owned or controlled by Ms. Hurry, not three, an actionable distinction. See Mahoney, 2018 WL 710385, ¶ 20 ("The sting of violating anti-fraud provisions of securities law in three states rather than two is inconsequential.").[4]

Lastly, Ms. Hurry consented to the findings against her and the ethical rule violations at issue in the 2011 FINRA order. [Dkt. 8-4 at 2.] ("Respondents have consented …. to the entry of findings and violations consistent with the allegations of the Complaint....). That a violation of this ethical rule goes to one's professional integrity and honesty (thus supporting the alleged false light innuendo) is supported both by the rule itself [Dkt. 8-5] and the cases cited by S&P Global discussing Rule 2010, which Plaintiffs ignore. [Dkt. 12 at 12:15-24.]

**C.     The Article's Description of Official Proceedings Is Privileged.**

A privileged report need only be a "substantially correct account of the proceedings." Sallomi, 771 P.2d at 472. "[A] court must determine whether the report of the public

---

[4] Contrary to Plaintiffs argument, S&P Global has not conceded whether the SEC has brought an action against clients of the third "Hurry-owed" securities firm, Cayman Securities Clearing and Trading. [Dkt. 12 at 7.] An action against Cayman Securities is detailed in the 2017 FINRA action. [Dkt. 8-7 at 14 (Bandfield action).] While it is literally true that the SEC has brought enforcement actions against clients of the three "Hurry-owned" companies, S&P Global focused on the companies admittedly owned or operated by Ms. Hurry to address the specific falsehood alleged by Plaintiffs—that "Ms. Hurry does not own three companies against which the SEC has brought cases against clients." [Cmpt., ¶ 31g.]

proceeding carries a 'greater sting' in defamatory content than the original publication during the proceedings." Green Acres Trust v. London, 688 P.2d 617, 619 (Ariz. 1984). Here too Plaintiffs' argument rests on negligible (and non-actionable) differences.

First, it was fair and accurate to report that regulators have filed enforcement action(s) against SCA for inadequate money laundering compliance. [See Dkt. 8-4 at 1.]

Second, stating that SCA was subject to a "ruling" for poor anti-money laundering compliance when the truth was that Plaintiffs entered into an order consenting to the findings and violations for poor anti-money laundering compliance carries no greater sting. That Plaintiffs admitted no wrongdoing in entering into the consent order does not alter this conclusion. This very argument was rejected in Colt v. Freedom Commcns, Inc., addressing California's similar fair report privilege. 109 Cal. App. 4th 1551, 1555-56 (2003). The court compared the gist of SEC charges against published statements that an "operator of the 'pump and dump-type Web Site, has been caught by the SEC" and the scheme involved using "false information about the company." Id. (emphasis added). Despite plaintiff's argument that this characterization was inaccurate because he settled with the SEC without admitting wrongdoing, the court held the articles were protected under the fair report privilege as they "fairly described the gist of plaintiffs' misconduct." Id. at 1560 ("Had he not been 'caught,' there would not be a consent decree."). Though plaintiff denied the truth of the SEC allegations and argued that one cannot infer guilt from a stipulated entry of a consent decree, the court held that the First Amendment and California's civil code permitted defendants to publish a fair and true report of the proceedings. Id. at 1558.

Third, whether Plaintiffs own or operate two businesses against which the SEC has filed charges against clients, or three, is inconsequential. Mahoney, 2018 WL 710385, ¶ 20. Because the First Amendment and common law demand breathing space in reporting on official proceedings, Plaintiffs' defamation claims and the second false light claim should be dismissed.

**D.     The Published Statements Are Not "Of and Concerning" Plaintiffs.**

In reviewing whether the complained of statements are "of and concerning" plaintiffs,

the Court should not ignore the actual language in the article or apply a tortured reading to the text. That the article is about Ms. Hurry's bank application does not mean that every allegedly defamatory statement in the article is an accusation about her. See, e.g., Reynolds v. Reynolds, 294 P.3d 151, 156 (Ariz. Ct. App. 2013) (upholding dismissal at pleading stage where article could not reasonably be read as implying daughter's responsibility for not having end-of-life plan for mother despite references to daughter's actions in encouraging her placement in facility). For example, the defamation and false light statements relating to the pump and dump scheme clearly concern clients of the Hurry-owned companies, not Ms. Hurry. The article negates any contrary implication when it states that Ms. Hurry was not personally responsible for the alleged wrongdoing. [See Cmpt., Ex. 1.] Similarly, the first and third allegedly defamatory statements concern SCA, not Ms. Hurry personally. See Earle v. Sedona Financial Center LLC, 2017 WL 4129314, at *2 ("The mere (undisputed) observation that a person's business partner is suspected of criminal activity is insufficient to create an actionable assertion of fact that the person himself was involved in malfeasance.").

**E. The First Amendment Protects Against Plaintiffs' False Light Claims.**

The United State Supreme Court, Ninth Circuit and this Court all recognize that where the gravamen of a claim is an injurious falsehood, protections afforded speech under the First Amendment apply regardless of the label affixed to the claim. Hustler Magazine v. Falwell, 485 U.S. 46, 50 (1988) (holding First Amendment precluded recovery for emotional distress for advertisement parody that "could not reasonably have been interpreted as stating actual facts about the public figure involved"); Partington v. Bugliosi, 56 F.3d 1147, 1160, 1153, 1156 (9th Cir. 1995) (holding defamation and false light statements, as well as claimed implication arising from statements, were non-actionable under Ninth Circuit's three-part test because they did not imply a false assertion of objective fact); Hosszu v. Barrett, 202 F. Supp. 3d 1101, 1108, 1106 (D. Ariz. 2016) (granting motion to dismiss false light and defamation claims based on same).[5] Indeed, the Ninth Circuit has explicitly

---

[5] S&P Global cited each of these cases in it moving brief, and another false light case—Hincey v. Horne, 2013 WL 4543994, at *9 (D. Ariz. Aug. 28, 2013)—contrary to Plaintiffs' contention that no false light cases supported S&P Global's argument. [Dkt 12 at 12.] Gardner v. Martino, 563 F.3d 981, 983, 989 (9th Cir. 2009), cited by S&P Global, also

recognized that "[f]alse light, like defamation, requires at least an implicit false statement of objective fact." Flowers v. Caville, 310 F.3d 1118, 1132 (9th Cir. 2002) (citing Restatement (Second) of Torts § 652E(b) (1977)); see also Dyer v. Dirty World, LLC, 2011 WL 2173900, * 4 (D. Ariz. June 2, 2011) (same)).

Thus, Plaintiffs' contention that false light implication need not be false to be actionable [Dkt. 12 at 12] is flatly wrong. Even the cases cited by Plaintiffs support the unremarkable proposition that innuendo arising from the publication of true statements must be false to be actionable. Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 787 (Ariz. 1989) (recognizing tort may where true information is published that creates a "false implication about an individual"). If the rule were otherwise, the tort of false light invasion of privacy would morph into one for hurt feelings arising from any negative publicity. The First Amendment would not countenance such a burden on free speech. See Partington, 56 F.3d at 1153, n. 10.

Turning to the first prong of the Ninth Circuit's three-part test—the general context in which the statements were made—Plaintiffs make no attempt to distinguish the numerous cases cited by S&P Global holding that speech that merely raises questions about possible outcomes, predicts the future, raises suspicions, or constitutes conjecture is non-actionable. [Dkt. 8 at 16 (citing cases).] As explained in Partington, "when an 'answer [is] within the wide range of possibilities, [it] is precisely [when] we need and must permit a free press to ask the question." 56 F.3d at 1154. Plaintiffs avoid any reference to the actual impetus of the article that necessarily informs its general tenor: namely, Ms. Hurry's application to become an owner of a financial institution, the factors considered by regulators in reviewing such applications, and the broad question raised by the article—"[w]hether the histories of Scottsdale Capital and Alpine Securities will affect Justine Hurry's application to buy Bank of Orrick …" [Cmpt., Ex. 1.] Instead, Plaintiffs argue without any reference to the Complaint that the entire article was done for the "singular purpose of trying to establish as fact that Ms. Hurry lacks integrity and good character." [Dkt. 12 at 11.] This is not how

---

involved dismissal of false light and defamation claims because the statements were not assertions of objective facts.

1 courts approach the analysis on prong one. Nor is it responsive to the relevant factual and
2 legal arguments raised in S&P Global's motion. It is an unsupported argument made in an
3 attempt to get the Court to adopt a tortured reading of the article that it cannot do at this
4 stage any more than it could do at the summary judgment stage. See Partington, 56 F.3d at
5 1157 ("The language cannot be tortured to 'make that certain which is in fact uncertain.'").
6 The first prong of the three-part test strongly supports a conclusion that the sued upon
7 implication is not a statement of objective fact.

8 On the second prong—the specific context—Plaintiffs again ignore the actual
9 language in the article which signals to readers that the author was merely questioning how
10 SEC and FINRA enforcement actions would affect the FDIC's decision on Ms. Hurry's
11 application. The article says that the FDIC declined to state why it returned Ms. Hurry's
12 application and a returned application is neither accepted nor denied. The includes cues
13 such as use of the term "raising the prospect" in reference to whether Ms. Hurry's
14 application would receive heightened scrutiny, and multiple statements explaining that Ms.
15 Hurry was not accused of wrongdoing or even named in the SEC or FINRA actions with the
16 largest fines, thus negating any contrary implication. Readers also were expressly told that
17 the one expert was talking "generally about the Bank Control Act…not specifically about
18 Ms. Hurry's application." The other expert's use of exaggerated expressions as a rhetorical
19 tool signals to readers that he was speculating about how regulators might react to the SEC
20 actions. Here again, Plaintiffs focus on the supposed reasons behind what the author wrote,
21 not on the actual information readers would understand from a reasonable reading of the
22 article and the language used therein. [Dkt. 12 at 12:3-11.] The second prong weighs
23 heavily in favor of S&P Global.

24 Plaintiffs fail to address the third-prong—whether the statements (or innuendo) is
25 susceptible to being proved true or false. By focusing entirely on an erroneous legal
26 argument—that this constitutional protection does not apply in false light innuendo cases—
27 they necessarily concede that any innuendo regarding a lack of integrity or good character is
28 not capable of being proven false. The two cases cited by Plaintiffs also fail to advance their

position. The first, <u>Xcentric Ventures, LLC v. Stanley</u>, involved a preliminary injunction order where <u>no</u> claim was advanced that the published statements were not susceptible to being proven true or false. It also did not involve a false innuendo claim, and the published statements related to alleged acts of extortion and claims that the plaintiff was a "wanted criminal." 2007 WL 1795811, at * 3 (D. Ariz. June 21, 2007). There is no comparison here where the alleged implication pertains to one's integrity and character, which have no measurable standard to determine the truth. See <u>Prostrollo</u>, 2018 WL 501414, at * 6 (holding that claims that one was privy to "behaviors that are unethical" are incapable of being objectively proven "because there is no identifiable standard from which a fact finder can assess such behavior"); <u>Wartell v. Lee</u>, 47 N.E.3d 381, 384-87 (Ind. Ct. App. 2015) (statements that plaintiff "lacked integrity" and whose "character is at issue" held too vague to be actionable).

The second case, <u>Douglass v. Hustler Magazine, Inc.</u>, actually supports S&P Global's position. 769 F.2d 1128 (7th Cir. 1985). There, a photograph of an actress who posed nude for Playboy magazine was published in Hustler magazine with text making it appear as though she voluntarily posed for Hustler. The specific question addressed by the court was "in what if any sense the light could have been found <u>to be a false one</u>." <u>Id.</u> at 1134 (emphasis added). Plaintiff's degradation injury stemmed from the false portrayal of plaintiff as having "voluntarily posing nude for Hustler," something she did not do. <u>Id.</u> at 1137. There is no comparison to implying someone lacks integrity or good character, which unlike the act of posing nude for Hustler, can't be objectively judged true or false.

### III. CONCLUSION

For all these reasons, and those more fully set forth in S&P Global's moving papers, this motion to dismiss should be granted with prejudice and without leave to amend.

Dated: May 9, 2018    JASSY VICK CAROLAN LLP

/s/ *Duffy Carolan*
Duffy Carolan
Jean-Paul Jassy
Kevin Vick

11

          QUARLES & BRADY LLP
          C. Bradley Vynalek
          Lauren Elliott Stine
          Kyle T. Orne

          Attorneys for Defendants
          S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Lau Haslett and Zach Fox

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Monica Limón-Wynn
Limón-Wynn Law, PLLC
1400 East South Avenue, Suite 915
Tempe, Arizona 85282-8008
Milmon-wynn@mlwlawaz.com

Charles J. Harder (Pro Hac Vice)
Jordan Susman (Pro Hac Vice)
Harder LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, CA 90067
CHarder@harderllp.com
JSusman@harderllp.com

Attorneys for Plaintiffs

Dated: May 9, 2018          /s/ *Duffy Carolan*