**QUARLES & BRADLEY LLP**
C. Bradley Vynalek (#020051)
Lauren Elliott Stine (#025083)
Kyle T. Orne (#032438)
Renaissance One Two North Central Ave.
Phoenix, AZ 85004-2391
Tel: (602)229-5261
brad.vynalek@quarles.com
lauren.stine@quarles.com
kyle.orne@quarles.com

**JASSY VICK CAROLAN LLP**
Duffy Carolan (Cal. Bar. No. 154988) (*Pro Hac Vice*)
601 Montgomery Street, Suite 850
San Francisco, California 94111
Tel: (415) 539-3399
dcarolan@jassyvick.com

Jean-Paul Jassy (Cal. Bar No. 205513) (*Pro Hac Vice*)
Kevin L. Vick (Cal. Bar No. 220738) (*Pro Hac Vice*)
800 Wilshire Blvd., Suite 800
Los Angeles, California 90017
Tel: (310) 870-7048
jpjassy@jassyvick.com
kvick@jassyvick.com

Attorneys for Defendants
S&P Global Inc., S&P Global Market Intelligence Inc.,
Kiah Lau Haslett and Zach Fox

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Justine Hurry, an individual; Scottsdale Capita Advisors Corp., an Arizona corporation<br><br>Plaintiffs,<br><br>v.<br><br>S&P Global, Inc., a New York corporation; S&P Global Market Intelligence, Inc., a New York corporation; Kiah Lau Haslett, an individual; Zach Fox, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-cv-01105-PHX-JAT<br><br>**DEFENDANTS' RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**(ORAL ARGUMENT REQUESTED)** |

1

Pursuant to Federal Rule of Civil Procedure 12(c), Defendants S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Lau Haslett and Zach Fox (collectively "S&P Global") hereby move for judgment on the pleadings as to each cause of action alleged in the Complaint filed by Plaintiffs Justine Hurry and Scottsdale Capital Advisors Corp. ("SCA"). This Motion is supported by the following Memorandum of Points and Authorities, three official records subject to judicial notice under Federal Rule of Evidence 201, and the subject news article appended to the Compliant. A Certificate of Consultation, as required by LRCiv 12.1(c), is also attached hereto as Exhibit "A."

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This action stems from an article (the "Article") published by S&P Global Market Intelligence reporting about a bank ownership application by Plaintiff Justine Hurry that is subject to review and approval by the Federal Deposit Insurance Corporation ("FDIC"). That application has been returned by the FDIC twice. As explained in the Article, a returned application is neither denied nor approved, and may be returned for technical deficiencies. Because regulators take into consideration an applicant's background, the Article reviews the regulatory history of companies associated with Ms. Hurry—raising the question of whether this history will affect Ms. Hurry's application.

Plaintiffs Justine Hurry and SCA filed suit asserting claims for Defamation (Count One) and False Light (Count Two). Plaintiffs' Defamation Claim is predicated on three alleged statements: (1) Ms. Hurry "'co-owns a broker/dealer that was subject to a ruling for poor anti-money laundering compliance'" (Defamatory Statement One); (2) "'The U.S. Securities and Exchange Commission has brought several cases against clients of the three Hurry-owned companies'" (Defamatory Statement Two); and (3) "Financial regulators have filed enforcement action(s) regarding inadequate anti-money laundering compliance at SCA" (Defamatory Statement Three)  [Cmpt., ¶¶ 35.]

The False Light claim, brought solely by Plaintiff Justine Hurry, alleges that four statements portray her in a false light: (1) Ms. Hurry lacks integrity (False Light Statement

One); (2) the SEC has brought cases against clients of three companies owned by Ms. Hurry (False Light Statement Two); (3) Ms. Hurry lacks good character (False Light Statement Three); and (4) Ms. Hurry has been involved in "pump-and-dumps" of penny stocks (False Light Statement Four).  Id. ¶ 43.

The Complaint itself, judicially-noticeable official and judicial records, and/or the Article appended to the Complaint demonstrate that each of these statements are non-actionable as a matter of law:

First, truth is a complete defense to defamation and false light actions, and indeed to any cause of action based on allegedly actionable speech.  See Read v. Phoenix Newspapers, Inc., 819 P.2d 939, 941 (Ariz. 1991); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-517 (1991).  Readily-verifiable official records (two of which are judicial records available from PACER) and the Article appended to the Complaint demonstrate that the Defamatory Statements One and Three are substantially true and therefore non-actionable.

Second, the fair report privilege immunizes publishers against libel and false light claims that are "fair and accurate summaries of public information."  Jorgensen v. Channel 5 KPHO TV, 249 F. App'x 526 (9th Cir. Sept. 27, 2007) (holding privilege barred plaintiff's claims for libel and false light against defendant television station whose reports were "fair and accurate summaries of public information").  Readily-verifiable official records (two of which are judicial records available from PACER) and the Article appended to the Complaint demonstrate that the each of the Defamatory Statements, and False Light Statement Two are protected by the fair report privilege.

Third, the First Amendment and common law require that allegedly injurious statements must be "of and concerning" – i.e., about – the plaintiff.  New York Times v. Sullivan, 376 U.S. 254, 288, 291-92 (1964); Reynolds v. Reynolds, 294 P.3d 151, 155-56 (Ariz. Ct. App. 2013) (dismissing defamation and false light claims at pleading stage because the allegedly injurious statement was not "of and concerning" plaintiffs). The Complaint allegations alone demonstrate that each of the Defamatory Statements are not actionable as to Plaintiff Hurry because they are not "of and concerning" Hurry, and

Defamatory Statement Two and False Light Statement Two and Four are not actionable because they are not "of and concerning" either Plaintiff.

Fourth, the First Amendment protections for "pure" opinion (statements that are not capable of being proven false) apply regardless of the label affixed to the claim. The Complaint allegations alone establish that False Light Statements One and Three are not objective facts capable of being proven true or false, and thus are non-actionable as a matter of law.

## II.     FACTUAL BACKGROUND

### A.     The Parties.

The Complaint states that in 2002, Justine Hurry "co-founded" SCA, and for its first 10 years served as its Chief Executive Officer. Cmpt. ¶ 18. The Complaint alleges that Ms. Hurry "remains" as a "Strategic Advisor to Plaintiff SCA." Id.

In 2017, according to the Complaint, Ms. Hurry "expanded her business portfolio by acquiring an interest in Bank of Orrick, a small, Missouri-based bank with two branches." Cmpt., ¶ 20. This acquisition is subject to regulatory approval by the FDIC. Id.

Defendant S&P Global Market Intelligence Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York. Id., ¶ 8. It, along with two of its reporters, and a separate parent company, S&P Global Inc., are accused of authoring and/or publishing on Market Intelligence's website the January 23, 2018 article that is the subject of this action. Id., ¶ 2 & Ex. 1 to Cmpt.

### B.     The Article.

The Article, titled "Regulator returns investor application to buy Bank of Orrick for a 2nd time," reports that the FDIC had "for a second time" returned an application from a "financial services director," Justine Hurry, "to acquire a controlling stake in the Bank of Orrick, a small Missouri bank." Ex. 1 to Cmpt. The Article states twice that the FDIC declined to comment on why the application was returned, and explains that a returned application "is neither approved nor denied." Id.

The Article states that "[a]pplications can be returned for technical deficiencies or as an indication regulators are lukewarm on the proposal." Id.  Citing an attorney whose practice focuses on bank regulatory compliance, Charles Horn, the Article explains that "[o]ne of the statutory factors that a regulator has to take into account is the background and integrity of the applicant."  This attorney, as made clear in the Article, was speaking "generally about the Change in Bank Control Act, a law that governs bank acquisitions, not specifically about Hurry's application." Id.

The Article sets forth Ms. Hurry's substantial background in selling securities.  It also states that Ms. Hurry, in 2002, founded SCA in Scottsdale, Arizona, with her husband, John Hurry; that John Hurry "would go on to acquire Alpine Securities Corp., in 2011, and in 2013 he established an offshore financial institution, Cayman Securities Clearing and Trading SECZ, in the Cayman Islands, according to regulatory actions."

After setting forth Justine Hurry's and John Hurry's connections to these three companies, the Article's next paragraph states: "[t]he U.S. Securities and Exchange Commission has brought several cases against clients of the three Hurry-owned companies, including one with allegations against two Scottsdale Capital employees.  According to the SEC complaints, clients conducted different penny stock pump-and-dump schemes using accounts at Scottsdale and Alpine." Id.

These cases, as the Article states, "do not allege any wrongdoing by the Hurrys individually"; rather, "regulators cited these cases when filing separate enforcement actions regarding inadequate anti-money-laundering compliance at Scottsdale and Alpine." Id.

An economics professor at New York University, Lawrence White, referenced in the Article, then hypothesizes that "this history could affect Justine Hurry's application to buy Bank of Orrick." Id.  "All of these things raise this 'suitability and good character' type of question.  If somehow, one penny stock pump and dump happened, the individual might say, 'That was a mistake and I learned from my mistake'…Fool me once, shame on you, Fool me twice, shame on me.  More than once, I think, is a serious flag." Id.

5

The Article then recounts in greater detail the underlying enforcement proceedings. It describes the June 2017 SEC Complaint against Alpine for failing to properly submit thousands of suspicious activity reports, or SARs. It recounts a June 2017 FINRA ruling against SCA and John Hurry in which John Hurry was barred from securities activities and SCA was fined $1.5 million. Immediately after discussing these enforcement actions, the Article states, "[n]otably, Justine Hurry was not personally named as a defendant in FINRA's action against Scottsdale Capital nor the SEC's action against Alpine Securities." Id.

The Article also references a 2011 FINRA fine and suspension against Justine Hurry, describing the allegations as involving the filing of "inaccurate or incomplete suspicious activity reports." Id. The Article states that Ms. Hurry consented to the sanctions "without admitting or denying the allegations." Id. The Article also states that FINRA "has levied four smaller actions against Scottsdale and two against Alpine." Id.

The Article ends by reiterating the uncertainty about whether this enforcement history will affect Ms. Hurry's application to buy Bank of Orrick: "Whether the histories of Scottsdale Capital and Alpine Securities will affect Justine Hurry's application to buy Bank of Orrick remains to be seen." Id.

## III.   LEGAL ANALYSIS

### A.   The Issues Presented Should be Decided at the Pleading Stage.

After the pleadings are closed, any party may move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Fed. R. Civ. P. 12(c). A Rule 12(c) motion "is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009). Thus, "[a]nalysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6), because under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." Chavez v. U.S., 683 F.3d 1102, 1108 (9th Cir. 2012). Here, they simply do not.

### B.     Judicial Notice of Official Records is Proper on a 12(c) Motion

Under Federal Rule of Evidence 201, the court may take judicial notice -- either on its own or on request of a party -- of any fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Based on that rule, it is well established that on a motion for judgment on the pleadings, the court "may take judicial notice of matters of public record outside the pleadings." See MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986) (emphasis added); Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981, n. 18 ("When considering a motion for judgment on the pleadings, this court may consider facts that are contained in materials of which the court may take judicial notice.").[1]

Applying this well-established law, courts have, on motions for judgment on the pleadings and on motions to dismiss, repeatedly taken judicial notice of court, SEC and FINRA records. See, e.g., U.S. v. Town of Colorado City, 2013 WL 11826544, at *3, n. 17 (D. Ariz. June 6, 2013) ("The Court can take judicial notice of official court documents and of the existence of the newspaper articles and the allegations contained therein."); U.S. v. Grace Xunmei Li, 2013 WL 147803, at *3 (D. Ariz. Jan. 14, 2013) (taking judicial notice of various court records and documents on a motion for judgment on the pleadings); Dreiling v. Am. Exp. Co., 458 F.3d 942, 946, n.2 (9th Cir. 2006) (holding that judicial notice of SEC filings is appropriate on a 12(b)(6) motion); In re White Elect. Designs Corp. Sec. Litig., 416 F. Supp. 2d 754, 760 (D. Ariz. 2006) ("Thus, judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.") (internal quotations omitted); In re Sterling Foster & Co., Inc. Sec. Lit., 222 F. Supp. 2d 216, 253 (E.D.N.Y. 2002) (taking judicial notice of Statement of Claim in NASD hearing (FINRA's predecessor)); Call v. Czaplicki, 2011 WL 2532712, at *7 (D.N.J. June 23, 2011) (taking judicial notice of FINRA Broker Check report because it's a public document).

---

[1] In looking beyond the complaint to public records, the court does not convert the motion to one for summary judgment. Biggs v. Town of Gilbert, 2011 WL 1793252, * 1, n. 1 (D. Ariz. May 11, 2011) (citing Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010)).

### C.  Defendants Request Judicial Notice of Three Documents to Resolve Defendant's Substantial Truth and Fair Report Privilege Defenses.

S&P Global requests that the Court take judicial notice of the following three official records, in addition to the Article appended to the Complaint[2]:

(1) <u>The 2011 FINRA Consent Order</u>.  This document is subject to judicial notice because it is a matter of public record.[3]  See <u>Dreiling</u>, 458 F.3d at 946, n.2.  In 2011, FINRA and SCA entered into an Order Accepting Offer of Settlement (the "Consent Order") in <u>Dept' of Enforcement v. Scottsdale Capital Advisors Corp. and Justine Hurry</u> (Disciplinary Proceeding No. 2008011593301).  An official copy of the Consent Order is attached as Exhibit B.  Defendants request the Court take judicial notice of the Consent Order to establish that (a) in 2010, FINRA's Department of Enforcement filed a disciplinary complaint against SCA (and Ms. Hurry) [see, Ex. B at 1]; (b) this action and the resulting Consent Order includes allegations involving anti-money laundering compliance against SCA (and Ms. Hurry) [<u>id.</u> at 3, 4-6, 14]; (c) the Consent Order also includes allegations that clients of SCA have been the subject of SEC complaints alleging schemes to evade the registration requirements of the federal securities law [<u>id.</u>, at 13]; and (d) under the Consent Order a $7,500 fine and 40-day suspension was entered against Ms. Hurry, and a $125,000 fine and censure was entered against SCA [<u>id.</u>, at 22-23].

(2) <u>The 2017 SEC Complaint against Alpine</u>.  Like the Consent Order, this document is also subject to judicial notice as a matter of public record.  See <u>In re White Elect. Designs Corp. Sec. Litig.</u>, 416 F. Supp. 2d at 760.  In 2017, the SEC filed a Complaint against Alpine in the United States District Court, Southern District of New York, captioned <u>SEC v. Alpine</u>, and pending as action No. 17-cv-04179.  An official copy of this 2017 SEC Complaint is attached as Ex. C.  Defendants request the Court take judicial notice of the 2017 SEC Complaint to establish (a) the fact that an enforcement action alleging anti-money

---

[2]  As a document attached to the Complaint, the Article is properly subject to judicial notice. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001).

[3]  The 2011 FINRA Consent Order is accessible to the public from FINRA's website at http://www.finra.org/industry/disciplinary-actions/finra-disciplinary-actions-online?search=2008011593301.

laundering compliance and related rule violations has been brought against Alpine; and (a) that the action alleges "[m]any Scottsdale and Alpine customers have been charged with violations of federal securities laws, including violations relating to transactions cleared though Alpine" [id., ¶ 15.].

(3) Specific Portions of a 2014 Complaint filed by Plaintiff Hurry. In 2014, Plaintiff Hurry filed a Complaint against FINRA in the United States District Court for the District of Arizona, captioned John J. Hurry and Justine Hurry et al. v. FINRA et al., and pending as action No. 14-cv-02490-PHX-ROS. This document is also a public record subject to judicial notice. See See Town of Colorado City, 2013 WL 11826544, at *3, n. 17. An official copy of the Complaint is attached as Exhibit D. Defendants request that the Court take judicial notice of Paragraph 2 of Exhibit D, wherein Ms. Hurry admits that she, along with her husband John Hurry, own or control both SCA and Alpine [Ex. D, ¶ 2]. Judicial notice is requested to establish the judicial admission that Ms. Hurry owns or controls both SCA and Alpine (or, under the fair report privilege, that it was, at least, accurate to characterize Hurry's interest as such whether true or not).

As noted above, these records are relevant only to S&P Global's substantial truth and fair report privilege arguments. Taken together, they establish that both SCA and Alpine have been subject to enforcement actions involving anti-money laundering compliance, and that both Ms. Hurry and SCA have been subject to an order involving poor anti-money laundering compliance and related rule violations—Defamatory Statements One and Three. They also establish that it was accurate to state that the SEC has brought enforcement actions against *clients* of both SCA and Alpine—Defamatory Statement Two and False Light Statement Two.

**C.     The Article Is Protected By The Substantial Truth Doctrine.**

Truth is a complete defense to defamation and false light actions, and indeed to any cause of action based on allegedly actionable speech. See Read v. Phoenix Newspapers, Inc., 819 P.2d 939, 941 (Ariz. 1991). It is well established that a defendant need only prove substantial truth, not literal truth. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S.

496, 516-517 (1991) (under substantial truth doctrine, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified'"); In assessing the accuracy of the reporting, it is sufficient if the report captures "the substance, the gist, the sting of the libelous charge." Crane v. Ariz. Republic, 972 F.2d 1511, 1519 (9th Cir. 1992). The key question in evaluating substantial truth is whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Masson, 501 U.S. at 517; Read, 169 Ariz. at 356, 819 P.2d at 941(court determines whether publishing literal truth would have made "material difference to a reader").[4]

### 1. FINRA and the SEC have brought enforcement actions against broker/dealers owned or operated by Justine Hurry, finding poor anti-money-laundering compliance.

To support Defamatory Statements One and Three, Plaintiffs allege that Ms. Hurry does not "co-own any broker/dealer that was subject to a ruling for poor anti-money-laundering compliance" [cmpt., ¶ 31b], and that "SCA has not been accused of inadequate anti-money laundering compliance [cmpt., ¶ 31h]." However, official records demonstrate that FINRA and SEC enforcement proceedings have been brought against SCA, Alpine, and against Ms. Hurry personally. Each of these proceedings involved, among other things, poor anti-money-laundering ("AML") compliance.

First, in 2011, FINRA assessed a $7,500 fine and 40-day suspension against Justine Hurry, and a $125,000 fine and censure against SCA in a proceeding in which both Hurry and SCA consented to FINRA's findings. See Ex. B at 2, 22-23. FINRA specifically found that both Hurry and SCA "failed to implement the firm's AML procedures for monitoring,

---

[4] See, e.g., Doe v. Mahoney, 2018 WL 710385, at *4 (Ariz Ct. App, Feb. 6, 2018) (holding that "sting of violating anti-fraud provisions of securities laws in three states rather than two is inconsequential," and statement that company "bilked" investors out of $30 million, where company only sought to raise $10 million, was substantially true as sting was fraudulent practices, not amount of money); Sign Here Petitions LLC v. Chavez, 402 P.3d 457, 466 (Ariz. Ct. App. 2017) (holding that there was no material difference between published statement claiming signatures gathered by company for voter referendum were "bad" because they were collected by felons where truth was that company failed to deliver sufficient number of valid signatures and two collectors were felons).

detecting, documenting, investigating and reporting red flags and suspicious activities." Ex. B at 3, 21. FINRA also found that "Scottsdale and Hurry took inadequate steps to investigate or report suspicious transactions in which the firm effected sales, as agent, of millions of shares of penny stocks received by firm customers, through journal transfers and deposits of stock certificates." Id. at 3. FINRA further found that Hurry and SCA failed to implement procedures necessary to detect and report suspicious activities. Id. at 21-22. They were found in violation of several NASD and FINRA rules, including those specific to deficient anti-money laundering compliance programs. Id. at 22 (citing FINRA Rule 3310).

The gist or sting of the FINRA Consent Order for poor anti-money laundering compliance is not materially different than the gist or sting of the published statements about which Plaintiffs complain. Cmpt., ¶ 35a, 35 c. Indeed, because the findings in this Consent Order were against Hurry individually, the truth would produce a greater sting on the average person than the published statements relating only to SCA.

Second, Ms. Hurry also has admitted to being an owner or operator of another broker/dealer – Alpine. Ex. D, ¶ 2. In 2017, the SEC filed an action against Alpine for violating the Bank Secrecy Act ("BSA") and its implementing regulations, which require broker-dealers to file SARs with the Financial Crimes Enforcement Network to report certain suspicious transactions. Ex. C, ¶ 2. This 2017 SEC Complaint alleges that Alpine omitted material red flag information from at least 1,950 SARs, and violated the BSA's implementing regulations, including those requiring that broker-dealers 'implement[] and maintain[] an anti-money laundering program that complies with the rules, regulations, or requirements of its self-regulating organization governing such programs…" Id., ¶¶ 28, 45.

Thus, not only has Ms. Hurry had anti-money laundering compliance findings made against her personally, but two broker-dealers that she owns or operates, SCA and Alpine, have had enforcement actions brought against them for anti-money-laundering compliance. Thus, the substantial truth doctrine under the First Amendment bars liability stemming from Defamatory Statements One and Three addressing allegedly false statements regarding anti-money laundering compliance. [Cmpt., ¶ 35a. & 35c.]

**D.     The Fair Report Privilege Independently Protects The Published Statements.**

The fair report privilege immunizes publishers against libel and false light claims based on reports that are "fair and accurate summaries of public information." Jorgensen v. Channel 5 KPHO TV, 249 F. App'x 526 (9th Cir. Sept. 27, 2007) (holding privilege barred plaintiff's claims for libel and false light against defendant television station whose reports were "fair and accurate summaries of public information"). Thus, in Sallomi v. Phoenix Newspapers, Inc., the court held that the fair report privilege barred the plaintiff's libel and false light claims because the defendant publisher's articles "were a fair and accurate abridgment of the public records used." 771 P.2d 469, 472 (Ariz. Ct. App. 1989); see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy, 860 F.3d 1244, 1259 (9th Cir. 2017) ("The First Amendment generally protects those who distribute information obtained through public court proceedings.").[5]

To be privileged, a report need only be a "substantially correct account of the proceedings." Sallomi, 771 P.2d at 472 (holding report that son owned a resort was fair and accurate where on police booking slip son identified his "employer" as "self" and his "occupation" as "resort manager," even though in truth his parents owned the resort). "In other words, a court must determine whether the report of the public proceeding carries a 'greater sting' in the defamatory content than the original publication during the proceeding." Green Acres, 688 P.2d at 627.

Given the prior enforcement actions[6] against SCA and Alpine, it was fair and

---

[5] The fair report privilege is lost only when the publisher does not give a fair and accurate report of the proceeding. Green Acres Trust v. London, 688 P.2d 617, 626-27 (Ariz. 1984); see also Restatement (Second) of Torts § 611 cmt. a (1977). The privilege is not conditioned on an absence of malice. Id., 688 P.2d at 627.

[6] Privileges similar to the fair report privilege have been found to apply to FINRA proceedings. See Adjian v. JPMorgan Chase Bank, N.A., 697 F. App'x 528, 529–30 (9th Cir. Sept. 13, 2017) (applying California's litigation privilege, Cal. Civil Code § 47(d), to statements made in a FINRA pleading because FINRA "is overseen by the Securities and Exchange Commission."); see also Wietecha v. Ameritas Life Ins. Corp., , 2006 WL 2772838, at *11 (D. Ariz. Sept. 27, 2006) (statements made in official forms filed with NASD are entitled to qualified privilege under Arizona law); Restatement (Second) of Torts, § 611, cmt. d. (fair report privilege "is also applicable to public proceedings and actions of

accurate to state that Ms. Hurry co-owns a broker/dealer that was subject to a ruling for poor anti-money laundering compliance [Defamatory Statements One and Two]; and that financial regulators have brought enforcement action(s) against Hurry-owned companies [Defamatory Statement Two and False Lights Statement Two]. See Cmpt., ¶¶ 35a., 35b. & 35c; and Ex. 1 (Article).

Stating in the Article that SCA was subject to a "ruling" for poor anti-money laundering compliance when the truth was that Plaintiffs entered into an order consenting to the findings and violations for poor anti-money laundering compliance carries no greater sting. That Plaintiffs admitted no wrongdoing in entering into the 2011 Consent Order does not alter his conclusion. This very argument was rejected in Colt v. Freedom Commcns, Inc., addressing California's similar fair report privilege. 109 Cal. App. 4th 1551, 1555-56 (2003). The court there compared the gist of SEC charges against published statements that an "operator of the 'pump and dump-type' Web Site, has been caught by the SEC." Id. (emphasis added). Despite plaintiff's argument that this characterization was inaccurate because he settled with the SEC without admitting wrongdoing, the court held that the statements were protected under the fair report privilege as they "fairly described the gist of plaintiffs' misconduct." Id. at 1560 ("Had he not been 'caught,' there would not be a consent degree."). Though plaintiff argued that one cannot infer guilt from a stipulated entry of a consent degree, the court held that the published statements were protected under the First Amendment and California's civil code, permitting a fair and true report of official proceedings. Id. at 1558.

Separately, both the 2011 FINRA Consent Order and the 2017 SEC Complaint against Alpine contain allegations that the SEC has filed many enforcement actions against clients of SCA and Alpine. Ex. B at 13; Ex. C, ¶ 15. Because the published statements

---

other bodies or organizations that are by law authorized to perform public duties, such as a medical or bar association charged with authority to examine or license or discipline practitioners"); Hurry v. Fin. Indus. Regulatory Auth. Inc., 2015 WL 11118114, at *4 (D. Ariz. Aug. 5, 2015) (recognizing the Ninth Circuit's acknowledgment of the "'quasi-governmental power'" of FINRA) (quoting Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1213 (9th Cir. 1998)).

mirror the statements contained in these official records, Defamatory Statement Two and False Light Statement Two are similarly protected under the privilege.

### E. The Published Statements Are Not "Of and Concerning" Plaintiffs.

The First Amendment and common law require that allegedly injurious statements must be "of and concerning" – i.e., about – the plaintiff. New York Times v. Sullivan, 376 U.S. 254, 288, 291-92 (1964); Reynolds v. Reynolds, 294 P.3d 151, 155-56 (Ariz. Ct. App. 2013) (dismissing defamation and false light claims at pleading stage because the allegedly injurious statement was not "of and concerning" plaintiffs). "Statements which refer to individual members of an organization do not implicate the organization. By the same reasoning, statements which refer to an organization do not implicate its members." Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting Provisional Gov't of New Afrika v. ABC, Inc., 609 F. Supp. 104, 108 (D.D.C. 1985)).

None of the three allegedly Defamatory Statements are "of and concerning" Ms. Hurry. Defamatory Statements One and Three concern enforcement actions against SCA (not against Ms. Hurry), and Defamatory Statement Two concerns "clients" of the Hurry-owned companies, not Ms. Hurry or even the companies she co-owns with her husband.

Similarly, False Light Statements Two and Four are not of and concerning Ms. Hurry. Again, these statements are concerning "clients" of the Hurry-owned companies. These clients (not Ms. Hurry or SCA) were accused of "pump and dump" schemes using accounts at SCA and Alpine. As made clear in the Article, these actions did not involve alleged wrongdoing by the Hurrys. [Cmpt., Ex. 1 at 2.]

### F. The First Amendment Precludes Liability for the Article's Reference to "Integrity" and "Character."

The U.S. Supreme Court has made clear that, under the First Amendment, statements that "cannot 'reasonably [be] interpreted as stating actual facts about an individual'" are not actionable. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) (quoting Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988)); Turner v. Devlin, 848 P.2d 286, 292 (Ariz. 1993) ("[t]o be actionable … words must be capable of being reasonably interpreted as stating actual facts"). To determine whether a statement implies an assertion of objective

fact, the Ninth Circuit examines (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates the impression, and (3) whether the statement in question is susceptible of being proved true or false. Gardner v. Martino, 563 F.3d 981, 987 (9th Cir. 2009); Underwager v. Channel 9 Australia, 69 F.3d 361, 366 (9th Cir. 1995).

First, looking at the general tenor of the entire Article here, no reasonable reader could conclude that S&P Global was stating as objective fact that Ms. Hurry lacked integrity or good character. Rather, the Article references the "statutory factors" that regulators consider when reviewing an application for bank ownership, making clear that a "returned application is neither approved nor denied" and can be returned for "technical deficiencies or as an indication that regulators are lukewarm on the proposal." Ex. 1 to Cmpt. The Article then raises "the prospect" that Ms. Hurry's application could be subject to "significant scrutiny" because of past enforcement actions, even though Hurry herself "has not been named as a defendant in the enforcement actions with the largest monetary fines." Id. The enforcement actions "raise this 'suitability and good character' type of question'" considered by the FDIC, as the Article states. Id. After discussing the enforcement actions, the reporting ends by raising the main question: "Whether the histories of Scottsdale Capital and Alpine Securities will affect Justine Hurry's application to buy Bank of Orrick remains to be seen." Id. (emphasis added).

Ample case law makes clear that a publication that merely raises questions does not reasonably "imply" a verifiable assertion of fact. For example, in Chapin v. Knight-Ridder, Inc., the Fourth Circuit held that an inquiry into a charity program's dealings could not be defamatory because "inquiry itself, however embarrassing or unpleasant to its subject, is not accusation." 993 F.2d 1087, 1094 (4th Cir. 1993) (emphasis added). As the court observed, there must be an "assertion of a false fact," and the "language used cannot be tortured to 'make that certain which is in fact uncertain.'" Id. (emphasis in original). The Ninth Circuit reached the same conclusion in finding that a book which invited questions about the trial tactics used by the plaintiff attorney in a murder trial was not actionable. Partington v.

Bugliosi, 56 F.3d 1147, 1157 (9th Cir. 1994); accord Hosszu v. Barrett, 202 F. Supp. 3d 1101, 1107-08 (D. Ariz. 2016) (relying on Partington and holding that raising "suspicions" is "not an assertion of fact" capable of supporting either defamation or false light claims); Thomas v. Los Angeles Times Commc'ns LLC, 189 F. Supp. 2d 1005, 1016 (C.D. Cal. 2002) (quoting from and endorsing Chapin's rule that "raising of questions" is not actionable), aff'd 45 F. App'x 801 (9th Cir. Sept. 6, 2002).[7]  Here, raising the "prospect" that Ms. Hurry's application could receive significant scrutiny because of prior enforcement actions does not convert statements of uncertainty into those of objective fact.  To hold otherwise would seriously chill important speech.

Second, the specific language used signals to readers that the author was not stating objective facts about Ms. Hurry's integrity or character.  The quoted experts were speaking generally about the law, "not specifically about Hurry's application." [Cmpt., Ex. 1.]  And statements about how regulators "might" react upon learning of pump and dump incidents—"[f]ool me one, shame on you. Fool me twice, shame on me …"—are nothing more than loose, figurative and conjectural language, fully protected under the First Amendment.

Third, language challenging a person's integrity or character are not statements of fact capable of being proven true or false.  See, e.g., Wartell v. Lee, 47 N.E.3d 381, 384-87 (Ind. Ct. App. 2015) (statements that plaintiff had "lack of integrity" and whose "character is at issue" were too vague to be actionable).  For example, this Court recently concluded that allegations of "unethical" conduct were not actionable as "[m]oral and professional standards differ between persons, companies, industries, societies, and religions," and assertions that the plaintiff was behaving unethically were "incapable of being objectively proven because there is no identifiable standard from which a fact finder can assess such behavior."  Prostrollo v. Scottsdale Healthcare Hospitals, 2018 WL 501414, at *6 (D. Ariz. Jan. 12, 2018); see also Glaze v. Marcus, 729 P.2d 342, 344 (Ariz. Ct. App. 1986) (calling

---

[7] Similarly, language that, taken in context, is understood as "conjecture" or "speculation" is not actionable.  Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997); Sign Here Petitions LLC v. Chavez, 402 P.3d 457, 464 (Ariz. Ct. App. 2017) ("[p]redictions of the future cannot reasonably be interpreted as statements of objective facts").

plaintiff "unprofessional" was protected opinion).[8]  The same holds true here.  The alleged innuendo regarding Ms. Hurry's integrity and character is incapable of being objectively proven as false.

In sum, all of the Ninth Circuit factors support the conclusion that the alleged integrity and character innuendo (False Light Statement One and Three) is not actionable because it is not an objective statement of fact capable of being proven true or false.

## IV. CONCLUSION

Because the First Amendment and common law protect S&P Global's reporting in this matter, and because the statements at issue are nonactionable on multiple grounds, this motion should be granted with prejudice and without leave to amend.

Dated: July 27, 2018

JASSY VICK CAROLAN LLP

/s/ *Duffy Carolan*
Duffy Carolan
Jean-Paul Jassy
Kevin Vick

QUARLES & BRADY LLP
C. Bradley Vynalek
Lauren Elliott Stine
Kyle T. Orne

Attorneys for Defendants
S&P Global Inc., S&P Global Market Intelligence Inc., Kiah Lau Haslett and Zach Fox

---

[8] See also Hincey v. Horne, 2013 WL 4543994, at *9 (D. Ariz. Aug. 28, 2013) (statement that plaintiff "can't be trusted" did not "contain factual connotations that [were] provable"); USA Techs., Inc. v. Doe, 713 F. Supp. 2d 901, 905, 909 (N.D. Cal. 2010) (accusing CEO of company of "fleecing," "skimming" and running an illegal Ponzi scheme was not actionable); Okun v. Superior Court, 629 P.2d 1369, 1374-77 (Cal. 1981) (accusing a developer of engaging in "corrupt" business practices is not actionable).

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Monica Limón-Wynn
> Limón-Wynn Law, PLLC
> 1400 East South Avenue, Suite 915
> Tempe, Arizona 85282-8008
> Milmon-wynn@mlwlawaz.com
>
> Charles J. Harder (Pro Hac Vice)
> Jordan Susman (Pro Hac Vice)
> Harder LLP
> 132 S. Rodeo Drive, Fourth Floor
> Beverly Hills, CA 90067
> CHarder@harderllp.com
> JSusman@harderllp.com
>
> Attorneys for Plaintiffs

Dated: July 27, 2018                              /s/ *Duffy Carolan*