# *EXHIBIT B*

FINANCIAL INDUSTRY REGULATORY AUTHORITY

OFFICE OF HEARING OFFICERS

| | |
|---|---|
| Department of Enforcement, <br><br>      Complainant, <br><br>   v. <br><br> Scottsdale Capital Advisors Corp. (CRD No. 118786), <br><br> and <br><br> Justine Hurry (CRD No. 2765969), <br><br>      Respondents. | DISCIPLINARY PROCEEDING No. 2008011593301 <br><br> Hearing Officer:  MC <br><br> **ORDER ACCEPTING OFFER OF SETTLEMENT** |

## INTRODUCTION

Disciplinary Proceeding No. 2008011593301 was filed on October 21, 2010, by the Department of Enforcement of the Financial Industry Regulatory Authority (FINRA) (Complainant).  Respondents Justine Hurry and Scottsdale Capital Advisors, Inc. submitted an Offer of Settlement (Offer) to Complainant dated October 25, 2011.  Pursuant to FINRA Rule 9270(e), the Complainant and the National Adjudicatory Council (NAC), a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA) have accepted the uncontested Offer.  Accordingly, this Order now is issued pursuant to FINRA Rule 9270(e)(3). The findings, conclusions and sanctions set forth in this Order are those stated in the Offer as accepted by the Complainant and approved by the NAC.

Under the terms of the Offer, Respondents have consented, without admitting or denying the allegations of the Complaint, as amended by the Offer, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the entry of findings and violations consistent with the allegations of the Complaint, as amended by the Offer, and to the imposition of the sanctions set forth below, and fully understands that this Order will become part of Respondents' permanent disciplinary records and may be considered in any future actions brought by FINRA.

## BACKGROUND

Scottsdale, which is located in Scottsdale, Arizona, became a member of FINRA on May 22, 2002. Respondent Justine Hurry is currently the firm's Chief Executive Officer, Financial and Operations Principal and Municipal Securities Principal. During FINRA's first examination of Scottsdale (the findings of which led to the filing of certain aspects of this Complaint) covering the period April 2006 through January 2008 ("the relevant period"), Hurry was also the firm's Chief Compliance Officer (CCO) and AML Compliance Officer. Hurry was also the AML Compliance Officer from approximately August 2009 through May 2010, during the review period of the 2010 cycle examination. During the relevant period, Scottsdale employed approximately 34 registered persons in approximately seven registered offices.

Justine Hurry first became registered as a general securities representative with a member firm in August 1996. She worked for two other member firms before becoming registered with Scottsdale on May 22, 2002 as a General Securities Representative and Principal, a Municipal Securities Principal, Equity Trader and Financial and Operations Principal. On November 2, 2009 she also became registered as a Limited Representative -- Investment Banking. Because

2

those registrations are currently in effect, Hurry remains subject to FINRA's jurisdiction for purposes of this proceeding.

## FINDINGS AND CONCLUSIONS

It has been determined that the Offer be accepted and that findings be made as follows:

## SUMMARY

From April 2006 through March 2009, Scottsdale Capital Advisors Corp. ("Scottsdale" or "the firm") and its AML Compliance Officer, Justine Hurry failed to implement the firm's AML procedures for monitoring, detecting, documenting, investigating and reporting red flags and suspicious transactions.  Scottsdale and Hurry took inadequate steps to investigate or report suspicious transactions in which the firm effected sales, as agent, of millions of shares of penny stocks received by firm customers, through journal transfers and deposits of stock certificates. The accounts involved were new and were opened at the firm by registered representatives who worked at the Carlsbad branch office.  They were often controlled by persons with questionable backgrounds and occupations or by persons who maintained multiple accounts at the firm for no apparent business purpose. In addition, Scottsdale violated NASD Conduct Rule 2110 in connection with its sales of unregistered shares of Universal Express and Dicut, Inc. in May, June and December 2007 and January 2008.  The securities were neither registered pursuant to Section 5 of the Securities Act of 1933 nor exempt from registration.  Finally, the firm's violations also included failures to establish, maintain and enforce reasonable supervisory procedures and systems, and failures to comply with Rules 3012 and 3013, including failing to produce reports required by such Rules.  Scottsdale and Hurry's conduct violated NASD

3

Conduct Rules 3010, 3011, 3012, 3013, 3110 and 2110, and Scottsdale also violated Municipal

Securities Rulemaking Board (MSRB) Rule G-41.

## FIRST CAUSE OF ACTION
### AML VIOLATIONS -- NASD CONDUCT RULES 3011(a) AND (b) AND 2110 AND FINRA RULE 2010 BY SCOTTSDALE AND HURRY AND MSRB RULE G-41 BY SCOTTSDALE

NASD Conduct Rule 3011, adopted on April 24, 2002 and amended on October 22, 2002

and March 6, 2006, requires all member firms to "develop and implement a written anti-money

laundering program reasonably designed to achieve and monitor the firm's compliance with the

requirements of the Bank Secrecy Act (31 U.S.C. § 5311, *et seq.*), and the implementing

regulations promulgated there under by the Department of the Treasury." It also requires

member firms to "establish and implement policies and procedures that can be reasonably

expected to detect and cause the reporting of transactions required under 31 U.S.C. 5318(g) and

the implementing regulations thereunder." Similarly, MSRB Rule G-41 requires "an anti-money

laundering compliance program reasonably designed to achieve and monitor ongoing compliance

with the requirements of the Bank Secrecy Act, 31 U.S.C. 5311, *et seq.* ("BSA") and the

regulations thereunder."

The United States Department of the Treasury issued the implementing regulation, 31

C.F.R. § 103.19(a)(1), on July 2, 2002. It provided that, with respect to any transaction after

December 31, 2002, "[e]very broker or dealer in securities within the United States . . . shall file

with FinCEN . . . a report of any suspicious transaction relevant to a possible violation of law or

regulation." Section (a)(2) of that regulation specifically provides:

> A transaction requires reporting . . . if it is conducted or attempted by, at, or
> through a broker-dealer, it involves or aggregates funds or other assets of at least
> $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the
> transaction (or a pattern of transactions of which the transaction is a part):

4

  (i)  Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

  (ii)  Is designed, whether through structuring or other means, to evade any requirements of this part or any other regulations promulgated under the Bank Secrecy Act. . . ;

  (iii)  Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

  (iv)  Involves use of the broker-dealer to facilitate criminal activity.

In August 2002, NASD issued Notice to Members ("NTM") 02-47, which set forth the final AML rules promulgated by the United States Department of the Treasury for the securities industry. This NTM further advised broker-dealers of their duty to file a SAR-SF for any suspicious transactions occurring after December 31, 2002.

Concurrent with its adoption of Rule 3011, in April 2002, NASD issued NTM 02-21, which reminded broker-dealer firms of the requirements of their AML procedures, including that AML procedures apply to:

  b. monitoring of account activities, including but not limited to, trading and the flow of money into and out of the account, the types, amount, and frequency of different financial instruments deposited into and withdrawn from the account, and the origin of such deposits and the destination of withdrawals; and

  c. monitoring for, detecting, and responding to "red flags."

NTM 02-21 stated that a broker/dealer who detects red flags should "perform additional due diligence before proceeding with the transaction."

The SAR-SF identifies 20 "Type[s] of suspicious activity" that must be reported, including: "Market manipulation," "Securities fraud," "Significant wire or other transactions without economic purpose," and "Other."

### Failure to Detect and Investigate Suspicious Activities

From at least April 2006 through May 2009, Scottsdale's AML Procedures stated that the firm would monitor a sufficient amount of account activity to permit identification of unusual size, volume, pattern or type of transactions….or any of the "red flags" identified in its procedures. It also indicated that it would look at transactions, including trading and wire transfers, in the context of other account activity to determine if a transaction lacked financial sense or was suspicious because it is an unusual transaction or strategy for that customer. Scottsdale's written AML program required the firm's AML Compliance Officer, Justine Hurry, to monitor for "red flags", to investigate any "red flags" detected, to document any such investigation and to file Suspicious Activity Report ("SAR-SFs") when appropriate.

The AML procedures in effect during FINRA's first examination stated that when a member of the firm detected a red flag, the member was to investigate further under the direction of the AML Compliance Officer. The AML procedures in effect during FINRA's second examination, covering the period from January 2008 through March 2009, indicated that employees would be trained to immediately alert their direct supervising principal or AML Officer upon detection of a possible red flag. Documentation of any ensuing red flag investigation, with results and further action taken, were to be maintained as part of the AML books and records.

6

The Firm's procedures identified a number of red flags, including, without limitation:

- The customer wishes to engage in transactions that lack business sense or apparent investment strategy, or are inconsistent with the customer's stated business or investment strategy;

- The customer (or a person publicly associated with the customer) has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations ("disciplinary background red flag");

- For no apparent reason, the customer has multiple accounts under a single name or multiple names, with a large number of inter-account or third-party transfers;

- The customer's account has unexplained or sudden extensive wire activity, especially in accounts that had little or no previous activity ("wire transfer red flag");

- The customer engages in extensive journal entries between unrelated accounts without any apparent business purpose ("journal transfer red flag");

- The customer, for no apparent reason or in conjunction with other red flags, engages in transactions involving certain types of securities, such as penny stocks, Regulation S stocks and bearer bonds, which although legitimate, have been used in connection with fraudulent schemes and money laundering activity. (Such transactions may warrant further due diligence to ensure the legitimacy of the customer's activity) ("penny stock red flag");

- The customer maintains multiple accounts, or maintains accounts in the names of family members or corporate entities, for no apparent purpose ("multiple account red flag").

7

Scottsdale failed, however, to implement its AML procedures as it did not adequately monitor for and/or investigate facts and circumstances present in certain customer accounts that constituted red flags as described in the written AML compliance program. These facts and circumstances arose as a result of the firm's association of registered representatives AR and JP in May and June of 2007 and activity involving certain customer accounts introduced to the firm by AR and JP.

AR and JP operated from Scottsdale's Carlsbad, California, branch office. The primary activity of AR's and JP's customers involved the deposit and immediate liquidation of large positions of low-priced equity securities. AR and JP customers also frequently journaled securities to other, sometimes unrelated, accounts at the firm as compensation for services rendered, and, when securities were liquidated, often wired the proceeds out of the firm. Some of the customers of the Carlsbad branch had been the subject of regulatory complaints. The foregoing represented a new and different type of customer activity for Scottsdale and, significantly, triggered the following red flags noted in Scottsdale's written AML compliance program: the penny stock red flag; the journal transfer red flag; the wire transfer red flag, the disciplinary background red flag, and the multiple account red flag.

From April 2006 through May 2008, neither Hurry nor anyone else at Scottsdale took steps to monitor for the disciplinary background red flag. As such, the firm was unaware during this time period whether firm customers had a questionable background, though several customers, including but not limited to, JD, BEL, GE, SE and KQ, had backgrounds that warranted characterization as questionable based upon the red flag description in the firm's written AML compliance program.

8

In addition, from on or about April 2006 through May 2009, Scottsdale failed to develop and implement a systematic means to identify customers whose accounts raised the multiple account red flag; further, neither Hurry nor anyone else at the firm took steps to monitor for this red flag. As a result, between April 2006 and May 2009, the firm failed to not only detect, but also to investigate, approximately 50 instances in which customer account activity raised the multiple account red flag. More specifically, the firm failed to investigate whether the customers had a legitimate purpose for maintaining multiple accounts.

In addition, from on or about April 2006 through May 2008, neither Hurry nor anyone else at Scottsdale took steps to monitor for transactions triggering the journal transfer red flag though Hurry was aware generally that customers were engaged in journal transfers between accounts. Nevertheless, Hurry and the firm failed to investigate whether these transfers constituted "red flags" or whether they had legitimate purposes. As a result, Scottsdale did not identify any of the transactions described below (and in paragraphs 19-23 of the Complaint) as suspicious, and therefore failed to conduct any sort of investigation of the transactions, although they triggered the journal transfer red flag, the penny stock red flag and the wire transfer red flag.

In May 2007, customer HF received approximately 5,200,000 shares of BioStem, Inc. (BTEME). HF journaled 1,000,000 shares to ATN. During the approximate period May 2007 through September 2007, HF sold approximately 687,000 shares of BTEME generating proceeds of approximately $198,000.00. During the approximate period May 2007 through June 2007, ATN sold all 1,000,000 shares received generating proceeds of approximately $1,112,000, and on six different occasions wired out proceeds totaling approximately $1,110,800.

On or about April 16, 2007, one of the firm's customers, TOP, received 3,000,000 shares of Spirit Exploration, Inc. (SPXP). It received another 3 million shares on or about May 3,

9

2007. In June and July 2007, TOP journalled approximately 2,974,500 shares to two unrelated accounts, EM and BC, and sold 25,500 shares. EM and BC journaled some of their shares to four unrelated accounts – JR, JJ, JH and CLG (which received approximately 2,750,000 shares from BC). EM also journaled approximately 100,656 shares of SPXP to BC. Three of those accounts sold all shares received and one transferred a portion of its shares to another unrelated account – LP&A. Certain of the customers wired out funds. EM wired out approximately $706,000.00 between April and August 2007 in approximately nineteen transactions; JR wired out approximately $43,000.00 in three transactions in October and November 2007; and LP&A wired out approximately $462,000.00 in one transaction in October 2007.

On or about September 20, 2007, FC received 11,000,000 shares of Grand Pacaraima Gold (GPGD). Between approximately September 2007 and November 2007, FC journaled approximately 5,933,300 shares of GPGD to four unrelated accounts – EMC, ESGG, RL and HM. EMC, ESGG, HM and RL, in turn journalled GPGD shares to other accounts at the firm, some of which were the same (e.g. VV account). During this same time period, the firm's customers sold approximately 4,206,200 shares of GPGD generating proceeds of approximately $77,000.00. This included FC which sold approximately $23,200 worth of GPGD between October 2007 and March 2008. Between in or about October 2007 and December 2007, FC wired out approximately $14,700.00 from its Scottsdale account in eleven transactions.

On or about April 23, 2007, customer JM received approximately 6,575,517 shares of BioStem, Inc. (BTEME), which was DTC'd from another broker-dealer. During the approximate period April 2007 through August 2007, JM sold approximately 3,507,080 shares generating proceeds of approximately $1,650,000.00. The shares were sold through two accounts. The first was numbered 150036, which opened in April 2007 with a zero balance. Its value as of June 30,

10

2007, was approximately $1,199,607; by Dec. 31, 2007, the account value was approximately $42,138. JM opened a separate account numbered ██████ with Scottsdale. This account opened with a value as of May 31, 2007, of approximately $1,770,000. By January 31, 2008, the account value was approximately $2.680 as JM wired out the proceeds from the sale of the BTEME stock, in numerous transactions. The activity in these two accounts signaled potential red flags as the accounts had sudden extensive wire activity involving the sale of penny stocks, in accounts that had little or no previous activity.

### Failure to Detect, Investigate and Report Suspicious Activities by filing a SAR-SF

In some instances, the deposit and liquidation of low-priced equity securities, journal transfers, wiring of transaction proceeds, maintenance of multiple accounts and questionable customer backgrounds, individually or in combination, was sufficiently suspicious to warrant the filing of suspicious activity reports on Form SAR-SF, the reporting form applicable to broker-dealers. In addition to the failures to monitor for and investigate the presence of red flags and suspicious activities described above, Scottsdale, acting through Hurry, failed to implement its written AML compliance program by failing to file SAR-SF forms to report these activities as set forth below. In part, the failure to investigate "red flags" and, where required, report suspicious activity on a Form SAR-SF resulted at least in part from Hurry's belief that the activity need not be considered suspicious, and Scottsdale did not need to conduct an investigation or file a Form SAR-SF, if the activity was typical of the business of the customer or of the business of AR's and JP's customers as a group.

From on or about April 2007 through June 2007, Scottsdale customers received into their accounts approximately 14 million shares of Ebenefitsdirect, Inc. (EBFD), via physical stock certificates. Between approximately May 2007 and December 2007, customers journaled a total

11

of approximately 50 million shares of EBFD to approximately 28 different firm accounts. Often, the same account that journaled shares to one account would have those same shares journaled back to them from the same account. The firm customers involved in the above transactions are: DSC; DC; MC; FG; BI; BEL; PD; RO; WH; DA; MAN; MON; GS; SYN; DM; TS; PW; WI; GE; GG; QS; EH; BF, SP and SL. The firm's customers then sold approximately 3,800,000 shares of EBFD. Certain of these customers then wired the proceeds of EBFD sales out of their accounts: PW wired approximately $49,000 in three transactions in July and September 2007; BI wired approximately $377,000.00 in five transactions between July and December 2007; and GG wired approximately $19,000.00 in two transactions in September 2007.

Certain of the customers involved in the above-described EBFD transactions maintained several accounts at Scottsdale. Although this indicated the possible presence of the multiple account red flag, the firm never conducted any investigation to determine if there was legitimate purpose or explanation for these separate accounts. In particular, the firm failed to ascertain the circumstances pursuant to which customer GM was the owner of the BI and GT company accounts, customer MS was the owner of the TS, FG, SP and PD accounts and customer IS was the owner of accounts in the name of DC and MC.

In or about August and September 2007, customers BEL, BI, DSC and WI received approximately 16,500,000 physical stock certificates for Canam Energy (CNGJ). From August 2007 through January 2008, in approximately 16 journal-entry transactions, approximately 13 million of those same shares were transferred by the above-identified customers to Scottsdale accounts in the names of customers JC, GE, CW, BI, AM, CLX, EH, HH, JAC, JJC, DSC. In several instances customers receiving CNGJ from BEL, BI, DSC and WI returned a portion of the shares received to the account in which they were deposited originally. The transferring and

12

receiving customers, as a group, then liquidated approximately 11,003,300 shares of CNGJ, generating proceeds of approximately $1,014,000.00. Some of the proceeds were wired out of the firm under circumstances implicating the wire transfer red flag.  For example, between approximately May 2007 and August 2007, BEL wired approximately $847,000.00 out of its account in seven separate transactions; between in or about July 2007 and January 2009, BI wired $617,000.00 out of its account in 8 transactions; and between on or about May 2007 and February 2008, WI wired approximately $429,000.00 out of its account in ten transactions.

Notwithstanding the "red flag" implications of this activity, neither Hurry nor anyone else at Scottsdale took steps to inquire about the journal or wire transfers in order to determine whether they constituted suspicious activity.  Unbeknownst to the firm, two of the customers who received CNGJ stock certificates, BEL and GE (which was controlled by TP), were the subject of a Complaint filed by the Securities and Exchange Commission in September 2007, alleging they had engaged in a scheme to evade the registration requirements of the federal securities laws, at the time they were liquidating their CNGJ holdings.

Scottsdale did not detect or investigate any of the activity set forth above.  The foregoing facts and circumstances pertaining to the EBFD and CNCJ transactions, particularly the journal transfers known to the firm, but also the other red flags the firm failed to detect, constituted activity that was sufficiently suspicious to warrant the filing of a Form SAR-SF.   The firm, acting through Ms. Hurry, failed to file a Form SAR-SF to report the activity, in violation of FINRA Rule 3011.

### Failure to Document Red Flag Investigations

During the first and second exams, Scottsdale's AML Procedures stated that its AML Compliance Officer was responsible for red flag monitoring and for creating a record of when

13

and how the monitoring was carried out.   Scottsdale failed to implement these AML procedures. More specifically, after he was hired in May 2008, the firm's current CCO and Legal Counsel, MC, began to investigate the backgrounds of certain customers when conducting due diligence in situations where customers deposited physical certificates.  MC learned of customers who had questionable backgrounds as described in the applicable red flag in the firm's written AML compliance program. These customers included EM, TD, TP and SE. Although the written AML compliance program specified that the AML Compliance Officer was to create a record of questionable background reviews, MC failed to create, or cause the AML Compliance Officer to create, such records

### Inadequate AML Procedures pertaining to Questionable Background Red Flag

Scottsdale's AML procedures pertaining to the disciplinary background red flag were not sufficiently specific to provide any meaningful guidance as to where and how the firm would look for customers with questionable backgrounds.  The procedures did not state when or how often the firm should undertake a background search (e.g. at account inception or from time to time thereafter or if triggered by concerns or certain types of account activity), how and by what means the firm would conduct a search or what further investigation or action should be taken upon discovery of matters that constituted questionable background as described in the red flag. These deficiencies contributed to the failure to monitor for this red flag as set forth above.

The procedures were also inadequate because they did not provide for certain practices related to background investigations that the firm claimed it employed during the period relevant to the second examination, including data base searches and a risk-based determination as to the occurrence of background investigations.   The foregoing also constituted violations of NASD

14

Conduct Rules 3011(a) and (b) and 2110 and FINRA Rule 2010 by Scottsdale and Hurry and

Municipal Securities Rulemaking Board (MSRB) Rule G-41 by Scottsdale.


### SECOND CAUSE OF ACTION

**Violation of NASD Conduct Rule 2110 (Sales of Unregistered Securities, in Contravention of Section 5 of the Securities Act of 1933) by Scottsdale**

**Sales of Unregistered Shares of Universal Express Inc. (USXP)**

In or about March 2007, BF, an LLC, opened an account with Scottsdale. BF was a

customer of representatives JP and AB at their prior broker-dealer. BF transferred his account to

Scottsdale at or about the time JP and AB were affiliating with Scottsdale. JPP and MB were the

two beneficial owners and control persons of the account. On or about May 8, 2007, BF

deposited two USXP stock certificates evidencing the ownership of a total of 800 million shares

into its account at Scottsdale. The certificates were dated April 27, 2007 and May 3, 2007,

eleven and five days before the certificates were delivered to Scottsdale. The Scottsdale

representatives handling the BF account, accepted orders from BF to sell the 800 million shares,

which were liquidated in approximately twenty-eight sale transactions in May and June 2007.

Scottsdale utilized a means of interstate commerce in connection with its sales of the eight

hundred million USXP shares.

BF earned net proceeds of approximately $463,300.00 from the sales and Scottsdale

earned approximately $17,000.00 in total commissions from the sales. The USXP shares were

not registered pursuant to Section 5 of the Securities Act of 1933 and the transactions were not

exempt from registration. By causing the sale of securities that were neither registered nor

exempt from registration, Scottsdale violated Conduct Rule 2110 in contravention of Section 5 of

the Securities Act of 1933.

### Sales of Unregistered Shares of Dicut, Inc.

On or about June 23, 2007, Dicut, Inc. issued 150 million shares of common stock pursuant to SEC Rule 701 to RR. On or about July 25, 2007, RR opened an account with Scottsdale and deposited the Dicut shares into the account. Account documentation identified AR as the representative on the account. Between approximately December 11, 2007 and January 3, 2008, RR sold all 150 million shares, generating proceeds of approximately $60,400.00. The Dicut shares were not registered pursuant to Section 5 of the Securities Act of 1933 and the transactions were not exempt from registration. In fact, the Rule 701 shares were restricted and were not sold, as required, in accordance with the requirements of SEC Rule 144 then in effect.

Scottsdale utilized a means of interstate commerce in connection with its sales of the Dicut stock. The Dicut shares were not registered pursuant to Section 5 of the Securities Act of 1933 and the transactions were not exempt from registration. By causing the sale of securities that were neither registered nor exempt from registration, Scottsdale violated Conduct Rule 2110 in contravention of Section 5 of the Securities Act of 1933.

### THIRD CAUSE OF ACTION
### Violations of NASD Conduct Rules 3012 and 3013 and 2110 BY SCOTTSDALE AND HURRY

From April 2006 through January 2008, Scottsdale, acting through Hurry, failed to designate and specifically identify to FINRA at least one principal to establish, maintain and enforce a system of supervisory control policies and procedures as set forth in Conduct Rule 3012.

During this same period, Scottsdale, acting through Hurry, also failed to establish, maintain and enforce written supervisory control policies and procedures pursuant to Conduct Rule 3012. More specifically, the procedures did not:

- explain how the firm would identify its producing managers;

- designate a principal responsible for reviewing the activity in customer accounts of producing managers or state how it would ensure that such principal was either senior to or otherwise independent of the producing manager;

- address the requirement to notify FINRA electronically of its use of the Limited Size and Resources Exception;

- address the heightened supervision requirements over the activities of each producing manager responsible for generating 20% or more of the revenue of the business units supervised by the producing manager's supervisor;

- address the testing of the firm's written supervisory procedures ("WSPs") to ensure that all rules were addressed and to ensure that the firm's WSPs were updated and kept current;

- address the designated principal's annual report to senior management; and

- state how the firm would comply with the requirement that the CEO or a person in an equivalent position certify annually that the firm has a process to establish, maintain, review, test and modify written supervisory policies and procedures.

From April 2006 through January 2008, the firm failed to enforce its supervisory control procedures requiring the review and supervision of customer account activity conducted by its producing managers as it failed in the first instance to even identify its producing managers.

17

Rule 3012 requires the principal responsible for compliance with the firm's supervisory control system to submit to the member's senior management no less than annually a report detailing each member's system of supervisory controls, the summary of the test results and significant identified exceptions, and any additional or amended supervisory procedures created in response to the test results. Scottsdale, acting through Hurry did not submit an annual report to management for 2006 or 2007, in violation of NASD Rule 3012.

Rule IM-3013 requires members to create a report detailing the process the firm has in place to establish, maintain, review, test and modify its written compliance policies and written supervisory procedures. The firm's Chief Executive Officer (or equivalent officer(s), any other officers the member firm deems necessary to make the certification, must review the Rule 3013 report. Scottsdale did not complete a 3013 report as required under IM-3013 in 2006 or 2007.

The foregoing constituted violations of NASD Conduct Rules 3012, 3013 and 2110 by Scottsdale and Hurry.

FOURTH CAUSE OF ACTION

**Violations of NASD Conduct Rules 3010 and 2110 by Scottsdale and Hurry**

**Inadequate Written Supervisory Procedures and Failure to
Implement Written Supervisory Procedures**

NASD Rule 3010(a) requires firms to "establish and maintain a system to supervise activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations." Under NASD Rule 3010(b), these systems must be documented in the firm's written supervisory procedures. The procedures also must be tailored to the businesses in which the firm engages, and they also must set out mechanisms for ensuring compliance and for detecting violations, and

18

not merely set out what conduct is prohibited. From April 2006 through January 2008, the firm's WSPs were inadequate for the following reasons:

- the firm's procedures were not reasonably designed to detect and prevent the sale of unregistered securities; while they required the firm to gather information concerning shares to be sold, they provided no instruction or direction as to the use of such information to determine whether a proposed transaction constituted the sale of securities that were neither registered nor exempt from registration;

- the procedures did not address heightened office inspections of branch and non-branch locations as required by 3010(c)(3);

- the procedures did not address short sale delivery requirements;

- the firm's procedures regarding variable annuity replacements and 1035 exchanges were not reasonably designed to ensure the firm supervised such transactions with a view to detecting and preventing inappropriate and unsuitable activity;

- the firm had no procedures concerning variable annuity disclosures to customers and delivery of variable annuity contracts;

- the firm's procedures were inadequate regarding MSRB Rule G-14 municipal transaction reporting; and

- the firm's procedures were inadequate regarding corporate bond transaction reporting pursuant to NASD Conduct Rule 6730.

**Inadequate Records of Branch and Home Office Inspections – Conduct Rule 3010(c)(2)**

Scottsdale's main office was designated as a branch office of the firm. The firm had no written records to reflect that it had conducted an inspection of the main office in 2006 or 2007.

19

Moreover, Scottsdale's written reports of its office inspections of branch offices other than the main office in 2006 and 2007 contained no discussions concerning the testing and verification of the firm's policies and procedures concerning the following aspects of its business, as specifically required by Rule 3010(c)(2): safeguarding of customer funds and securities; maintaining books and records; supervision of customer accounts serviced by branch office managers; transmittal of funds between customers and registered representatives and between customers and third parties; validation of customer address changes; and validation of changes in customer account information.

**Failure to Enforce Procedures Pertaining to Letters of Authorization**

During the period from April 2006 through January 2008, Scottsdale did not enforce its written supervisory procedures requiring that the firm obtain, in connection with all journals of funds or securities between accounts, a letter of authorization ("LOA") from the client transferring the funds/securities and from the person accepting the funds/securities. Rather, the firm only obtained an LOA from the transferring customer and not the transferee of shares.

By failing to establish a supervisory system and written supervisory procedures reasonably designed to achieve compliance with applicable securities laws and regulations and by failing to enforce its written supervisory procedures as set forth above, Scottsdale and Hurry violated NASD Conduct Rules 3010(a) and (b) and 2110. In addition, Scottsdale and Hurry violated NASD Conduct Rule 3010(c)(1)(A) in connection with the failure to prepare a report pertaining to its home office inspection during 2006 and 2007 and NASD Conduct Rule 3010 (c)(2) by its failure to include in its written branch inspection reports the testing and verification of policies and procedures pertaining to those areas specifically enumerated in Rule 3010(c)(2).

**Filing of Inaccurate, Incorrect and Inadequate SARS and Failure to Develop a Reasonable AML Program**

Under the terms of the Offer, Respondents have also consented to the entry of findings and violations arising out of the 2010 cycle examination of the firm (set forth below), without admitting or denying the allegations, findings and violations and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the imposition of the sanctions set forth below, and fully understands that this Order will become part of Respondents' permanent disciplinary record and may be considered in any future actions brought by FINRA.

The Respondents filed approximately 290 SARS from on or about August 2009 through April 2010, which contained inaccurate or incomplete information. During this same time period the Respondents also filed SARS that failed to provide adequate information for determining that the reported activity was suspicious.

In addition, between approximately August 2009 and April 2010, the Respondents failed to establish and implement policies and procedures reasonably expected to detect and cause the reporting of transactions required under 31 U.S.C. 5318(g) and the implementing regulations thereunder by (i) failing to establish a system requiring a that a reasonable determination or review of suspicious activity be made prior to the filing of SARs; failing to ensure that SARS were reviewed for accuracy and completeness before being filed with FinCEN and failing to establish a reasonable system to review and report suspicious activity which was related in nature. For example, the procedures did not detail what course of action the firm would take should suspicious activity be detected, under what circumstances would the firm file a SAR, refuse a transaction or restrict or close an account. Moreover, the procedures did not incorporate

21

the firm's actual practices relating to the completion and filing of SARS. This conduct violated NASD Rule 3011(a)(for conduct occurring before January 1, 2010) and FIRNA Rule 3310(a)(for conduct occurring after January 1, 2010); and FINRA Rule 2010. In addition, Scottsdale's conduct also violated MSRB Rule G-41.

Scottsdale sold approximately 1,639,000 shares of S-8 stock for customer GIA between August and December 2009, that was not available for resale, in violation of FINRA Rule 2010. In addition, from August 2009 through November 2009, Scottsdale's written supervisory procedures did not adequately address the circumstances in which S-8 registered stock could be legally sold, in violation of NASD Rule 3010(b) and FINRA Rule 2010.

Based on the foregoing, Scottsdale and Hurry's conduct violated NASD Conduct Rules 3010, 3011, 3012, 3013, 3110; 2110 (for conduct occurring before December 15, 2008) and FINRA Rule 2010 (for conduct occurring after December 15, 2008) and FIRNA Rule 3310(a)(for conduct occurring after January 1, 2010). Scottsdale also violated MSRB Rule G-41.

Based on these considerations, the sanctions hereby imposed by the acceptance of the Offer are in the public interest, are sufficiently remedial to deter Respondents from any future misconduct, and represent a proper discharge by FINRA, of its regulatory responsibility under the Securities Exchange Act of 1934.

## SANCTIONS

It is ordered that:

1. Justine Hurry is suspended from associating with any FINRA member in any principal capacity other than the capacity of Financial and Operations Principal for 40 business days, and fined in the amount of $7,500.00; and

2. Scottsdale is censured and fined in the amount of $125,000.00 ($40,000.00 of

which pertains to the violations of MSRB Rule G-41), which includes the

disgorgement of $18,000 of commissions earned in connection with violative

sales of unregistered securities.


Respondents agree to pay the monetary sanctions upon notice that this Offer has been

accepted and that such payments are due and payable.  Respondents have submitted

Election of Payment forms showing the method by which they propose to pay the fines

imposed.


The sanctions herein shall be effective on a date set by FINRA staff.


SO ORDERED.

FINRA

Signed on behalf of the
Director of ODA, by delegated authority

Helen G. Barnhill
Senior Regional Counsel
FINRA Department of Enforcement
4600 S. Syracuse St., Suite 1400
Denver, CO  80237
Phone Number: 303 446-3111
Fax Number 303 446-3150

23